# EXHIBIT 1

**In the Matter Of:**

*LIZA GRAY*

*-v-*

*MANORCARE HEALTH SERVICES, LLC*

———————————————————————

**Liza Gray**

*September 23, 2021*

———————————————————————

**Liza Gray - Plaintiff and Former HCR employee**

1            UNITED STATES DISTRICT COURT
          NORTHERN DISTRICT OF ILLINOIS
2              EASTERN DIVISION

3

4
  LIZA GRAY,                    )
5                              )
          Plaintiff,           )
6                              )
          -v-                  ) CAUSE NO.
7                              ) 20-CV-02466
  MANORCARE HEALTH SERVICES,   )
8  LLC, DOING BUSINESS AS HCR  )
  MANORCARE HEALTH SERVICES,   )
9  LLC,                        )
                               )
10          Defendant.         )

11

12        The videoconference deposition upon oral

13  examination of LIZA GRAY, a witness produced and

14  remotely sworn by me, Grace E. Roh, Notary Public in

15  and for the County of Marion, State of Indiana, taken

16  on behalf of the Defendant via Zoom on September 23,

17  2021, at 11:11 a.m., pursuant to the Federal Rules of

18  Civil Procedure.

19

20

21

22

23

24        STEWART RICHARDSON & ASSOCIATES
          Registered Professional Reporters
25               (800)869-0873

1                APPEARANCES

2   FOR THE PLAINTIFF:

3     Ethan E. White, Esq.
     EMERY LAW, LTD.
4     2021 Midwest Road
     Suite 200
5     Oak Brook, IL 60523

6

  FOR THE DEFENDANT:
7

    Peter T. Tschanz, Esq.
8     LITTLER MENDELSON, P.C.
     111 Monument Circle
9     Suite 702
     Indianapolis, IN 46204

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          INDEX OF EXAMINATION
                                     PAGE
2   EXAMINATION

3       Questions By Mr. Tschanz:              4

4

5

6           INDEX OF DEFENDANT'S EXHIBITS

7   NUM.              DESCRIPTION              PAGE

8
    Exhibit 1    Plaintiff's Response to       24
9                Defendant's First Set of
                 Interrogatories
10
    Exhibit 2    Plaintiff's Response to       24
11               Defendant's First Set of
                 Requests for Production
12
    Exhibit 3    Policy Handbook               26
13
    Exhibit 4    Plaintiff's E-mail            33
14
    Exhibit 5    6/6/18 Doctor's Note          70
15
    Exhibit 6    6/12/18 Doctor's Note         91
16
    Exhibit 7    FMLA Request Paperwork        101
17
    Exhibit 8    Non-FMLA Leave Request Form   113
18
    Exhibit 9    Social Security Approval      120
19
    Exhibit 10   Charge of Discrimination      124
20
    Exhibit 11   Right to Sue Notice           140
21
    Exhibit 12   Complaint                     97
22

23

24

25

1      THE REPORTER:  My name is Grace Roh, an

2   associate of Stewart Richardson & Associates, One

3   Indiana Square, Suite 2425, Indianapolis, Indiana.

4   Today's date is September 23, 2021.  The time is

5   11:11 a.m.  This deposition is being held remotely

6   via Zoom videoconference.  The deponent's name is

7   Liza Gray.

8      Will counsel please identify themselves and

9   persons present with you for the record.

10      MR. WHITE:  Ethan White for the plaintiff.

11      MR. TSCHANZ:  Peter Tschanz, T-S-C-H-A-N-Z for

12   the defendant.  No one is present but myself.

13      MR. WHITE:  Same here.

14          LIZA GRAY,

15   having been first duly sworn to tell the truth, the

16   whole truth, and nothing but the truth, was examined

17   and testified as follows:

18   EXAMINATION

19   BY MR. TSCHANZ:

20   Q  All right.  Good morning, Ms. Gray.  My name is

21   Peter Tschanz.  I'm counsel for the defendant with

22   regard to the lawsuit that you filed.  Will you

23   understand I'm referring to ManorCare when I

24   reference the defendant or HCR?

25   A  Yes.

1  Q  And I know you had just done this for the court

2     reporter, but just so we have it on the record, can

3     you again please state and spell your name.

4  A  My -- well, my legal name, first name, is spelled

5     L-I-S-A on my birth certificate, but I spelled it

6     L-I-Z-A.  It's pronounced Liza.  Last name,

7     G-R-A-Y.

8  Q  Thank you.  Do you go by any other aliases?

9  A  No.

10 Q  Or any aliases other than the Liza with the Z?

11 A  No.  No.

12 Q  Have you ever given a deposition before, Ms. Gray?

13 A  Yes.

14 Q  I'm sorry.  Can you say that again?

15 A  Yes.

16 Q  Okay.  When did you sit for a deposition?

17 A  It's been many years ago.

18 Q  I guess I should ask, how many times have you sat

19    for a deposition?

20 A  I believe it was three.

21 Q  Three times?  Okay.  Were they different cases?

22 A  Yes.  They -- yes.

23 Q  Let's just go through each one of them quickly.

24    The first deposition that you participated in, what

25    was the nature of the case?

1    A   They were -- all three of them were lawsuits

2        regarding patients.  And they deposed me and wanted

3        to speak to me regarding my documentation.

4    Q   And what do you mean by documentation?

5    A   In the patient's progress note.

6    Q   Okay.  So were they in the nature of medical

7        malpractice lawsuits?

8    A   Not against me, against some of the facilities that

9        I worked at.  They were hospitals.

10   Q   Okay.  So you were not a party to any of those --

11       you were not a party in those cases when you sat

12       for a deposition?

13   A   I was not.

14   Q   Okay.  Okay, Ms. Gray.  The purpose of today's

15       deposition is to discuss the facts and evidence you

16       claim support your case with respect to the lawsuit

17       that you filed.  Do you understand you're providing

18       testimony under oath today?

19   A   I do.

20   Q   Okay.  Do you understand the testimony you're

21       providing today is subject to the penalties of

22       perjury just as if you were testifying live in a

23       courtroom?

24   A   I do.

25   Q   So ordinarily, I would be sitting in a conference

1  room with you and we would -- and Mr. White would

2  be there as well with the court reporter.  But

3  obviously with the circumstances around the

4  pandemic, we're doing a lot of these depositions

5  remote, which is what we're doing today.

6      So we've made those necessary adjustments.

7  But do you understand that despite your deposition

8  being conducted by video, you are still under

9  penalties of perjury just as if you were taking a

10   deposition in person?

11 A  Absolutely.  I absolutely know that.

12 Q  Okay.  And is there anything about providing

13   deposition testimony through video that would

14   prevent you from testifying truthfully today?

15 A  (Inaudible) not.

16      MR. TSCHANZ:  Okay.  And your audio is kind of

17   cutting in and out.

18      Is that just on my end or is everyone

19   experiencing that?

20      MR. WHITE:  You know, Liza and I -- Liza and I

21   did a practice run yesterday and it happened a

22   little bit too.

23      I think you just need to keep your voice up

24   and kind of stay close to the computer because

25   that's where the microphone is.

1      THE WITNESS:  Yeah.  Can you hear me clear --

2      MR. WHITE:  Yes.

3      THE WITNESS:  Can you hear me?

4      MR. WHITE:  That's much better.

5      MR. TSCHANZ:  Yes.

6      THE WITNESS:  Okay.

7      MR. TSCHANZ:  Thank you.

8      THE WITNESS:  If you can't, can you just let

9   me know?

10      MR. WHITE:  Yes.

11      MR. TSCHANZ:  Yes.  We absolutely will.  And I

12   just didn't know if that was something on my end.

13   So I'm glad that we can kind of clear that up.

14      And I guess in that same vein, I will let you

15   know if there's any sort of technical difficulties

16   that I'm experiencing on my end.  If you cannot

17   hear any of my questions due to a technical

18   difficulty, please let me know and we'll do our

19   best to work through that; do you understand?

20      THE WITNESS:  I do.

21   BY MR. TSCHANZ:

22   Q  Ms. Gray, are you under the influence of any

23    medication or substance that would prevent you from

24    providing complete and truthful testimony today?

25   A  (Inaudible).

1  Q  I'm sorry.  What was that?

2  A  No.

3      THE REPORTER:  Sorry.  Can I interject for a

4  second?  I think what's happening is when she

5  answers too quickly, the audio doesn't come

6  through.  So she could give a little pause after

7  your question and then give an answer.  I think

8  that'll help the audio situation a tiny bit.

9      MR. TSCHANZ:  And alternatively, there is a

10  dial-in option as well.  Would that be helpful, do

11  you think?

12      THE REPORTER:  Yes.  There's no delay with a

13  phone dial-in.

14      MR. WHITE:  So Liza, maybe what makes sense is

15  you're going to mute your audio and then we're

16  going to give you a phone number to call in to.

17      THE WITNESS:  Okay.

18      MR. WHITE:  Because the audio is kind of

19  cutting in and out a little bit.  So that will --

20  that will make it better.  Let me just pull up that

21  information.

22      MR. TSCHANZ:  Do you want to go off the record

23  and then --

24      MR. WHITE:  Yeah.

25      (Discussion was held off the record.)

1       (Witness reconnected telephonically.)

2   BY MR. TSCHANZ:

3   Q  All right.  Ms. Gray, it looks like we've worked

4       through those technical issues so we're back on the

5       record.

6           And do you understand despite taking a break,

7       you're still subject to penalty of perjury --

8   A  Yes, I understand that.

9   Q  -- with regard to your testimony?

10          And I ask asked this before but the audio cut

11      out, so I'm just going to ask it again.  Are you

12      under the influence of any medication or substance

13      that would prevent you from providing complete and

14      truthful testimony today?

15  A  I am not.

16  Q  Is there anything bothering you today more so than

17      any other day that would prevent you from providing

18      complete and truthful testimony?

19  A  No.

20  Q  Okay.  Is there any medical condition you are

21      suffering from that would prevent you from

22      understanding my questions or providing truthful

23      testimony?

24  A  No.

25  Q  All right.  I want to take a few minutes to run

1    through some ground rules, make sure things run

2    smoothly, Ms. Gray.

3        So you see we have a court reporter

4    documenting our conversation.  Our court reporter

5    can only document audible responses, and you've

6    been doing a really great job of this so far.

7        So in other words, the court reporter can't

8    document head nods or inaudible responses.  So I

9    ask that you provide audible responses when

10    answering my questions.  Do you agree to do that?

11  A  I do.

12  Q  Thank you.  And additionally, the court reporter

13    cannot document our discussion if we talk over each

14    other.  So I ask that we -- that you wait until I

15    complete my question before providing your answer.

16    And I will, of course, provide you with the same

17    courtesy when you're answering my question; do you

18    understand?

19  A  I do.

20  Q  Okay.  And, Ms. Gray, the deposition isn't intended

21    to be a marathon by any stretch of the imagination.

22    So if you have to take a break at any time, please

23    let me know.  I only ask that we take a break at

24    the next logical point in my line of questioning;

25    do you understand?

1    A   Yes.

2    Q   Okay.  And then if we do take a break, do you

3        understand that you will still be under oath and

4        obligated to provide truthful testimony when we

5        resume?

6    A   I do.

7    Q   Now, at some points during your deposition,

8        Ms. Gray, you might hear your lawyer object to some

9        of the questions I ask.  Unless your lawyer

10       instructs you not to answer, you're required to

11       answer the question that I have asked; do you

12       understand?

13   A   No.  If I heard what you said -- you said if he

14       objects, then I'm still required to answer your

15       question?

16   Q   Did you -- is it a matter of not hearing the

17       question or do you just need clarification to

18       understand?

19   A   Clarification, please.

20   Q   Perfect.  Mr. White may -- a certain objection on

21       the record if he disagrees with a question that I

22       may ask.  But you're nonetheless required to answer

23       the question unless Mr. White specifically

24       instructs you not to answer.

25           So for example -- and I would never do this,

1    and I'm sure Ethan wouldn't as well.  If I were to

2    ask you what you had discussed with Mr. White to

3    prepare for your deposition, I'm very confident

4    Ethan would object and say that's privileged

5    attorney-client communication and tell you not to

6    answer; okay?

7        If Mr. White, for example, disagreed with the

8    way that I phrased a question or thought it might

9    be confusing, he might object for the record so at

10   a later time, it might get raised with a judge.

11   But you nonetheless will still have to answer the

12   question unless he instructs you not to do so.

13   Does that help clarify?

14   A  Yes.  Yes, it does.

15   Q  And then, obviously, you know, if you don't

16   understand a question -- and we just went through

17   this -- just ask me to rephrase it.  Happy to do

18   that.

19       But if you don't tell me that you do not

20   understand a question, I'm going to assume that you

21   understood it.  Do you --

22   A  Okay.

23   Q  Is that fair?  Okay.

24   A  Yes.

25   Q  Without getting into anything that you discussed

1    with your lawyer because I'm not entitled to that,

2    nor do I want to hear any of your discussion or the

3    content of your discussions, what have you done to

4    prepare for today's deposition?

5  A  Well, I just talked to my attorney regarding what

6    the deposition --

7  Q  I do not want to hear anything about the content of

8    your discussion.  So let me -- let me -- let me ask

9    a follow-up question.  Did you review any

10   documents?

11 A  Yes, the interrogatories.

12 Q  Any other documents?

13 A  No.

14 Q  Okay.  And again, without telling me anything you

15   discussed with Mr. White, did you meet with him to

16   prepare for today's deposition?

17 A  No.

18 Q  Okay.  When did you retain Mr. White as your

19   counsel?

20 A  I don't know the date.

21 Q  Was it prior to -- was it prior to filing a charge

22   of discrimination with an administrative agency?

23 A  I can't tell you that.  I don't know.

24 Q  And how are you compensating Mr. White for your

25   services as your lawyer?

1  A  I --

2      MR. WHITE:  I would object.  That's

3  attorney-client privilege.

4      Don't answer.

5      MR. TSCHANZ:  I'll move on.  I disagree.  But,

6  Ethan, I obviously am not interested in prolonging

7  the deposition more than it has to be.

8  BY MR. TSCHANZ:

9  Q  Ms. Gray, what is your marital status?

10  A  I'm married.

11  Q  Do you have any children?

12  A  I do not.

13  Q  Where do you currently reside?

14  A  I live in Justice, Illinois.

15  Q  Okay.  What is your address?

16  A  7998 South 84th Avenue, Justice, Illinois 60458.

17  Q  And who resides with you at this address?

18  A  My husband, myself, and I have animals.

19  Q  Okay.  So a few minutes ago, we talked about the

20  three depositions that you participated in.  My

21  understanding of your testimony is that you were

22  not a party to those lawsuits.  Am I -- am I

23  understanding your prior testimony correctly?

24  A  That's correct.

25  Q  Okay.  Other than this lawsuit, have you ever been

1    a party to any civil matter?

2  A  No.

3  Q  Okay.  Have you ever been a witness -- well, strike

4    that.  Other than the three depositions you

5    participated in, have you ever been a witness in a

6    civil matter?

7  A  No.

8  Q  Okay.  Have you ever been a party in a criminal

9    matter?

10  A  No.

11  Q  Okay.  Have you ever been a witness in a criminal

12    matter?

13  A  I understand the question, but I have a question

14    and I don't know if that's okay to ask.

15  Q  Well, I'm the one asking the questions right now.

16    Obviously, if you need to clarify anything, happy

17    to do it.  But you said you understood the

18    question, so I'm just going to --

19  A  Well --

20  Q  I'm going to say it again and then we can just make

21    sure we're on the same page. I just asked you if

22    you had ever been a witness in a criminal matter.

23  A  Can you define the word "witness"?

24  Q  Sure.  Not a party, not a defendant in a criminal

25    matter, a criminal action where you were asked to

1    provide testimony or your account of something that

2    was considered relevant to the underlying criminal

3    action.

4  A  And would that have been in a court of law?

5  Q  It could have been in a court of -- we'll leave it

6    at -- as a court of law, correct.

7  A  No.

8  Q  Okay.  Have you ever been convicted of a crime?

9  A  No.

10  Q  Have you ever filed for bankruptcy, Ms. Gray?

11  A  I did, yes.  I did.

12  Q  Okay.  And when did you file for bankruptcy?

13  A  I don't remember the date.

14  Q  Was it after your employment with HCR?

15      MR. WHITE:  Object to form.

16  A  No.  It was at -- no.

17  Q  Okay.  Do you recall what -- was it a Chapter 7

18    bankruptcy or was it a Chapter 13?  Do you remember

19    what --

20  A  I don't.  It was so, so many years ago.

21  Q  Okay.  Do you recall the jurisdiction?

22  A  You mean the geographic area?

23  Q  Sure.

24  A  It was downtown in the city of Chicago.

25  Q  Okay.  Are you planning on filing for bankruptcy at

1   any point in the future?

2   A  I hope not to.

3   Q   Other than the administrative charge you filed

4   prior to initiating this lawsuit, have you ever

5   filed any other charges or administrative

6   complaints against any employer?

7   A  No.

8   Q  Okay.  And did you graduate from high school,

9   Ms. Gray?

10  A  Yes.

11  Q  Okay.  Where did you attend?

12  A  Morton West Junior -- High School in Berwyn.

13  Q  Okay.  And did you -- and I'm assuming -- I'm

14  familiar with your background and -- some of your

15  background and credentials, but I'll ask this

16  anyway.  Did you attend college?

17  A  I did.

18  Q  And where was that?

19  A  That was Morton College.

20  Q  And what -- did you obtain any degrees or

21  certifications?

22  A  Two degrees.  An associate's in applied science of

23  nursing as an RN and an associate's in science

24  degree and multiple further education, courses, and

25  things like that for CEUs.

1  Q  Okay.  When you say RN, are you referring to

2     registered nurse?

3  A  Yes, I am.

4  Q  And then when you -- I think you said CEU?

5  A  CEUs.  Those are required by the State of Illinois.

6     They're part of your licensure requirement.  And I

7     also took online classes and things just to further

8     my education and expand my knowledge base.

9  Q  Okay.  And CEU would be continuing education --

10     what does that stand for, CEU?

11  A  I believe -- because I don't know what the U stands

12     for.  I think they consider it a unit of measure.

13  Q  Okay.

14  A  Because it's given a number.

15  Q  All right.  Okay.  Ms. Gray, what I'm going to

16     attempt to do right now is I'm going to share my

17     screen so we can talk about some of the exhibits

18     that I provided your counsel and the court

19     reporter.  So let me go ahead and get that.

20        THE WITNESS:  I can't hear you for some

21     reason.

22        MR. TSCHANZ:  No, I stopped talking.  I'm

23     sorry.  I was trying to make sure I'm sharing the

24     correct screen here.

25        THE WITNESS:  Oh, okay.  It says some kind of

1   scan is running.  Is that -- would that come up or

2   should I X out of that?  Is that my virus scan --

3       MR. WHITE:  Yeah.

4       THE WITNESS:  -- that's doing that?

5       MR. WHITE:  No, you should --

6       THE WITNESS:  Should I go back --

7       MR. WHITE:  You should just see a document on

8   the screen now with a bunch of faces over on the

9   side.

10      THE WITNESS:  I don't see anything.

11      MR. TSCHANZ:  Ethan, do you see what I'm

12  sharing?

13      MR. WHITE:  Yeah.  I see the complaint, yeah.

14      Liza, are you still there?  Now it looks like

15  your video froze.

16      THE WITNESS:  I'm here.  I'm here.  I'm here.

17  Can you hear me?

18      MR. WHITE:  We can hear you, but it looks like

19  your video froze.  So I'm wondering if something's

20  wrong.

21      THE WITNESS:  That's because this AVG scan --

22      MR. WHITE:  No, that's --

23      THE WITNESS:  -- just came up, but I clicked

24  out of it.

25      MR. WHITE:  Yeah.  That's a virus scan.

1      THE WITNESS:  Yeah.  I X'd out of it so it

2   wouldn't run now.

3      MR. WHITE:  Okay.  Do you see --

4      THE WITNESS:  But I'm not seeing any doc- --

5      MR. WHITE:  Do you still see us on the screen?

6      THE WITNESS:  Yes.  Uh-huh.

7      MR. WHITE:  And am I --

8      THE WITNESS:  I see Peter --

9      MR. WHITE:  Am I moving or am I frozen?

10      THE WITNESS:  Oh, now -- now I see the

11   document.

12      MR. WHITE:  Okay.

13      THE WITNESS:  You all moved to the right of my

14   screen.

15      MR. WHITE:  Yup.

16      THE WITNESS:  Okay.

17      MR. WHITE:  We're all back.  All right.

18   Great.

19      MR. TSCHANZ:  Perfect.

20   BY MR. TSCHANZ:

21   Q  All right.  So just to confirm, Ms. Gray, you can

22      see the document that I have on the screen --

23   A  Yes.

24   Q  -- titled "Plaintiff's Response to Defendant's

25      First Set of Interrogatories"?

1  A  Yes.

2  Q  Okay.  And these are your responses to defendant's

3     interrogatories; correct?  Well, let me back up,

4     Ms. Gray.  I apologize.

5        Can you please review this document?  And then

6     once you've had a chance to take a look at it, just

7     let me know and then I can ask the questions that I

8     have around this document.  I apologize.

9        MR. WHITE:  And Liza, Peter's -- or

10    Mr. Tschanz is driving the bus on this document.

11    So if you need him to scroll through or zoom in or

12    zoom out, please just let us know.

13       MR. TSCHANZ:  And actually, I think there's a

14    way where -- let's just go off the record real

15    quick, if we could, because then we could just get

16    this handled.

17       (Discussion was held off the record.)

18  BY MR. TSCHANZ:

19  Q  So, Ms. Gray, we're back on the record.  Can you

20    see the document?

21  A  Yes.

22  Q  Okay.  And when you see movement here, that's my

23    cursor.  I'm -- this is on my screen.  I'm sharing

24    my screen.  So I'm going to scroll through this.

25    You just let me know when you want me to scroll

1   further.

2  A   Okay.  Okay, you can scroll.  Okay.

3        MR. TSCHANZ:  And, Ethan, so we got -- just

4   for the sake of efficiency, you know, these are

5   just some generalized questions.  The witness has

6   already said she's reviewed these in preparation.

7       Do you want to go off the record and have her

8   review it in its entirety or do you -- you know?

9        MR. WHITE:  I guess if you -- if you just want

10   to ask her, you know, if she knows what the

11   document is or whatever.  And she's seen it before,

12   so ...

13        MR. TSCHANZ:  Yeah.

14        MR. WHITE:  And, Liza, I think he's just going

15   to ask specific questions about specific items that

16   I'm sure he can direct you to.

17        THE WITNESS:  Sure.  Okay.

18  BY MR. TSCHANZ:

19  Q   And, again, Ms. Gray, if you do need to take time

20   to review the document, let me know.  I mean,

21   obviously I'll scroll through it.  But simply, I --

22   you know, we mentioned the interrogatory responses

23   earlier on in the deposition.

24       I'm just going to page 11 here, and I --

25  A   Okay.

1   Q   Do you see the verification?

2   A   Yes.  Duly sworn on -- uh-huh.

3   Q   And is that -- did you sign this document?

4   A   I did.

5   Q   And you signed it on December 1st, 2020?

6   A   I did.

7   Q   And you agree you signed these interrogatory

8       responses under penalty of perjury?

9   A   I do.

10  Q   Is there anything that you wish to change within

11      these interrogatory responses you provided?

12  A   Well, under some of the names, it has it was my

13      supervisor, but it was not my direct supervisor.

14      Some of the titles of the people on there were not

15      exactly correct.

16  Q   Okay.  And we can talk about that.  Anything other

17      than that?

18  A   No.

19  Q   Okay.  I am now going to put up on your screen

20      what's been marked -- that was Exhibit 1, for the

21      record.  I want to make sure I get that on the

22      record.

23          (Defendant's Exhibit 1 previously marked.)

24  Q   This is Exhibit 2.

25          (Defendant's Exhibit 2 previously marked.)

1   A   Uh-huh.

2   Q   Do you see "Plaintiff's Response to Defendant's

3       First Set of Requests for Production"?

4   A   Yes.

5   Q   Okay.

6   A   I'm sorry.  I'm reading, so -- okay.

7   Q   Do you agree these are your responses to

8       defendant's requests for production of documents?

9   A   Yes.

10  Q   Okay.  Did you understand the importance of

11      providing all documents responsive to the document

12      requests?

13  A   Yes.

14  Q   And if you believe the document was important to

15      your case, do you agree you would have provided it

16      to your attorney?

17  A   I would have if I could have found all of them,

18      yes.

19  Q   And do you agree if something was significant to

20      you, you would have -- you would take the steps to

21      document any such event?

22          MR. WHITE:  Object to form.

23          You can answer.

24  A   Peter, could you -- could you explain that a little

25      bit to me, your question?

1  Q  Yeah.  You know what, I'm going to -- I'm going to

2     strike the question.  I'm going to move on.

3        Ms. Gray, did you withhold any documents in

4     response to these document requests?

5  A  No.

6  Q  So, Ms. Gray, do you agree -- is it accurate you

7     were employed by HCR from on or about May 11th,

8     1994, to December 31st, 2018?

9  A  I couldn't hear the -- I heard the last part of the

10    question.  I didn't hear the first part.

11 Q  Sure.  I'll restate it.

12       Do you agree that you were employed by HCR

13    from around May 11th, 1994, to December 31st, 2018?

14 A  I worked for ManorCare in Sarasota, Florida, for a

15    summer after a traveling nurse assignment.  Then

16    there was as space of about a year in my employment

17    before I became reemployed with them.  But I don't

18    know -- I believe that was -- August 14th was the

19    rehire date in my record.

20 Q  Do you remember the year?

21 A  Well, it would have been 25 years as of 2018 of

22    August.

23 Q  Okay.  I am now going to ask you to take a look at

24    what I've marked as Exhibit 3.

25       (Defendant's Exhibit 3 previously marked.)

1  Q  I might zoom out a little bit.  And I'll represent

2     to you, Ms. Gray, these are policies from the

3     defendant's handbook that were produced to your

4     lawyer during discovery.  I am going to just ask

5     you some specific questions about your knowledge

6     related to these policies, but -- okay.

7         So do you see the page that is marked "Equal

8     Employment Opportunity," Ms. Gray?

9  A  Yes, I do.

10 Q  And do you agree that the defendant maintained an

11    equal employment opportunity policy during your

12    employment?

13 A  I do not.

14 Q  You do not agree that they maintained a policy or

15    you do not agree that they followed it?

16 A  I do not agree that they followed it.

17 Q  Okay.  My question is do you agree that they

18    maintained a policy, an equal employment

19    opportunity policy?

20 A  Does your definition of maintain mean that they --

21    I guess that's what I'm confused about.

22 Q  Sure.  I'll rephrase it.  Do you agree that the

23    defendant had an equal employment opportunity

24    policy in place during your employment?

25 A  Yes, they did.

1  Q  Okay.  And do you agree that this policy prohibited

2    discrimination on the basis of disability?

3  A  Can you repeat that question, please?

4  Q  Sure.  So in your earlier testimony, you had

5    mentioned that you agree that the defendant had an

6    equal employment opportunity policy in place during

7    your employment; is that right?

8  A  Yeah.

9  Q  My question is do you agree that this policy

10    prohibits discrimination or differential treatment

11    based on disability?

12  A  I believe the policy does, yes.

13  Q  Okay.  And any reason to dispute that the policy

14    also required reasonable accommodations for

15    workplace limitations associated with the

16    disability?

17  A  The policy said that it had that -- I don't know

18    how to word it.  Could you ask me the question

19    again, please?

20  Q  Sure.  Do you have any reason to dispute that the

21    defendant's equal employment opportunity policy

22    provided for a mechanism by which employees could

23    seek and maintain reasonable accommodations

24    associated with mental and physical limitations?

25         MR. WHITE:  Object to form.  The document

1    speaks for itself.

2        You can answer.

3  A  So the document says that they do, yes.

4  Q  Okay.  And do you agree that the defendant had a

5    Family and Medical Leave Act policy in place?

6  A  Yes.

7  Q  Okay.  And do you agree that the defendant also had

8    a personal leave policy in place?

9  A  Yes.

10  Q  And that was during your employment; correct?

11  A  Yes.

12  Q  Okay.  And going to the last page of this exhibit,

13    do you see where it says at the top "employment

14    at-will"?

15  A  Yes.

16  Q  And do you agree you're classified as an at-will

17    employee?

18  A  Yes.

19  Q  Okay.  So I want to focus really quick on the 2018

20    time frame, Ms. Gray.  My understanding is that you

21    were employed by the defendant at its Oak Lawn East

22    facility; is that right?

23  A  Yes.

24  Q  Okay.  And what was your job title in 2018?

25  A  Well, it changed in 2018.

1  Q  Okay.  What was it and what did it change to?

2  A  Well, I was a regional nurse for the company for, I

3     believe, over 20 years.  And when Diane Lube took

4     Leslie Ohm's position, she came to the building and

5     told me that she was eliminating my position as a

6     regional nurse, as the regional nurse educator, as

7     a pharmacy consultant, as the preceptor training

8     manager, and as the medical records consultant.

9        And then Kelly Cigar, when that happened,

10     asked me who was a temporary -- a new administrator

11     in training at Oak Lawn East, to take her -- if I

12     would stay there with her and take her nurse

13     educator position in the building.  And I agreed to

14     do that.

15  Q  And Kelly Cigar asked you to do that?

16  A  Yes.  Yes, she was my direct supervisor.  She was

17     the administrator of the building.

18  Q  And is it -- do you pronounce it Diane Lube?

19  A  Diane Lube was the new regional director of

20     operations.  She, preceding that, was the

21     administrator at the Hinsdale building.  And Leslie

22     Ohm's --

23        MR. WHITE:  Liza, just -- Liza, just answer

24     his question or we're going to be here all day.  He

25     asked you how you pronounce it.

1  Q  And, Ms. Gray, so is it accurate that Ms. Lube

2     started in her regional role over Oak Lawn East in

3     the December/November 2016 time frame?

4  A  I believe so.

5  Q  Okay.

6  A  I don't know the exact date.

7  Q  Okay.  Any reason to dispute that that is not

8     accurate?

9  A  I can't give you an exact date.

10 Q  Okay.  So during 2018, Ms. Gray, what were your

11    typical hours like?

12 A  Generally, I worked three days in a row.  I

13    normally worked Tuesday, Wednesday, and Thursdays.

14    It would be ten-hour days on some days.  Some days,

15    they would be shorter.  Some days, if they had to

16    be, they could be longer.

17        As a nurse, that just comes with the

18    territory.  I often worked other days of the week,

19    changed my schedule to accommodate the needs of the

20    center.

21 Q  And were you able to select the hours that you

22    preferred to work?

23 A  Yes.

24 Q  Okay.

25 A  For the most part, yes.

1 Q Okay. Are you familiar with the phrase "hanging

2   one's license" as a nurse?

3 A Yes. I hear it all the -- I would hear it all the

4   time.

5 Q Okay. Can you -- what's your understanding of what

6   that means?

7 A What that means to me and what my -- I -- what that

8   means to me, I can only base on what I have seen

9   over the years with my company. So is that how you

10   want me to answer it?

11 Q I'm just asking for what your understanding is of

12   what that means.

13 A It means that somebody puts their license on a wall

14   so that there's coverage in that position.

15 Q And is it accurate that this is something that you

16   were not willing to do?

17     MR. WHITE: Objection to form.

18 A And what -- that I was not willing to do?

19 Q Yeah.

20 A They had a copy of my license in my employee file.

21 Q If someone had -- let me ask it this way. Did

22   anyone ever -- I just got a little feedback. I'll

23   rephrase that.

24     Did anyone ever ask you to hang your license?

25     MR. WHITE: Objection to form and foundation.

1   You can answer.

2   A  No.

3   Q  Ms. Gray, I'm going to show you what is marked

4     Exhibit 4.

5        (Defendant's Exhibit 4 previously marked.)

6   A  Okay.

7   Q  And I will -- I'll just kind of scroll through

8     this.  You take a look at this and then just let me

9     know when you want me to scroll down; okay?

10  A  Uh-huh.  Okay.  Okay.  Go ahead.  You can scroll

11    down.  Stop, please.  Okay.  Okay.  Okay, you can

12    keep going.  Okay.  You can scroll up.  Okay.

13    Okay.  Okay.  Stop, please.  Okay.  Okay.  Can you

14    go up -- or scroll down?  I'm sorry.  Okay.  Okay.

15    Okay.

16  Q  Have you had a sufficient opportunity -- and I'll

17    say this, Ms. Gray.  That's the end of the -- last

18    page of the exhibit.  So did you have a sufficient

19    opportunity to review this exhibit?

20  A  Yes.

21  Q  Okay.  And I'll represent to you that this is a

22    letter -- appears to be a letter that was provided

23    to the defendant during the discovery process.  Is

24    this a letter you authored, Ms. Gray?

25  A  It was an e-mail I sent to the CEO.

1  Q  Okay.  And so this is a copy of an e-mail that you

2     wrote; is that right?

3  A  It is.

4  Q  Okay.  I don't see a date on this.  Do you recall

5     the date you authored this e-mail?

6  A  I don't remember the exact date.  It was the date

7     she called me on the phone, and I know that, and

8     told me that she was eliminating my position.

9  Q  Okay.  So you know it was on the date that you were

10    advised that your position was going to be

11    eliminated, but you don't remember the specific

12    date?  Is that your testimony?

13 A  Yes.

14 Q  Okay.

15 A  I know -- I can say I know it was in the month of

16    June, and I believe it was on a Thursday.  And I

17    know for a fact that Kelly Cigar was on vacation.

18    She was my boss.

19 Q  Okay.  Now, if we look at the first page -- and

20    I'll go to that.  I have a couple questions around

21    some specific things that are referenced in here.

22    And you can see my cursor.

23       You state, "I'm going to be frank.  When I

24    heard Diane Lube was going to take" -- it appears

25    Leslie's place -- "I knew my job would be

1  eliminated."  Do you see that?

2  A  Yes.

3  Q  Okay.  And are you talking about the nurse educator

4    position?

5  A  I'm talking about all the responsibilities and

6    positions, entitled, that I had.

7  Q  Okay.  So let me ask it another way because I just

8    want to make sure that I understand.

9      Again, you say, "I'm going to be frank.  When

10   I heard Diane Lube was going to take" -- Leslie's

11   place -- "I knew my job would be eliminated."

12      Was it the job that you had that you were

13   holding at the time you wrote this e-mail?

14      MR. WHITE:  I'm going to object.  It misstates

15   the document.

16      Go ahead and answer.

17  A  I meant any job or jobs that I had in the company

18   would be eliminated.

19  Q  Okay.  And then do you see where -- you go on to

20   talk about -- you were called to do an

21   investigation at the Hinsdale location.  Do you see

22   that?

23  A  Yes.

24  Q  Tell me about that.  What did -- who told you --

25   what sort of investigation was it?

1    A  My boss, Leslie Ohm, who was the regional director

2       of operations at that point -- and I believe it was

3       a couple years prior to this -- to her -- to Diane

4       stepping into Leslie Ohm's position.

5          I got a call from Leslie Ohm who asked me to

6       go into the Hinsdale building.  She wanted me to go

7       unannounced.  In other words, not send an e-mail

8       letting them know I was coming because she felt

9       that there was mishandling of controlled

10      substances.  And that's why I was sent there.

11   Q  Okay and this was prior to Diane Lube assuming

12      authority over the Oak Lawn East facility; right?

13   A  Yes.  I believe it was about two years before that.

14      I could be wrong.

15   Q  Okay.  And you state, "After the Hinsdale

16      assignment I was given and had completed, much to

17      Diane Lube's frustration."

18          What is your understanding as to why Ms. Lube

19      would be frustrated in this circumstance?

20   A  The position that I held required me to go into

21      buildings and report what I saw.  And when Diane

22      Lube got in the building, she was furious,

23      absolutely furious that I was even there doing an

24      investigation.  She did not want me there.

25          And I had already started the investigation,

1   went into the medication room with the director of

2   nursing who is no longer with the company -- her

3   name is Kris -- and found out that they were saving

4   controlled substances that belonged to other

5   patients, which is illegal and can't be done

6   because they weren't getting them from the

7   pharmacy.  And they were handing them out to the

8   patients who needed them.

9  Q  What specifically did Diane Lube say to you that

10   led you to conclude she was frustrated?

11  A  It was her actions.  I mean, she was -- she threw

12   her purse down, you know.  She was -- or not

13   yelling, but, you know, you could tell by her

14   facial expressions.

15      I don't remember the exact conversation, but

16   she didn't appreciate it.  She didn't think that

17   they were doing anything wrong and that she would

18   handle it.  And I said, well, obviously Leslie was

19   concerned and that's why she asked me to come in.

20      And that's all I can tell you is, you know,

21   she was mad.  She was angry.  She was very angry.

22      And then I was told by two other regional

23   staff members, after we had a regional quality

24   assurance meeting there, that she told them that if

25   she ever became the RDO, then I would be one of the

1    first people to go.

2  Q  And you learned this through some regional team

3    members?

4  A  Yes.

5  Q  Okay.  And obviously you can't speculate about what

6    was going on in Diane Lube's mind.  What do you --

7    why do you think that she was frustrated?  Because

8    you go on to say, "Diane Lube never liked when

9    Leslie sent me into her center."

10  A  Well --

11  Q  Why do you believe that -- why do you believe she

12    didn't like when you were sent to the center?

13  A  It wasn't just me.  It was -- she didn't like when

14    any consultant, including the clinical services

15    team, came into her building.  Because there were

16    things that were going on, and Hinsdale was doing

17    things that were not according to policy and

18    procedure and she knew that.  And she did things

19    her way and she directed her staff to do them her

20    way.

21        And that's why she was uncomfortable if she

22    knew -- or did not know that somebody was coming.

23    Or when somebody was coming, she wanted somebody

24    glued to their side so she knew what was going on.

25    I think she felt very intimidated.

1       And, you know, the joke in the region was that

2    Hinsdale -- things go Hinsdale's way, not the

3    ManorCare way.

4  Q  And you -- were you -- was it your job in this

5    particular instance to determine whether Hinsdale

6    was doing it the Hinsdale way or doing it the

7    ManorCare way?

8  A  My job was to see that they were following the

9    laws, policies, and procedures of the company, and

10   they are not.  And that's what I reported to my

11   boss.

12  Q  Okay.  Did you tell --

13  A  Which is her boss.

14  Q  Did you tell Ms. Lube what your conclusions were?

15  A  Yes.

16  Q  Okay.  And what was her reaction?

17  A  She said she didn't believe it.  I said -- and I

18   told her -- I said, you have narcotics in there for

19   patients that were discharged weeks ago, controlled

20   substances.

21       And the procedure is on the day of the

22   discharge, that those controlled substances are

23   counted by two nurses and the destruction is done

24   and they are signed off so that they do not remain

25   in the building because diversions occur,

1   obviously, in situations like that.

2   Q   Okay.  And then on the next page of this exhibit,

3   you write "The week Diane Lube stepped into the RDO

4   role."

5   A   Yes.

6   Q   She came to the Oak Lawn East facility where you

7   had been helping out as a regional nurse and told

8   you she was eliminating your regional position and

9   it was no longer --

10  A   Yes.

11  Q   -- needed; right?

12  A   Yes.

13  Q   What did she specifically say to you in that

14  instance?

15  A   I can't remember exactly verbatim.  But the gist of

16  it was that she no longer needed me to do the

17  region, no longer needed me to do the things that I

18  was doing, and that that position was going to be

19  eliminated, the positions with my responsibilities.

20      And that the only position that was open, as

21  far as she was concerned, was a five-day-a-week

22  nurse educator position that would include me

23  making sure that all nurses and CNAs had all their

24  clinical competencies done and up to date and,

25  beyond that, any additional other things that would

1   be required for education.

2       And I replied to her that there's nobody that

3   would be able to do or perform -- oh, and she said,

4   and you will be held responsible and accountable if

5   these competencies and these things are not done.

6       And I was honest with her and I said, there is

7   no feasible way that with the staff size that we

8   have in this city and the turnover that anybody,

9   even working five days a week, could be held

10   accountable or be able to produce those kind of

11   results unless they were going to work seven days a

12   week, ten hours a day.

13       And even then, I said, I don't believe it

14   would be done -- it could be done.

15  Q  So in that -- in that week that she starts -- so

16   that would have been in the November of 2016 time

17   frame?

18  A  That she started, in November?  Did you say --

19  Q  Let me rephrase that.  The week that Diane Lube

20   stepped into the RDO role, you state here that she

21   came to Oak Lawn East and had this discussion with

22   you.  And I'm just simply asking, that would have

23   been in 2016; right?

24  A  No.  It was in 2018.  It was not long before she

25   eliminated my position at Oak Lawn East when she

1    called me.  I believe she stepped into that role at

2    the end of May of 2018 and was transitioning and

3    was making rounds to every building with Alan Hash.

4    But it was not '16, it was 2018.

5  Q  Okay.  So this conversation that you're referencing

6    here deals with the position that you held

7    immediately prior to your termination of

8    employment?

9  A  No.  It was the regional nurse position, not the

10   nurse educator position at Oak Lawn East.  I had

11   been helping Oak Lawn East at two years -- for

12   two years as a regional nurse trying to get into

13   compliance, help the new CON and Kelly Cigar as

14   well with whatever they needed done to get the

15   building, like I said, in compliance, educate the

16   staff.

17       And then when I was told Kelly Cigar would be

18   coming there as the administrator -- Kelly was

19   there one day and she and I were talking and she

20   said we had a good working relationship, would you

21   stay here and be my nurse educator?  And this was

22   after Diane had spoken to me in the conference room

23   at Oak Lawn East.

24  Q  Okay.

25  A  It was just she and -- it was just she and I in

1   there.

2  Q  And I just want to make sure that I'm

3   understanding.  So the conference room at Oak Lawn

4   East and this conversation that you had with Diane,

5   are you saying that Diane was going to -- told you

6   that you're -- you would eventually be terminated

7   or she was transitioning you to another role?

8  A  She wasn't transitioning me to anything.  She said

9   that she was eliminating my position as the

10   regional nurse and all the other responsibilities

11   that I had.

12       I was the medical records liaison, the

13   pharmacy liaison, the preceptor trainer for nurses

14   and CNAs and a multitude of other things.  She no

15   longer "needed me to do those things anymore" and

16   that the only position that was open was a -- and

17   at that point in time, the north region, which was

18   Elk Grove, Arlington Heights, and then the south

19   region, which were all the buildings which were

20   near my home, became under one umbrella and

21   Kelly -- I mean -- and Diane Lube's responsibility.

22       The whole company changed all their zones and

23   regions.  So she was eliminating the position that

24   I had held for over 20-some years, and the only

25   thing that was available was this nurse educator

1    position.

2         And, as I said, you know, there were I don't

3    know how many thousand employees that she expected

4    to have competencies done on, all their training

5    done.

6         And that would be the responsibility of this

7    nurse educator for the region, which, now I

8    think -- I don't know.  So I'm not even going to

9    say because I would be -- I would be speculating,

10   and I'm not going to speculate.  But it would be

11   for the building's -- and it was an impossibility

12   to get done all the things that she was naming

13   would be my responsibility if I wanted to take that

14   role on.

15        And I said, I don't -- I can't work more than

16   30 hours.  I seldom am able to do that.  I was in

17   physical therapy.  I was seeing doctors.  And it

18   not only would not be feasible for me or

19   achievable, I told her it would be unfair to expect

20   that of any nurse to take on that role because it's

21   impossible.

22   Q  Okay.  So --

23   A  Unless they -- you know.

24   Q  So just so I'm understanding correctly, around May

25    of 2018, you had a meeting with Diane Lube wherein

1    she said she was eliminating your position as a

2    regional nurse; is that right?

3  A  Yes.

4  Q  And during the --

5  A  And not just the regional nurse but all the other

6    positions.  I was the, like, director of nursing of

7    the regional TRM pool of nurses that we had, which

8    was, I don't know, 55 nurses.  And then all the

9    other jobs that I took care of.

10 Q  Okay.  And --

11 A  She didn't --

12 Q  And did she offer you this educator position that

13    you said couldn't be completed 30 hours a week?  Or

14    was that an option provided to you and you declined

15    it?  Or how did that happen?

16 A  Well, she said the only -- not that you could have

17    it or I would give it to you but that I could apply

18    for this nurse educator position for the region.

19        And I don't know if she was simply talking

20    about a set of eight buildings that we still had or

21    if she was including her entire region when she

22    started going on about the list of all the things

23    that her expectation would be that I would be

24    responsible, make sure that the RNs, all the CNAs,

25    LPNs were competencied [sic], worked with,

1    educated, and that they passed their competencies,

2    in 30 hours a week, you know.

3        She said, well, you would have to be able to

4    do it and accomplish it if you -- if, you know, are

5    interested in this position.

6  Q  So did you think you were out of a job at that

7    point or ...

8  A  I don't -- I don't think so because I -- and I

9    don't know for sure.  Because I believe I talked to

10    Kelly before this.  She and I had phone

11    conversations about staying at Oak Lawn East since

12    I knew she was coming there.  And I did not mention

13    that to Diane at that point in time.

14  Q  Well, you had a conversation with Kelly about

15    staying at Oak Lawn East?

16  A  Yes.  Because Kelly Cigar, who was the director of

17    nursing at Hinsdale, was coming to be the

18    administrator at Oak Lawn East, the building where

19    I had been at for a couple years, helping them

20    either get into compliance.

21        Now, I wasn't only at Oak Lawn East.  I went

22    to Oak Lawn West, I went to the Paloses,

23    South Holland, and Homewood over the years.  And

24    that was part of our region.  So I didn't just stay

25    at Oak Lawn East, you know.  I would have to help

 1   as a regional nurse, go to other buildings.

 2  Q  So -- and, again, I'm not in the medical

 3   profession, Ms. Gray.

 4  A  Yeah.

 5  Q  So I don't understand hospital administration.  I

 6   have kind of a vague understanding of how things

 7   may work, so -- obviously, depending on your

 8   account here.

 9      But I'm just trying to figure out -- you said

10   you had -- prior to this meeting with Ms. Lube, you

11   said that you had a conversation with Ms. Cigar

12   about staying at Oak Lawn East.  Were you -- did

13   you think you were going somewhere or -- prior to

14   this conversation?

15  A  No.  No, I didn't think I was going anywhere.  I

16   mean, I didn't -- I knew I couldn't -- or I knew I,

17   myself, or no other nurse could take on a position

18   that she was sitting there telling me.

19      No uncertain terms about all the plethora of

20   things that would need to be accomplished in

21   30 hours.  I wasn't quite sure what I was going to

22   do.  But I do know that Kelly and I had

23   conversations about me staying there and being her

24   nurse educator, and I had that in the back of my

25   mind.

1      I didn't -- I didn't think that -- I knew I

2    couldn't do what she was asking me to -- or, you

3    know, was saying was out there.  She didn't give me

4    the job.  She didn't say, it's yours if you want

5    it.  It was just this is all -- this list is

6    everything you're going to have to accomplish.

7  Q  Okay.

8  A  And I --

9  Q  So you --

10  A  I'm sorry.  I couldn't --

11  Q  No, that's fine.  I think I'm starting to follow

12    now.  So you knew that your position -- well, I

13    guess you said it in your letter earlier.  You knew

14    your position was going to be eliminated even

15    before Diane assumed responsibility over at Oak

16    Lawn East.

17      So you knew that this was coming prior to your

18    meeting with Diane Lube, and that's why you had

19    those discussions with Kelly Cigar; is that right?

20      MR. WHITE:  Objection.  Misstates testimony.

21    You can answer.

22      THE WITNESS:  I just need a minute.

23      MR. TSCHANZ:  Do you want to take a -- do you

24    want to take a short break?

25      Ethan, do you want to take a --

1        MR. WHITE:  That's fine.

2        (A brief recess was taken.)

3   BY MR. TSCHANZ:

4   Q  Ms. Gray, we are back on the record after a short

5      recess.  Do you understand that you're still under

6      oath?

7   A  Yes, sir.

8   Q  Okay.  And your counsel asked you this off the

9      record, but I'll ask it on the record.  Are you

10     okay to continue?

11  A  Yeah.  I just got a little emotional.  I'm sorry.

12  Q  No need to apologize, ma'am.

13  A  I'm ready.

14  Q  Thank you.

15        So, Ms. Gray, I just want to kind of

16     unpackage [sic] some of the things that you're

17     talking about in this letter -- or e-mail, I guess,

18     you clarified.  And so is it your testimony that

19     you had a meeting with Ms. Lube wherein she

20     informed you that your regional nurse position and

21     all the other functions you already testified

22     earlier --

23  A  Yes.

24  Q  -- was going to be eliminated?

25  A  Yes.

1  Q  Okay.  And is it correct that she had described a

2     potential nurse educator position that you did not

3     feel could be completed working a 30-hour-a-week

4     schedule?

5  A  Correct.

6  Q  And did you tell her that?  Did you tell her that

7     you didn't think it would be possible?

8  A  Absolutely.

9  Q  Okay.  Now, if we look at your letter, you say,

10    "The following week, Kelly Cigar started at OLE" --

11    and that's Oak Lawn East; right?

12 A  Yes, sir.

13 Q  -- "as the admin."

14       Now, earlier on, is it accurate that you

15    testified that you had conversations with Kelly

16    prior to her starting at OLE as an admin about

17    being Kelly's nurse educator?

18 A  Yes.  Because there was talk in the region that she

19    was going to be coming over to the building.

20 Q  Okay.  And so help me understand.

21       So "the following week, Kelly Cigar started at

22    OLE as the admin."  And then you write, "Kelly and

23    I spoke and I explained I could not possibly carry

24    that responsibility and complete all that Diane

25    required working 30 hours a week."

1       And then a little bit further down, you said,

2    "Kelly offered me the nurse educator position at

3    Oak Lawn East working 30 hours a week.  I gladly

4    accepted."

5  A  Yes.

6  Q  So my question is Kelly Cigar offered you a nurse

7    educator position at Oak Lawn East working 30 hours

8    a week; is that right?

9  A  Yes.

10  Q  And just broadly, how long --

11  A  Just --

12  Q  How long did you work as Kelly's nurse educator at

13    Oak Lawn East?  Was it a year, two years?

14  A  You know, I -- I believe it was over a year.  I

15    can't -- I can't exactly recall the date that she

16    stepped into the position.  I do know it probably

17    was over a year, maybe a little longer.  Because

18    she was -- she did my evaluation and that's what

19    I'm basing that on.  I think she was there a little

20    over a year.

21       Because in that conversation when she did my

22    evaluation, she told me, verbatim, she said that

23    she wanted to thank me and told me that if I had

24    not been there -- and she said, "I'm not just

25    blowing smoke up your A-S-S" -- I'm not even going

1    to say the word she said, but "Liza, I could not

2    have done this without you."

3        And I thanked her for that.  And I was happy

4    to help her.

5  Q  Okay.

6  A  So I believe she was there over a year.

7  Q  Okay.  That's helpful, and I appreciate you

8    clarifying.  So I just wanted to scroll back up

9    to -- if I'm understanding your testimony earlier,

10   well -- strike that.

11       At the top of this exhibit, we have a

12   statement that says, "The week Diane Lube stepped

13   into the RDO role, she came to Oak Lawn East."  And

14   that's in reference to the conversation you had in

15   a conference room with her that we just talked

16   about; correct?

17  A  Yeah.

18  Q  And, again, let me just -- I'm just asking a pretty

19   broad question here.  And you said that you had

20   thought that that was in May of 2018.

21  A  Well, I believe it was around the, you know, the

22   middle of May.  You know, it was -- I can't say the

23   date for sure.  I don't know.  I'm not good with

24   dates and I apologize about that.  I'm not.

25  Q  That's -- it's -- a deposition only is asking for

1   your personal knowledge, Ms. Gray.  It's not a pop

2   quiz.  So I understand.

3   A  Okay.

4   Q  But your employment with the defendant ended,

5   effective December 31st, 2018; correct?

6   A  Yeah.  That was when I had called.  Yeah.  Yeah.

7   That's when I called and found out when they had

8   terminated me out of the system.

9   Q  Okay.  Now, my question is if you -- if this

10   conversation -- the conversation referenced in this

11   exhibit with Diane Lube, the week she stepped into

12   the RDO role, that happened prior to your --

13   according to your e-mail, Kelly Cigar starting as

14   OLE.

15       And if you began reporting to Kelly Cigar in

16   the nurse educator role and you were in that role

17   for a year, maybe more, do you agree that this

18   conversation that you had with Diane Lube could not

19   have happened in May of 2018?  It had to have

20   happened maybe in 2017?

21       MR. WHITE:  Object to form.

22   A  No.

23       MR. WHITE:  You can answer.

24   A  She didn't -- she didn't take the job until -- I

25   don't think she was in that job for more than a

1    couple months before I left, before she eliminated

2    my position at Oak Lawn East.

3  Q  And what position are you talking about, before she

4    eliminated the position?  Are you talking about the

5    regional nurse and the other functions?

6  A  No.  No.  No, the one -- when she called me on the

7    phone when I was the nurse educator at Oak Lawn

8    East, she had not been in that position for a year.

9    There's no way she was in that position.

10  Q  Well, let me just clarify because maybe it was a

11    poorly worded question on my part.

12        Just trying to figure out when this meeting

13    took place with Diane Lube -- Lube -- and

14    specifically the meeting in the conference room

15    where she informed you that your regional nurse

16    role and the functions would be eliminated and let

17    you know that the -- there's an educator position

18    that you believe couldn't be completed within

19    30 hours per week -- strike that.

20  A  I --

21  Q  Understanding that you might not know specific

22    dates, I'm just trying to nail down exactly when

23    something -- because you had this -- my

24    understanding is you had this conversation with

25    Diane Lube when she told you the regional nurse

1    position was going to be eliminated.  The following

2    week, Ms. Cigar starts, and then you began

3    reporting to Ms. Cigar as nurse educator.

4        Now, you said earlier that you believe that

5    you were a nurse educator for a year, maybe more.

6    If your employment ended with Ms. Cigar in December

7    of 2018, I'm trying to understand how the

8    conversation with Diane Lube would have happened in

9    May of 2018.

10   A  Because I was under a physician's care for a couple

11     of years.  I was going to therapy, seeing a pain

12     doctor, seeing my attending physicians for my back.

13     And I had been going for quite some time, and I had

14     gone for years prior to that on and off.  So I --

15     and I was in physical therapy at -- in June, and I

16     believe I started in April or May of 2018.

17        But I do know that Diane Lube was coming

18     around to all the buildings with -- I believe it

19     was her new boss, and just to make rounds to

20     announce her position.  And then she came into the

21     building again, and that's when she asked to talk

22     to me and had that conversation.  She said that --

23     you know, about eliminating that position and what

24     kind of position was out there, if I was

25     interested.

1    Oh, and then she also told me -- while I was

2    thinking about it, she was changing me from an

3    hourly to a salaried employee.  And I had in the

4    back of my mind that I knew that I was not going to

5    be able to complete all the things that she needed

6    me to do.

7    I can't -- I don't believe it was in 2017.  It

8    was in 2018.  But as I said, you know, I can't give

9    you a specific date.

10   Q  Okay.  If the company records indicated that

11   Ms. Lube started as RD- -- in the RDA -- RDO role

12   in 2016, would you have any basis to dispute that?

13       MR. WHITE:  Objection to foundation.

14       You can answer.

15       THE WITNESS:  In 2000 and -- did you say I

16   could answer, Ethan?

17       MR. WHITE:  Yes.  Yes, you can answer, if you

18   know.

19   A  That she started in 2016?  She may have been.  I

20   know that she was working some other jobs as she

21   was still the license administrator at Hinsdale.

22   Q  Well, let me just simplify it and ask it this way.

23   A  They were trying to --

24       MR. WHITE:  Liza.  Liza.  Liza, just wait for

25   his question; okay?  You just got to listen to his

1    question and answer his question.

2  Q  Maybe this will simplify it, Ms. Gray.  You do not

3    know for certain, sitting here today, the date that

4    Ms. Lube stepped into the RDO role over Oak Lawn

5    East.  Is that a fair statement?

6  A  That's correct.  I don't know the date in 2018, but

7    that's the year, I believe, she stepped into that

8    role.

9  Q  So that's your recollection, is that it was 2018?

10    Do you know of any evidence to support that belief

11    or is that just your -- what your recollection is

12    sitting here today?

13  A  I just recollect that because of the events that

14    occurred.

15  Q  Okay.  So kind of marching through this letter --

16    or e-mail.  So you then begin reporting to Kelly

17    Cigar at Oak Lawn East in the nurse educator role;

18    right?

19  A  Yes.

20  Q  Okay.  And you were working no more than 30 hours a

21    week?

22  A  On rare occasions if there was, you know,

23    catastrophic staffing issues, then I would try to

24    help as much as I could.

25  Q  But on average, your work schedule was capped at

1    30 hours --

2  A  30 hours.

3  Q  -- a week?

4  A  Yes.  Yes.

5  Q  Okay.  And you -- sitting here today, you believe

6     you had served in that nurse educator role for

7     Kelly Cigar for a year, maybe more; is that

8     accurate?

9  A  I believe so.

10 Q  Okay.  So towards the bottom, is the -- first of

11    all, who is -- you said Mr. Cavanaugh is the CEO?

12 A  He was the CEO of the company.

13 Q  Okay.  You state at the bottom of this exhibit, "I

14    received a call today from Diane Lube telling me

15    that, once again, my job was being eliminated and

16    she wanted to transfer me to Elk Grove Village.

17    Diane said that the DON" -- is that the director of

18    nursing?

19 A  Yeah.

20 Q  Okay.  "The DON is doing excellent at OLE and is --

21    and so is the center.  So because of the cost of my

22    position, the center does not need me anymore."

23       So are you referring to Kelly Cigar when you

24    say the DON is doing -- when you're recounting what

25    was said to you, the DON is doing excellent?  Is

1   that your --

2  A  No.  Diane was saying that Jackie, who was the

3     director of nursing, was now in place, doing well,

4     and the other staff didn't need my help anymore,

5     and that it cost too much for my position and that

6     the center didn't need me anymore.

7  Q  And that's the nurse educator role; right?

8  A  Yes.

9  Q  Okay.  So the DON is doing excellent.  So were you

10     essentially just helping people get up to -- I'm

11     just trying to understand what you were doing as a

12     nurse educator.

13        Were you sort of helping the facility get up

14     to speed or were you -- was that a transitional

15     period of some kind that you were assisting with?

16  A  No.  I never -- for -- I started with the company

17     as an assistant director of nursing and became a

18     director of nursing, and then my boss created this

19     regional position.

20        I had no job description for over 20 years.  I

21     had no job description after leaving the DON

22     position.  They wanted me to go into buildings and

23     help them get into compliance, do whatever needed

24     to be done, and that's what I did.  And that's what

25     I was doing at Oak Lawn East.  It changed from day

1   to day.

2       You know, the needs in these type of centers

3   are vast, and they can be -- care at the bedside --

4   they can be many things.  It just depends.  You

5   know, there's not just one thing that I did.  I did

6   many things.

7  Q  Is that true in the nurse educator role that you

8   performed for Ms. Cigar?

9  A  Oh, yeah.  Because even when I was hired by Kelly

10   as -- when we told Diane Lube in a meeting with

11   Kelly and I that I could not -- I told her in front

12   of Kelly I could not do the regional nurse educator

13   position and complete everything she wanted me to

14   do in 30 hours a week, that it was impossible and

15   that Kelly and I spoke and Kelly asked if I would

16   stay with her and be her nurse educator and give

17   her a hand.

18       And the response from Diane was, number one,

19   she doesn't need any help.  Number two, she was

20   very upset about it and said, well, you will be

21   responsible here as well as you would have been in

22   the other position that was out there for the

23   region.

24       And Kelly and I just looked at each other and,

25   you know, I said, I understand.  I'll do whatever

1     Kelly needs me to do.

2  Q  So --

3  A  And that was the end of that conversation.

4  Q  So Diane, you said she was upset about the nurse

5     educator role at Oak Lawn East --

6  A  At Oak Lawn --

7  Q  But she nonetheless permitted you to transition

8     into that position under Kelly Cigar; is that

9     right?

10  A  Yes.  However --

11        MR. WHITE:  Liza.  Liza.  Liza, we're going to

12     be here all day if you --

13        THE WITNESS:  Okay.

14        MR. WHITE:  Just answer his question.  You

15     said yes.  Let's move on.

16        THE WITNESS:  Okay.

17  Q  And I want to get into -- I'm going to get into

18     this conversation with Ms. Lube, the call that

19     we're talking about that's the subject of this

20     letter -- one of the subjects, I guess I should

21     say.  But, you know, I just kind of want to know

22     what the dynamic is in your mind.

23        And I -- if you scroll down to this -- the

24     page that's marked 578.  And I'll just say this

25     because we're going to be talking about a few other

1    documents today, Ms. Gray.  And if your lawyer

2    already explained this to you, I apologize.  I'm

3    going to say it again just so we're on the same

4    page.  Do you see where it says "Gray00589"?

5  A  Yes.

6  Q  Okay.  That's a designation that the lawyers are

7    using when they're exchanging documents.  So when I

8    refer -- particularly with a longer document -- I'm

9    going to refer to these Bate- -- they're called

10    Bates ranges.

11        So in Mr. White's case, he has them on the

12    left side of the page.  In my case, I put them on

13    the right side.  So when I refer to a page as a

14    Bates range, I'll let you know, that's what I'm

15    talking about, just so we can be on the same page;

16    okay?

17  A  Okay.

18  Q  Okay.  So if we go to page -- Bates range 589,

19    beginning 589, let me -- okay.  Well, first of all,

20    who is "Allan" down at the bottom here?

21  A  Alan Hash was the divisional vice president.  He

22    was the one that all the RDOs, regional directors,

23    reported to.  But he announced that he was leaving

24    the company at that time as well, shortly after

25    Diane -- you know, this announcement was made about

1   Leslie, my boss, leaving, and Diane taking over.

2  Q   Okay.  So you say -- and we'll talk about the phone

3   conversation with the new position that was

4   presented.

5       But you said, "Once again, Diane has made me

6   feel insignificant, is once again eliminating my

7   position."  And you go on to say, "It is personal

8   with her, and I can't take this anymore."

9  A   Uh-huh.

10  Q   "I cannot help from feel that she is doing exactly

11   what she said she wanted to do, and that was to get

12   rid of me."

13       And then if you scroll a little further down,

14   you say --

15  A   Uh-huh.

16  Q   -- "I did speak to Alan about my concerns."  And

17   you go -- you write, "And told him Diane Lube did

18   not like me and has -- had an attitude about me

19   ever since I did the investigation at her center."

20       And then you told Alan you were worried about

21   your job.

22  A   Yes.

23  Q   And so if you go up to the first page of this

24   exhibit, the investigation of the center, that was

25   the narcotics issue we talked about; right?

1   A   Yes.

2   Q   And, again, when -- right after -- "I'm going to be

3       frank.  When I heard Diane Lube was going to

4       take" -- I guess, Leslie's place, you knew your job

5       would be eliminated.

6           And then we go down, and you had mentioned

7       earlier on in your deposition that some regional

8       folks had told you that Diane conveyed to them that

9       she -- that once she becomes the RDO, your position

10      would be one of the first positions to go.

11          So is it your belief that Diane was

12      retaliating against you for this investigation?

13          MR. WHITE:  Objection to form.

14          You can answer.

15  A   That was my feeling.  I mean, I feel that way --

16      you know, part of me felt that way in my heart,

17      yes.

18  Q   Okay.  And I'm just asking for what you believe

19      sitting here today.  Do you believe that Diane did

20      all this because she was dissatisfied with the

21      Hinsdale investigation?

22  A   No.  It doesn't have to do with just Hinsdale, no.

23  Q   What did it have to do with?

24  A   Well, there were instances where, when I was at Oak

25      Lawn East, that I would be asked to review medical

1   records of patients coming in that they wanted to

2   admit into the facility.

3        And there were a couple of occasions where I

4   looked at the medical records and one of the

5   patients was a trach patient.  We had no

6   respiratory therapists in the building, and we did

7   not have the proper equipment to safely accommodate

8   that patient that day.

9        And we have liaisons that work at the hospital

10  that are ManorCare employees, and we had another

11  patient that was an alcoholic that drank over two

12  pints of alcohol a day, and they brought him into

13  the ER at Christ.  And they kept him and were going

14  to send him right over to us.

15       The staffing was such that when you have an

16  alcoholic or somebody that was addicted to drugs,

17  they are an extreme elopement risk.  And it is

18  important that we have the appropriate staff and

19  equipment to care for a patient.

20       So I talked to Juan, the liaison for

21  ManorCare, and said, you've got to try to hold this

22  admission off for one more day because he's going

23  to be trying to exit the building.  They're already

24  challenged with staff, and we don't have the proper

25  trach equipment.

1    And 15 minutes later, Diane D'Antonio, who all

2  the liaisons report to, got this information from

3  Juan that I wanted them to hold off, that would be

4  my recommendation.  And Diane Lube got on the phone

5  and talked to the admissions director, talked to

6  Kelly Cigar, and then I was told that I was no

7  longer to review -- nobody was to review any of the

8  information that the liaisons were sending over,

9  that if we were told that there was an admission

10  coming, we were to take them.  And Kelly and I had

11  a conversation about that afterwards.

12    They sent the trach patient.  They ended up

13  having to cut up tubing and tape it and piecemeal

14  it together, and it was very unsafe for the

15  patient.  And I made no qualms about that.

16    I made a call to Diane D'Antonio and told her

17  that your DONs are upset that they are not getting

18  accurate information from Juan, that he is telling

19  them mistruths about these admissions and they

20  don't trust the information they're given.

21    And once Diane heard that -- because Diane

22  D'Antonio told Lube.  That's when the phone call

23  was made and they no longer wanted me to review any

24  medical records.  So it had something to do with

25  that as well, I'm sure.

1  Q  Earlier on in --

2  A  I just --

3  Q  Well, what I -- you said something earlier on in

4     the deposition that kind of helped clarify things

5     for me because I'm not in the industry.

6         But you had said that, you know, Diane Lube --

7     when it comes to Hinsdale, for example, Diane

8     Lube -- Hinsdale did things the Hinsdale way and

9     not the ManorCare Way; do you remember?

10 A  Yes.

11 Q  Okay.  And that was when Diane was -- had

12    responsibility for Hinsdale; right?

13 A  Yes.

14 Q  And so do you believe that -- and I got pretty

15    specific to that -- I mean, because you referenced

16    in your letter, you said that she wanted to

17    eliminate your -- you knew that your position was

18    going to be eliminated, in part, because of this

19    Hinsdale investigation.

20        I guess my question is do you believe that

21    Diane's decisions were due to you being outspoken

22    about following ManorCare policies?

23        MR. WHITE:  Objection to form.

24    Mischaracterizes testimony.

25        You can answer.

1    A  I think it has a little bit to do with it, you

2       know.  I don't think it has everything.

3    Q  Okay.  What else does -- do you believe motivated

4       Diane Lube to eliminate your position?  Because you

5       state here you had the Hinsdale assignment.  We

6       talked about the medical records issue.  What

7       else -- what else would have frustrated Diane Lube,

8       in your mind, for her to make the decision --

9    A  Because -- because I've met so many people who were

10      so very intimidated by her, and they wouldn't speak

11      up when it came to the patients and patient care.

12      And I am outspoken when it comes to patient care.

13      We're there to take care of them.  We need to have

14      what we need to take care of them.

15          And oftentimes, it gets about the numbers and

16      the number of admissions and, you know, the

17      financial side of it.  And although that's

18      important, it's not as important as the patient or

19      the staff that's caring for them.

20          And she knew that I felt that way and would

21      question whether or not something was appropriate

22      or inappropriate when nobody else would do that

23      with her.

24   Q  And, again, I obviously -- you are not Diane Lube,

25      so you can't testify to what exactly her thought

1  process is necessarily.

2  A  I can't.

3  Q  But I'm asking you what you believe.  Do you

4  believe that she was intimidated by your

5  outspokenness?

6  A  Yes, I do.

7  Q  Do you believe that played a part in the decisions

8  regarding your employment status?

9  A  Yes, I do.

10  Q  Okay.  Is there anything else that you think played

11  a part in her decisions regarding your employment

12  status?

13  A  Well, I think the fact that I had to have an

14  accommodation that, basically, I was able to do and

15  had been doing.  I was able to sit and stand like I

16  do now, as I'm sitting here, because of my back

17  issues and the tumor that was in my sacrum that I

18  needed to reposition.  And I couldn't sit for

19  longer than, you know, 15 or 20 minutes without

20  having to move around at that point in time.  And

21  it was not a problem.

22      I was able to do my job there, you know.  I

23  just got my computer and stood up and started

24  working and -- or would go to the nurses' station

25  and work.  And I could have went to any other

1  buildings that were in the driving distance that I

2  could have gotten.  But, you know, she didn't want

3  to accommodate me.

4  Q  And on that note --

5  A  And --

6      MR. WHITE:  Wait for a question.  Wait for a

7  question.

8  Q  We can talk a little more about the letter.  But

9  since you brought it up, I want to talk to you

10  about what's been marked as Exhibit 5.

11     (Defendant's Exhibit 5 previously marked.)

12  A  5 ...

13  Q  Do you see what I'm scrolling down?

14  A  Lori -- yes.  Uh-huh.

15  Q  Okay.  Is this a doctor's note?  This appears to be

16  a doctor's note dated June 6th, 2018.

17  A  Yes.

18  Q  Okay.

19  A  Yes.  That was after my MRI.  Uh-huh.

20  Q  Okay.

21      MR. WHITE:  Peter, you said this is Exhibit 5?

22      MR. TSCHANZ:  Yeah, this is Exhibit 5.

23      MR. WHITE:  Okay.

24      MR. TSCHANZ:  And if I go out of order, I'm

25  still going to stick with how I numbered them

1    because I just don't want to confuse the court

2    reporter.  So, Ethan, for your reference, I have

3    the exhibits labeled in the actual PDF.

4         MR. WHITE:  Yeah.

5         MR. TSCHANZ:  I'm sure you got that.

6         MR. WHITE:  I got it now.  Thank you.

7  BY MR. TSCHANZ:

8  Q  Okay.  Ms. Gray, this is a doctor's note dated

9    June 6, 2018.  And it says, "Please note that Liza

10   Gray was seen on June 6, 2018.  At this time, she

11   should not sit for long intervals and should stand

12   and reposition herself after 15 minutes.  She

13   should also not stand for longer than 15 minutes at

14   one time.  Please consider these --

15  A  Yeah.

16  Q  -- "restrictions until further notice."

17  A  Yeah.

18  Q  So you went to the doctor on 6/6/2018?

19  A  Oh, I went to the doctor months before that and

20   then I continued to see different doctors.

21  Q  Sure.  I'm just asking, is it accurate that this

22   note says you were seen on 6/6 of 2018?  Is that,

23   to your recollection, accurate?

24  A  I would assume so.  I mean, if it says that, that's

25   when I was there.

1  Q  Okay.

2  A  I can only go by what they say.

3  Q  Tell me about -- tell me about what gave rise to

4     this note and what -- you know, you provided it

5     to -- you provided it to the defendant.  You said

6     it was after an MRI?

7  A  Yeah.  I -- I had been having pain in my back.

8     I've had issues with my back my whole life since I

9     was 16, on and off, and gone for treatments.  I've

10    gone for osteopathic treatments, all different

11    types, and it was come and go.  And it started

12    getting worse in the early spring and, you know, in

13    the winter in 2018.

14         And I didn't know, you know, what it was.  I

15    could tell -- I kind of felt I had a pinched nerve.

16    And when you've had them, you know.  And then I saw

17    my attending.  She wanted me to see and get X-rays

18    and things like that.

19         I've seen so many doctors and -- multiple

20    doctors in, I believe, '17 and '18.  But '18, it

21    was getting to the point where it was pretty

22    unbearable.  And I know I was going for physical

23    therapy.  I was seeing a pain doctor and getting

24    injections, and I was told to see

25    Dr. DiGianfilippo -- who is a neurosurgeon -- by my

1   attending doctor.  I believe maybe recommendation

2   or gave me the form.  I don't know.

3       And he wanted an MRI done.  And, basically,

4   when I met with him, he had told me that I had

5   multiple issues with my entire spine and that

6   that's what causes me pain sitting and getting

7   searing pain down my leg when I sit for longer

8   than, you know, 10 or 15 minutes.

9       And I kept telling him, I have to -- even now,

10  I'm shifting back and forth in my chair and I have

11  to stand up.

12      So he said, you have to take that pressure off

13  those nerves and this is how you do it, and he said

14  to continue to go to therapy.  But then he told me

15  that there was a tumor in my sacral bone, and that

16  is at the end of your tailbone.  And they did not

17  know at that time if it was malignant or benign.

18  So they were all consulting with each other, and he

19  was going to see his partners and show them the

20  films and so on and so forth.

21  Q  Okay.

22  A  He's -- he's -- I'm sorry.

23  Q  I just want to make sure I understand.  So you said

24      that you had -- you kind of discussed -- and,

25      again, I'll let you do the testifying here,

1   Ms. Gray, obviously.

2       But to me, you discussed that you didn't have

3   any problems of, like, getting up and going to the

4   nurses' station.  Do you -- and, you know, if you

5   had to or -- do you remember testifying to that?

6   A  Yeah.  If my back was sore, I would stand up and

7   take my computer and put it up so I could stand for

8   15 minutes and then go sit back down.

9   Q  And was that ever an issue at all in your mind?

10  A  Never.

11  Q  Okay.

12  A  No.

13  Q  My question is what did you -- if that wasn't an

14  issue, why did we provide this note to defendant

15  then?  Was there a reason why that was --

16  A  Because --

17  Q  -- necessary?

18  A  I'm sorry.  I couldn't hear you.

19  Q  I'm sorry.  And I violated my own rule.  I cut you

20  off.

21      I was just asking -- you had mentioned that

22  you had no issues with -- you know, if you needed

23  to -- your back was sore, you could stand up for

24  15 minutes and then, you know, go back to what you

25  were doing before.

1      And then we started talking about this

2  exhibit, and this is memorializing sort of, like,

3  this standing and repositioning 15-minute --

4  A  Right.

5  Q  -- accommodation.

6      So I guess my question is why did you need to

7  submit a note if you were already able to do that

8  without any issues?

9  A  Well, I -- because I had this tumor now in my

10  sacral bone, and I did not know if it was going to

11  have to be surgically removed.

12      But over the years of my employment, I have

13  given them multiple doctors' notes and, you know,

14  leave papers when I've had surgeries.  So, you

15  know, we require that from our employees.  And I'm

16  no different than any other employee.

17  Q  And so what was -- in what context do you believe

18  this sitting and standing and repositioning

19  yourself -- well, strike that.

20      Did this have anything -- was this also to do

21  with sitting in a car?

22  A  Well, I didn't even think about sitting in a car

23  because it took me 12, 13 minutes to get to Oak

24  Lawn East.  I mean, you know, I -- so that wasn't

25  an issue.

1    He wanted to make sure that, you know, that I

2    knew about this tumor and that it was important

3    because -- not only it's a tumor but because of the

4    pressure on the spinal nerve, that you have to take

5    the pressure off.  And sitting or standing for any,

6    you know, length of time is going to cause pain

7    regardless.

8        And the medication they treat you for was pain

9    medication, Lyrica and things like that.  I would

10   not be able to take it and even drive.  They're

11   extremely sedating.

12   Q  Uh-huh.  Okay.  And so you -- is it accurate that

13   you've never had any issues with being able to sit

14   or reposition yourself at work after 15 minutes?

15       MR. WHITE:  Objection.  Misstates testimony.

16       You can answer.

17   A  I'm sorry.  Could you -- Peter, could you repeat

18   that for me?

19   Q  Oh, sure.  Yeah.  I guess my question simply is you

20   said you had gotten this note just like you had

21   gotten any other doctor note prior if you had a

22   surgery or something like that.  And I asked, you

23   know, whether you experienced any issues with

24   someone letting you stand or reposition yourself

25   after 15 minutes.

1      My question is, is it accurate that you never

2   experienced any issues with someone allowing you to

3   reposition yourself after 15 minutes?

4      MR. WHITE:  Objection to form.

5  A  Um ...

6  Q  I can restate that.  Did anyone ever tell you that

7   you would not be permitted to stand or reposition

8   yourself?

9      MR. WHITE:  Objection to form and foundation.

10      You can answer.

11  A  Well, I explained to Diane when she called me to

12   eliminate my position and she offered me Elk Grove

13   Village.  I said the mileage is not an issue, it's

14   the commute.

15      I lived in Berwyn, and it took me -- when I

16   was the DON in Rolling Meadow [sic],  45 minutes to

17   get there.  I said -- and then I told her, there's

18   no way I could drive to Elk Grove Village going

19   northbound, you know, at that time of the day.  I

20   couldn't do it.  I'd have to get out on the

21   interstate and stand on the side of the road and

22   move around, you know, I don't know how many times.

23  Q  Did you tell her about this -- did you discuss this

24   doctor's note?

25  A  Yeah, I told her.  And I said to her -- and I told

1   her, I said, I just found out that I have a tumor

2   in my sacral bone.  I said, Diane, I don't know if

3   it's benign or if it's malignant.

4       And I made a mistake in the letter I sent to

5   the CEO where it said -- she said, oh, I'm sorry.

6   No, she didn't.  What I meant to say in there is

7   she didn't even say I'm sorry to hear that, I hope

8   everything's okay.  Her comment was, well, I'm

9   offering you this position in Elk Grove Village,

10   you know, you can sleep on it overnight and let me

11   know tomorrow.  And that was her response.

12       And I'm thinking, you're kidding me.  I don't

13   know if I have cancer or don't, and that's the

14   response you're giving me?

15 Q  Do you -- let me pull up Exhibit 4 again really

16   quick.  And if I just go to the top of the first

17   page, which is 587 -- again, we talked about this

18   before, but I'm just trying to -- making sure we're

19   understanding context.

20       Again, when you heard Diane Lube was going to

21   take the job over at Oak Lawn East, you knew your

22   job was going to be eliminated.

23       So when you -- my question to you is when you

24   accepted the nurse educator position with -- under

25   Kelly Cigar, were you worried that at some point --

1   you know, you testified you were in it for a year

2   or more.  Were you worried throughout that year or

3   more when you were a nurse educator that Diane Lube

4   was going to come in and eliminate your position?

5   A  I can't say that I was or wasn't.  I really don't

6   know.

7   Q  Okay.

8   A  I was just thrilled to work with Kelly.

9   Q  So it never -- so you don't -- you can't recall if

10   you -- it ever crossed your mind that that position

11   might be eliminated by Diane Lube?

12   A  No.  I can't say.  I just knew that I wanted to

13   work with Kelly and I got the job.  I was thrilled.

14   Q  Oh, I want to make sure I'm getting -- I'm phrasing

15   it correctly.

16       I guess my question is when you accepted the

17   job, and I understand that you were thrilled about

18   it, was there ever any worry that Diane Lube was

19   going to step in and eliminate this position as

20   well?

21   A  I honestly don't know.  I mean, I'm sure it crossed

22   my mind, you know.  How long is she going to let me

23   do this?  Because that was her MO.  That's what she

24   kept doing.  But I thought if I was with Kelly, it

25   wouldn't be an issue.

1    Q   And why would that be an issue if you were with

2        Kelly -- would not be an issue if you were with

3        Kelly?

4    A   Because I didn't report to Diane Lube anymore.

5    Q   Okay.  And did Kelly, did she discuss with you how

6        long she anticipated you would be in the nurse

7        education position?

8            MR. WHITE:  Objection to foundation.

9    A   Well --

10           MR. WHITE:  You can answer.

11   A   Oh, no. We never had that discussion, and it

12       wasn't -- I didn't just do nurse education there.

13       I was asked -- even though my position was

14       eliminated as a regional nurse, Kelly kept getting

15       e-mails or calls from Diane still requesting that I

16       go to the buildings in the surrounding area to help

17       them out with different duties.

18   Q   And that was -- it was your understanding that

19       Diane was asking you to go do that?

20   A   Oh, I know she was.  She was telling Kelly, I need

21       Liza to go to Palos West and do a drug diversion

22       investigation.  I need her to go to Oak Lawn East

23       and help them with their Joint Commission.

24           So even though she eliminated my position, she

25       still told my supervisor that she wanted me to do

1    these things.

2        And Kelly said she didn't -- you know, she was

3    intimidated by her.  She didn't, you know, feel

4    comfortable questioning her or telling her that she

5    still needed me at the building, and I had to go.

6  Q  Did you ever tell Diane that you disagreed with you

7    still having to leave the building?

8  A  I -- I sent her e-mails regarding questions I had

9    on that, and she would never answer them.

10 Q  What facilities did she have -- well, so would this

11   have been in 2018 you were still traveling to

12   different facilities?

13 A  Oh, yeah.  Yeah.  I went to Palos West -- which

14   took me about, I don't know, 15 minutes to get

15   to -- Palos East, and Oak Lawn West.

16       And I could get to Homewood in 20 minutes

17   because I lived right at the intersection of

18   La Grange Road and 294, and you go against traffic

19   there.  So you can fly down 294 with no problem.

20 Q  And so did you ever go to Elk Grove during this

21   time frame?

22 A  No.  No, because that was not in my region.

23 Q  Oh, okay.  I understand.  I understand.  So during

24   the time frame where Diane Lube was directing Kelly

25   Cigar to have you visit other facilities, were you

1   still limited by the 15 minutes of sitting and

2   repositioning yourself or were you limited -- like,

3   did you have that same sort of restriction as

4   described in the doctor's note during this time?

5       MR. WHITE:  Object to form.

6       You can answer.

7   A  Yeah.  But yeah, I mean, I could sit or stand, but

8   I don't remember if I had gone anywhere during that

9   time.  I know I had gone to Palos West.

10      But I could sit and stand doing some of the

11  things that I needed to do and -- you know,

12  standing now.  And I just did it when it was

13  hurting me.  But I don't recall if or when that

14  was.  I can't tell you when I went to help them

15  with Joint Commission, when I went to Pa- -- Oak

16  Lawn East.  I was going back and forth to these

17  buildings all the time.

18  Q  Did you ever raise with Diane during this time

19  frame issues that -- anything related to a commute?

20  And let me strike that.

21      I am not talking about what you had talked to

22  about in your letter.  Prior to this telephone

23  conversation, did you ever discuss limitations

24  traveling in a car with Diane or express concerns

25  in that regard?

1      MR. WHITE:  Objection to form.

2      You can answer.

3  A  It really had never come up until my back started

4    getting worse, you know, in that spring and I

5    started going for physical therapy.  And then I had

6    to seek, you know, more medical help.

7      So it was on the phone the day she -- we had

8    the conversation about my job being eliminated

9    again.

10 Q  Was that the first time you talked about the

11    commute issue?

12 A  Yeah.

13 Q  Okay.  And so when she called you on the phone,

14    like, the -- is it your under- -- the purpose of

15    her calling you, your understanding is to tell you

16    that your position as a nurse educator was being

17    eliminated?

18 A  Yes.

19 Q  So, I mean, is it safe -- do you agree that the

20    decision was made prior to that conversation?

21      MR. WHITE:  Objection.  Calls for speculation.

22 A  Oh, absolute- --

23      MR. WHITE:  Lacks foundation.

24      You can answer.

25 A  Can you ask me that question again?

1  Q  Sure.  I just wanted -- you had stated that the

2     purpose of the phone call was to inform you that

3     your position was being eliminated.

4  A  Yeah.

5  Q  And my question was, you know, do you believe it's

6     safe to assume or do you believe it's reasonable to

7     assume that the decision wasn't made right then and

8     there on the telephone?

9        Ms. Lube had -- based on your belief, Ms. Lube

10    had made the decision prior to picking up the phone

11    and calling you; right?

12       MR. WHITE:  Objection to form.  Foundation.

13    Calls for speculation.

14       You can answer.

15 A  I don't -- my understanding was that that was the

16    purpose of the call, was that she called me and

17    that was the conversation.

18 Q  Okay.  And I guess my question is -- and, again,

19    your counsel is going to raise objections.

20       And, you know, I'm not asking you to speculate

21    what was actually happening in her mind, but is it

22    your understanding that the decision to -- that

23    your understanding and belief that the decision to

24    eliminate your position was made prior to that

25    telephone call?

1      MR. WHITE:  Objection to foundation.  Calls

2    for speculation.

3  A  I don't know.  I can't answer that.  I just know

4    that was her conversation.

5  Q  You just know what from the conversation?  Did she

6    tell you that she had made the decision?  You

7    know --

8  A  Yes.  Yes, she did.

9  Q  Let's do it this way.  What did -- you referenced

10   the telephone call in your letter.  Tell me

11   everything that was discussed during that telephone

12   call.

13  A  She said, Liza, Diane -- and she made some comments

14   about I was difficult to get ahold of.  I don't

15   know why she said that.

16     I said, why would you say that?  Because I was

17   just in the building on Friday or, you know, the

18   day before.  And I said, well, I must not have been

19   there that day.

20     And she said, well, I just wanted to let you

21   know that I've made the decision and we're going

22   to -- we're going to eliminate your position at Oak

23   Lawn East.  That Jackie, the director of nursing,

24   is doing a phenomenal job and I don't think the

25   building needs your help anymore.  And because of

1  the amount of money that you make, you know, I'm

2  going to eliminate the position.

3      And I said to her, this building is the only

4  building that made budget.  We made over a million

5  dollars, and you're telling me that you can't

6  afford to keep me here?  And I don't recall what

7  her response was.

8      And she said, the only position that's open is

9  in Elk Grove Village.

10     And that's when I told her, I said, I have

11  been to see multiple doctors.  I said, I just found

12  out from my MRI that I have a tumor in my pubic --

13  I mean in my sacral bone.  I said, I don't know if

14  it's benign or if it's cancerous.  And I said,

15  you're telling me that the only position open is in

16  Elk Grove Village?

17     I said, Diane, when you were an administrator

18  and we were all discussing the location -- the

19  regional team, because we all went to the regional

20  Q and A meetings.  I said, we were discussing

21  location, and when somebody wanted it to be up

22  north at Elk Grove Village, all the administrators

23  started -- you know, and I'm being facetious, you

24  know, crying and whining and begging Leslie to not

25  make them drive there because the commute was

1    absolutely insane.

2        And she said, well, you know, I don't -- I

3    don't -- I don't think it's going to take all that

4    long.

5        And I said, well, I lived 14 miles closer to

6    it than that and it took me 45 minutes just to get

7    to Rolling Meadows, which isn't far at all from

8    there.  And that was on a good day.

9        And she just said -- and she didn't -- when I

10   told her about the tumor, she didn't say, oh, I'm

11   sorry.  What I meant is she didn't even give

12   credence to it.  You know, like, I'm sorry to hear

13   that.  Let me know if everything's okay.  Do you

14   need anything?  Nothing.  It's just, you know,

15   well, why don't you sleep on it and let me know

16   tomorrow?

17       And I just -- I was just flabbergasted.  And

18   then I immediately got on the phone and made some

19   other calls.

20 Q  And we can talk about those other calls.  When did

21   this conversation with Diane occur?

22 A  It was -- I believe it was on a Thursday and Kelly

23   Cigar, my boss, was on vacation.  And so that much

24   I know for fact.

25 Q  So you don't know the -- you can't recall?

1    A   Date -- the exact date?  No.  I -- I don't.  I

2        don't remember the exact date.  And I would be

3        speculating, and I don't want to do that.

4    Q   And that's fine.  If you don't recall, you don't

5        recall.  Would it -- is it possible that it was at

6        the end of May 2018?

7    A   Oh, no, no, no, no.  It was in June, when Kelly was

8        on vacation.

9    Q   Okay.  And do you remember what part of June that

10       would have been?

11   A   I believe it was the week around the 18th of June.

12       You know, it was -- it was preceding the 18th.  I

13       don't know why the 18th sticks in my head.

14   Q   Okay.  So if we take a look at ...

15   A   Are you there?

16   Q   Yeah.  I'm sorry.  I'm just trying to get my screen

17       back up.  Okay.  So we had talked about Exhibit 5.

18       Are you seeing that?

19   A   Yes.

20   Q   And if we go up to the top of this exhibit, "Work

21       note for Liza" --

22   A   Liza Gray.

23   Q   Liza.  Sorry, Ms. Gray.  I stopped myself because I

24       realized I mispronounced it.

25           Did you -- did you send this doctor note or

1   provide it to anyone or was this sent by your

2   doctor's office, to your knowledge?

3   A  It was sent by my doctor's office.  And I know -- I

4   remember seeing it because my desk is right next to

5   the fax machine.  And anytime we printed on the fax

6   machine or there were e-mails that came over,

7   everybody sorted through them and put them in

8   people's appropriate box.

9       And I think -- I believe Carol, the

10   receptionist, was there because I was going to hand

11   it to Sharon and I think her door might have been

12   closed.  And I said, would you give this to Carol?

13   This just came over from the doctor's office.

14       And they said they would send something, and

15   then they were going to send another notice if I

16   needed to have surgery.  But anyway, that's all I

17   remember about that.

18   Q  Okay.  Do you know --

19   A  But that's --

20   Q  Did you give this to Diane Lube at any point?

21   A  Did I give it to her?

22   Q  Correct.  Did you give it to her?

23   A  No.  Because I told -- no.

24   Q  So do you know if she knew anything about this

25   doctor's note prior to you telling her that on what

1   you believe to be the 18th of June of 2018?

2       MR. WHITE:  Objection.  Calls for speculation.

3       You can answer.

4   A  I know that I told her that.

5   Q  During the telephone call --

6   A  Yeah.

7   Q  -- that we discussed?

8   A  Yes.

9   Q  And that was the first time you told her about it?

10  A  Yes.  Because I would have no sense to tell her.

11     She wasn't my boss.  It was, you know, Kelly -- for

12     Kelly and for my files.

13  Q  So based on your knowledge of company policy, Diane

14     wouldn't even have been -- well, strike that.

15         Did you -- did you -- at any point, did you

16     assume that this doctor's note that was sent in

17     would be given to Diane?

18       MR. WHITE:  Objection to form and foundation.

19       You can answer.

20  A  I don't know.  I don't know.  I don't think so.  I

21     don't know.

22  Q  So you don't know either way.  So sitting here

23     today, you can't say -- you have no evidence to

24     suggest that she knew anything about this note

25     prior to you telling her during that telephone

1    call?

2        MR. WHITE:  Objection.  Misstates facts.

3    Calls for speculation.

4        You can answer.

5   A  I don't know.  I don't know that she knew or did

6    not know.

7   Q  Okay.  I'm going to put up another exhibit.

8        MR. TSCHANZ:  This is Exhibit 6, Ethan.

9        MR. WHITE:  Okay.  Thanks.

10       (Defendant's Exhibit 6 previously marked.)

11  Q  Okay.  This looks to be -- it's a one-page

12   document.  It looks to be another doctor's note

13   dated 6/12/2018.  Do you see that exhibit?

14  A  Yeah.  Yes.

15  Q  And it says, "To whom it may concern: I have

16   advised that above-named patient to take a medical

17   leave due to her severe medical condition.  If you

18   require more information, please feel free to

19   inform me."

20       So this was after the doctor's note that we

21   just discussed; right?

22  A  Yes.

23  Q  Okay.

24  A  And -- yeah.

25  Q  So what changed between June 6th and June 12th?

1   A  Well, after I wrote the e-mail to the CEO, I got an

2      immediate response.  And Steve Cavanaugh told me

3      that this gentleman, Jeff, would be calling me and

4      he would be sending him out to Chicago to look into

5      all this.

6          And I had called Deb Durham, who is the

7      regional HRD.  I called -- well, I tried calling

8      Kelly first after I got off the phone with Diane.

9      Then I called Deb Durham to find out if she had any

10      knowledge of this, and --

11  Q  Knowledge of what?

12  A  Of her terminating my position.  Because the

13      company policy is that you cannot eliminate a

14      position of employment for any employee that's been

15      with the company longer than five years without the

16      CEO's permission.  And Deb Durham had no knowledge

17      of Diane Lube doing this, so it was not done

18      according to the company policy.

19          So then Jeff called me on the phone after I

20      talked to Deb Durham, and the letter -- the letter

21      went over to the CEO, the e-mail.  And Jeff called

22      me and told me he would be there in the morning.

23      And then when he called me, he said -- you know, I

24      talked to him.

25          And he said, well, you've had, you know, these

1    issues, you've been going for therapy.  And he

2    said, did anybody even offer you an FMLA?

3        I said, no.  I said, I've just been going to

4    my appointments and going to my therapy.

5        He said, well, you are entitled by law to have

6    an FMLA.  And he said -- I'm just letting you know

7    that he said, I will call you tomorrow.  Just give

8    me a chance to get into the building and, you know,

9    see what's happening and going on.

10        And then I believe he was with Deb Durham.

11    She came into Oak Lawn East the next day.  And then

12    at -- at some point -- I can't remember if I went

13    to work the next day or Diane came in that

14    afternoon.  But she came in and had me sign a piece

15    of paper that she was eliminating my position and

16    that there was a position opened in Elk Grove

17    Village if I wanted it.

18  Q  After the conversation on the telephone?

19  A  Yes.  Yes.  And she made me sign it.  I did not get

20    a copy.

21        And anyway, the next -- I believe it was the

22    next day, I think I actually went to work.  But I

23    was so upset and despondent, I couldn't even

24    concentrate.

25        So Jeff told me he was on his way and he said

1   it was fine just to go home and that they would pay

2   me for that workweek, Tuesday and Wednesday and

3   Thursday.  I think it was that Monday I went in and

4   met with Diane and she gave me this piece of paper

5   to sign, and --

6   Q  And I just want to be efficient as possible,

7      Ms. Gray.  I'm just trying to figure out -- because

8      we have a restriction that -- of sitting and

9      standing and repositioning yourselves in the

10      June 6th note, but --

11  A  Right.

12  Q  -- now we have this continuous recommendation for a

13      continuous leave of absence.  It looks like --

14  A  Because --

15      MR. WHITE:  Liza.

16  A  Because --

17      MR. WHITE:  Liza.  Liza, you need to wait for

18      him to ask a question; okay?  Don't cut him off.

19      Let him ask a question.

20  Q  I'm just trying to -- I'm just trying to get a

21      sense of what had changed, you know.  Because you

22      had testified earlier that despite memorializing

23      these restrictions in this doctor's note dated

24      June 6, 2018, you had not experienced pushback

25      regarding, you know, sitting and standing at your

1    desk, that sort of thing.  And now, six days later,

2    we have a recommendation for a -- take a medical

3    leave due to severe medical condition.

4        So, you know, what changed?  Because this

5    reads to me -- and you tell me what you're

6    understanding -- that this is a continuous leave of

7    absence.

8  A  Because that's different -- oh, I'm sorry.  I

9    thought you were done.

10 Q  No, no, no.  Go ahead and answer.

11 A  Oh, okay.  Because Deb Durham and Jeff had gone

12   into the building and, Sunday, called me.

13       And that's when he had told me, he said, Liza,

14   has anybody offered you a medical leave?

15       And I said, no.

16       And he said, well, you're entitled to that and

17   you should have been offered that and you were not.

18   And he said, we want you -- you know, see your

19   doctor.

20       And I was going to have to see her anyway and

21   talk to her about what Dr. DiGianfilippo said about

22   my sacral -- this mass there.  And I said, well,

23   I'll see her and I'll get the paperwork.

24       And that's what changed, is they told me to

25   get the note from the doctor for the FMLA.  And I

1   got it and went to see her, and they told me to do

2   that.  And they said, make sure you get the FMLA

3   paperwork filled out because you're entitled to it

4   and you should have been given it, and then, you

5   know, that they would be in touch.  And that's what

6   I remember about that.

7        And so I went and saw Dr. Nasreen Hamidani,

8   and -- I believe that's who that's from.  I can't

9   see.  She was my -- yeah, she was my attending and

10   she filled out the paperwork.  And she said, just

11   don't work until, you know, they do -- they did

12   some other tests.  They did a CAT scan.  They did

13   the MRI and an EMG, and she said not to work and go

14   on the FMLA.  And that's what I did.

15        And not only was it due to the -- my back, I

16   was in such a severe mental state --

17        MR. TSCHANZ:  Ethan, do you think we need to

18   take another five-minute break?

19        MR. WHITE:  Yeah, that's fine.  We've been

20   going a while too.  Why don't we take another

21   five-minute break.

22        (A brief recess was taken.)

23   BY MR. TSCHANZ:

24   Q  Ms. Gray, we're back on the record.  Do you

25    understand that you're still under oath?

1  A   Yes.

2  Q   Okay.  Are you able to continue on?

3  A   Uh-huh.  Yes.

4  Q   Yes?  Okay.  I'm going to share my screen again.

5      All right.  Can you see the document, page 3 of 4?

6      It says it at the top.

7  A   Yes.

8  Q   Okay.  So then this is Exhibit 4, and we had been

9      discussing Exhibit 12.

10         (Defendant's Exhibit 12 previously marked.)

11 Q   And I just kind of want to the unpackage some of

12     your testimony to see if I can -- because I know we

13     have been uncertain about dates, but I think that

14     we might be able to kind of nail down some of these

15     time lines.

16         So in Exhibit 4 in your letter -- e-mail, as I

17     scroll through here -- okay.  Do you see towards

18     the bottom of this page, says, "Mr. Cavanaugh, I

19     received a call today from Diane Lube telling" you

20     "once again, my job was being eliminated."

21         Do you see that?

22 A   Yes.

23 Q   So did you send this e-mail the day you learned

24     that your nurse educator position would be

25     eliminated?

1  A  Yes.  As soon as I got off the phone --

2  Q  Okay.

3  A  -- with her.

4  Q  Okay.  And then if I'm understanding your

5    testimony, this doctor's note followed that e-mail;

6    is that right?

7  A  From Dr. Hamidani?  Yes.

8  Q  And so your telephone call with Ms. Lube would have

9    to have occurred, at the earliest, on 6/12.  Would

10    you agree with that statement?

11  A  Yeah.  It had to be before that, I guess.

12  Q  Okay.  And how long do you estimate -- after you

13    sent your e-mail, when did you receive a response;

14    do you remember?

15      MR. WHITE:  Objection.  Foundation.

16      You can answer.

17  A  I -- it wasn't very long after I sent it, you know,

18    within maybe an hour.

19  Q  Okay.  And did you have to go to the -- your

20    doctor's office or did you call --

21  A  No, no.  I -- oh, I'm sorry.  I thought you were

22    done.

23  Q  No, you go ahead.  Go ahead.

24  A  No.  I had to see Dr. Hamidani anyway to follow up

25    with her about the MRI and the other scan that the

1    surgeon had ordered.

2  Q  And do you remember when that appointment was?  Was

3    it on the 12th or was it before the 12th?

4  A  I don't know.  I saw her -- I had many visits with

5    her.

6  Q  Okay.  But you would have had to have seen this

7    doctor on or before June 12th?  Is that -- do you

8    agree with that?

9  A  On or before June 12th, yes.

10  Q  Okay.

11  A  And I --

12  Q  And I recognize that -- well, let me just ask you

13    the question.  In Exhibit 5, do you see where it

14    says "Confidential Facsimile Transmittal Sheet"?

15    Do you see --

16  A  Yes.

17  Q  -- that?  Okay.  Did you write any of this?

18  A  No.  That's not my writing.

19  Q  Okay.  And do you see it says June 7, 2018?

20  A  Yes.

21  Q  Okay.  And you didn't write that date; did you?

22  A  No.

23  Q  Okay.

24  A  That's none of my writing.  That's Lori's writing

25    from DiGianfilippo.

1  Q  So do you have any basis to dispute that this fax

2    was sent on June 7th, 2018?

3  A  Wait.  I'm sorry.  Could you repeat that?

4  Q  Sure.  Do you have any basis to suggest that this

5    doctor's note was sent on any date other than

6    June 7th, 2018?

7  A  I don't think so.  Doesn't it say on the top of it

8    when it was received via the fax?

9      "Resend 06-07-18:03:11 p.m."

10      I don't know what that means.

11  Q  So if someone were to tell you that this doctor's

12    note was sent or received by ManorCare on June 7th,

13    2018, would you have any evidence to say that's not

14    true?

15  A  No.

16  Q  Okay.  So is it possible that your meeting,

17    telephone call with Ms. Lube occurred prior to 6/7

18    of 2018?

19      MR. WHITE:  Objection.  Asked and answered.

20  A  No.  It was towards the week of the 18th.  And I --

21    that sticks in my mind because I think the 18th,

22    they put down as my last day that I physically

23    either worked or -- I'd have to have a calendar in

24    front of me.

25      But that may have been a Tuesday that they

1   paid me for, Tuesday, Wednesday, and Thursday.

2   Even though they told Jeff, the corporate HR, told

3   me not to worry about coming into work that week,

4   that I could stay home and they would pay me.

5   Q  Okay.  Well, let's take a look at what's marked

6   Exhibit 7.

7       (Defendant's Exhibit 7 marked.)

8   A  Uh-huh.

9   Q  And I'm just going to ask some just generalized

10   questions about these -- this document.  Does -- at

11   least this first page.  Does this look familiar to

12   you?

13  A  Yes.

14  Q  Okay.  "On June 16th, 2018, we became aware of your

15   need to take a leave of absence."  Did you write

16   that?

17  A  No.  Uh-uh.

18  Q  Okay.  Are these your initials, one or more of

19   these your initials?

20  A  No.  The -- the dates were struck out.  The dates

21   where it says 6/18/18 and 9/10/18, I think, were

22   mine because those -- she told me to fill out the

23   dates that, I think, we counted on the calendar,

24   like, the FMLA weeks.  Because they said it could

25   end sooner than that if I was okay or, you know,

1   not.  If I needed more time, I could take a

2   personal leave.

3       But Sharon, for some reason, I guess, didn't

4   put it in the system.  So that's why we both

5   initialed.  She initialed -- she wrote the 7/13/18

6   and initialed -- that's Sharon Jones.  And then I

7   initialed by -- like, just below that sentence,

8   that's my initial and hers, under 10/11/18.  And

9   that's --

10  Q  Did --

11  A  -- the June 18th is Sharon Jones's writing.

12  Q  Okay.  So do you agree that on June 18th, you were

13     given paperwork to complete?

14  A  Yeah.

15  Q  Okay.  And so were you given a leave of absence

16     paperwork to complete on the day that you had your

17     telephone conference with Diane Lube?

18  A  No.  It was never even brought up with Diane, no.

19  Q  So you're -- so you would agree that your meeting

20     with Diane Lube would have had to occurred before

21     June 18, 2018?

22  A  Yes.  I think it was that Thursday before that,

23     what I thought I recalled.

24  Q  Okay.  And you agree that your meeting with Diane

25     Lube would've had to occurred on or before

1   June 12th; right?

2  A  The day of the meeting would have been the date --

3   we would know for sure if they checked the e-mail

4   that I sent to Steve Cavanaugh.

5  Q  That's fine. And the exhibit that I have in front

6   of me at this point doesn't have a date, so I'm

7   trying to --

8  A  I know.

9  Q  -- get at that, and, you know, it is what it is.

10   But, you know, that's the purpose of our

11   deposition. And plus, I want to get -- the idea is

12   to get your personal knowledge, you know?

13  A  Yes.

14  Q  So you had testified earlier that this doctor's

15   note followed your meeting with Ms. Lube. So the

16   meeting with Ms. Lube would have been -- would have

17   had to occurred prior to June 18th, and it would

18   have had to occur at least as early -- or at least

19   as late as June 12. So do you agree with that

20   statement?

21  A  Yeah.

22  Q  Okay.

23  A  I know I can say that, for certainty, the facts

24   that came from the surgeon, I thought was about

25   two -- a week and a half to two weeks or so before

1      I got the call from Diane Lube, and then I saw

2      Dr. Hamidani.  That, I can say for certain.  The

3      exact date, I can't.

4  Q   You're saying that -- I just want to make sure I

5      understand.  You're saying that the fax -- did you

6      say that the meeting occurred two weeks before

7      this --

8  A   Yeah -- no.  It occurred after the 6 -- this note

9      dated 6/7 from the surgeon.

10 Q   How do you know that for a fact?

11 A   Because I remember that I had given -- you know,

12     that Sharon -- Carol had given it to Sharon to put

13     in my file.  I didn't think it was any big deal.

14     And then a week and a half or two weeks later, I

15     get this call from Diane Lube telling me that she's

16     eliminating my position.

17 Q   Okay.  Quickly going back to your letter -- or

18     e-mail.

19 A   Uh-huh.

20 Q   During this -- you explained to Mr. Cavanaugh --

21     you say, "I cannot help from feel that she is doing

22     exactly what she said she wanted to do, and that

23     was to get rid of me.  I feel singled out and now

24     intimidated by someone."

25         Why did you feel -- why did you believe, at

1    this point, she wanted to get rid of you while you

2    were working as a nurse educator?

3  A  Because of the time that I had to go into her

4    building and she told a couple of people that I was

5    friends with that if she ever became the RDO, that

6    I would be the first one that she would get rid of.

7    And I just felt that this was all part of her plan.

8  Q  So do you feel she made good on that promise?

9  A  I think she got what I think she wanted.

10  Q  And what did she want?

11  A  Well, when I told her I couldn't make that drive

12    because of my back -- I said, there's no way I can

13    do that.  And I said, I can go to any other

14    building around here you need me to and I know they

15    all need help.  You know, they would love for me to

16    come there.

17        And she's like, well, there's not much work

18    out there.  That was her response.

19  Q  And what did you say in response to that?

20  A  I said, I'm sure if you called any administrator or

21    DON and said Liza can come, give you a hand, they

22    would have jumped at the opportunity to have me

23    come to their building and help them.

24  Q  Is that just your belief or do you have any

25    specific documents or evidence to suggest that

1  there was a need that you could have filled?

2  A  No.  I just know that anytime I said I'm available

3  if you need me, they're like, oh, please, come.

4  You know, they're -- they need all the help they

5  can get.

6  Q  What else did you propose as a solution, short of

7  transferring to Elk Grove?

8  A  I just told her, I said, there's no reason why I

9  can't go to the Paloses or Oak Lawn East or even to

10  Homewood, and South Holland takes 22 minutes to get

11  to if there's no traffic.  If there's traffic, then

12  I -- you know, which I've had to do before if

13  there's an accident or something because I go

14  against the flow of traffic because of where I'm

15  located and where my building is, so I was very

16  blessed.  I had to get off the interstate and, you

17  know, just get out of the car and move around.

18      But when you go to Elk Grove Village, you

19  can't just get off on the interstate.  And there's

20  no easy way to get off and then get back on and

21  then get off and then get back on.  I'd have to do

22  that, you know, three or four times to get to Elk

23  Grove.  And I told her that.  And I told her again.

24  And --

25  Q  When you say you "told her again," when did you

1    tell her again?

2  A  Well, I repeated it --

3  Q  Okay.

4  A  -- to her.

5  Q  I got you.

6  A  Sorry.

7  Q  So at the end of your letter, you say, "Please help

8    me stay where I am, at OLE, three days a week as

9    the educator reporting to Kelly Cigar"; is that

10   right?

11 A  Right.

12 Q  Is that what you wanted?

13 A  I wanted to stay and continue working with Kelly in

14   whatever capacity I could.  Technically, I was

15   hoping -- I was hoping to maybe be her assistant.

16 Q  Okay.  And why didn't you reference in your e-mail

17   to him your belief that there were other

18   opportunities at different locations?

19 A  Well, I did that with Jeff, the gentleman he sent

20   to talk to me, because I knew Jeff would be

21   communicating with him.  And when I wrote this, I

22   was in such a bad state of mind.  I just was just

23   beside myself.  And ...

24 Q  And what did you discuss with Jeff?

25 A  I believe he drove in that following day after this

1   went to Mr. Cavanaugh.  Because he replied to me by

2   e-mail that -- by -- and I think I got a call from

3   Jeff saying that Steve had asked him to come into

4   Chicago, and the first thing they're going to do is

5   look at your employee file, you know.  And he and

6   Deb met at Oak Lawn East.

7       And I don't know if they called me that day

8   or -- but he told me, don't worry about coming to

9   work.  He said, we'll pay you for your three days

10   off, you know, your three days that you normally

11   work.  And he told me, he said, has anybody offered

12   you an FMLA?  Did Diane offer you anything?

13       And I said, no.

14       And he said, you are absolutely entitled to

15   that.  And he said -- not only that, he said they

16   were in the process of selling South Holland.

17   So -- or Homewood, one of the two.  So those

18   buildings -- oh, it was South Holland -- that

19   wouldn't have been an option.  Which would have

20   been fine anyway because I couldn't have gone

21   there.

22       But I told him, I said, I could go to the

23   other buildings, you know.  And ...

24   Q  And what did he say to that?

25   A  And he said, okay.  You know, because I said the

1   ride's not far.  You know, they're all within 15,

2   20 minutes of me and I said I can do that.

3       And he took my information and, you know, they

4   all spoke, and I also called Diane Lube's boss.

5   And I think I called him the day she called me to

6   terminate -- you know, terminate my position.

7       And he said, you know, well, she's now stepped

8   into the RDO role and they're making cuts and

9   basically it was what it was.

10  Q  What do you mean they were "making cuts"?

11  A  They were making cuts, cutting staff.

12      And so I said --

13  Q  So wait.  Were you a part of that reduction in

14   staff?

15      MR. WHITE:  Objection.  Calls for speculation.

16  A  Yeah.

17  Q  Is it your understanding that you were part of that

18   reduction in staff?

19  A  Well, I could have been.

20      But as I said to him, I said, our policy in

21   the company has always been when you do a reduction

22   in staff, it's done by seniority and I've been with

23   this company for 25 years.

24      And, you know, I don't recall what his

25   response was.

1  Q  Okay.  And then if you look back to -- quick back

2    to Exhibit 7, we were just talking about your

3    request for leave.  And at the bottom of the page

4    marked 718, is that your signature?

5  A  Yup.  Mine and Sharon's.

6  Q  And then -- and my apologies.  It's a little bit

7    out of order.  It happens with certain documents.

8    Because you can see page 3, page -- and then it

9    goes to page 2.

10      So beginning on 723 at the bottom, that Bates

11    range, we see the amount of leave needed.  I take

12    it you didn't complete this; correct?

13  A  No.  That's Noelle Wocasick's writing.  And on one

14    of those, I did put the date that they gave me the

15    paper because they said -- whatever they told me

16    the portion I fill out, I filled out.

17      And then the doctor's assistants filled out

18    the other portion of it, where it says, "patient is

19    unable to work" due to "lesion in sacrum surgery to

20    follow once determination" -- da da da.

21  Q  Okay.  So here it says, "Will the employee be

22    incapacitated for a single continuous period of

23    time?"  And do you see where it's marked "yes"?

24  A  Yeah.

25  Q  And then it says the estimated beginning and ending

1   dates of the capacity [sic], 6/18 of 2018.  And I

2   don't see a second date, but do you see that?

3  A  Yes.

4  Q  Okay.  And then --

5  A  They don't -- they don't know.

6  Q  I know.  And then they ask -- the form asks if

7   there's going to be follow-up treatment.  Do you

8   see it says "yes"?

9  A  Uh-huh.

10  Q  If so, reduce number of hours medically necessary.

11   Again, it says "yes."  And then right under here,

12   it says "unable to work at this time."

13  A  Right.

14  Q  Do you agree with that?

15  A  Well, at that point in time, I was so emotionally

16   distraught I couldn't hold it together.  I almost

17   had a nervous breakdown from this.

18  Q  Okay.  So --

19  A  And the doctor -- the doctor did not want me in

20   that environment, around her.

21  Q  Where in this document -- do you know anywhere in

22   this document that talks about your emotional

23   condition?

24  A  No.  But I'm sure it's in the doctor's progress

25   notes.

1  Q  Well, do you agree there's nothing of the sort in

2     this document?  And I'm happy to scroll through it

3     as much as ...

4  A  No.  Because the severe pain that was causing, you

5     know, the need to sit and stand was -- the primary

6     diagnosis was this mass.

7  Q  So had you never had a conversation about the

8     elimination of your nurse educator position, do you

9     believe you'd still have to have gone on a leave of

10    absence?

11 A  Peter, could you repeat that?

12 Q  Sure.  Had your -- and, again, I understand that

13    this is not what happened, but I'm asking you for

14    your belief.

15       Do you believe, even if your nurse educator

16    position had not been eliminated, you would have

17    still had to have gone out on a leave of absence?

18 A  Well, I really can't say that.  I mean, because of

19    the mass, until they determined what it was, I

20    can't answer that, you know, because I don't

21    remember at that point in time.

22       I just know that I probably would have had to

23    take some time off to get it back together because

24    I absolutely was psychologically and emotionally

25    distraught over this, and I don't know when I could

1    have returned.  In spite of the physical issues

2    that I was having, it was the emotional, that

3    was -- that, to me, was worse.

4  Q  Okay.  Do you see what's been marked as -- this has

5    been marked as Exhibit 8.

6        (Defendant's Exhibit 8 previously marked.)

7  Q  Do you see this document?

8  A  Yeah.

9  Q  Okay.  And the first page, is this -- are you

10    familiar with this first page of this form,

11    "Non-FMLA Request for Leave of Absence"?

12  A  I seen that, yeah, for -- for personal leave, I

13    think.  I believe.  I don't know.  It's been a

14    while since I seen this.

15  Q  Okay.  Do you see "On 10/1/18, the company became

16    aware of your need to take a leave of absence"?  Do

17    you see that?

18  A  Yeah.

19  Q  You didn't write that date; did you?

20  A  No.

21  Q  Okay.

22  A  I don't know whose writing --

23  Q  And these dates --

24  A  I don't know whose writing that is.  It looks like

25    it might be Sharon's.  Mine's not that --

```
 1        MR. WHITE:  Liza.  Liza, nobody wants you to
 2     guess; okay?  Just answer his questions.
 3   Q  Did you write your name there, "Employee"?
 4   A  No.
 5   Q  Okay.  Is that your signature?
 6   A  Yes.
 7   Q  Okay.  So do you agree that you received an FMLA
 8     leave of absence after June 18th, 2018, up until
 9     this request for a personal leave on October 1st,
10     2018?
11   A  Yes.
12   Q  Okay.  So you didn't work at all between June 18th
13     of 2018 and the date of this designation form; is
14     that right?
15   A  No, right.
16   Q  Okay.  And you signed this on 10/16?
17   A  Yes.
18   Q  And same sort of question again.  Is this your
19     signature?
20   A  Yes.
21   Q  Okay.  Now, again, you didn't write any of this,
22     begin date, end date; right?
23   A  It's hard for me to see it.  Hang on.
24   Q  Sure.  And I'll make it bigger.
25   A  Oh.  Oh, okay.
```

1  Q  Do you see my cursor?

2  A  Yes.

3  Q  Okay.  So, like, 3/18 and then end date, you didn't

4     write that; did you?

5  A  No.

6  Q  Okay.

7  A  That's -- okay.  Nevermind.

8  Q  Well, go ahead.  Do you know who wrote that?

9  A  Yeah.  That was Noelle Wocasick, the doctor's

10    assistant.  I know her writing.

11  Q  Okay.  And do you agree that in your request for

12    this personal leave, it was noted that your return

13    to work was undetermined at that time?  Do you

14    agree with that statement?

15  A  Could you repeat that question again?

16  Q  Sure.  So based on -- it says based on the medical

17    history and knowledge of medical condition, you

18    know, what's the frequency of flare-ups in related

19    incapacity?  And then also up in that section A, it

20    does not give an end date.

21  A  Right.

22  Q  And then under -- in section F, it says

23    "undetermined at this time."  So do you agree that

24    your request for personal leave did not provide a

25    definitive return to work date?

1 A  Correct.  For ManorCare, yes.

2 Q  And when you submitted this request for personal

3   leave in October, did you -- at the time you filled

4   out the forms that we just talked about here where

5   you signed, did you have any idea of when you would

6   be able to return?

7 A  Well, I believe it was Deb that I was talking to,

8   or they said --

9 Q  I just want to make sure you understand my

10   question.  I'm just saying when you submitted a

11   request for personal leave, did you have any idea

12   when you would be able to return to work or did you

13   just -- could you not predict when you would return

14   to work?

15 A  It's a hard question for me to answer because I

16   don't know.

17 Q  Well, that's actually -- that's what I'm asking.

18   Did you know whether -- did you know a date or time

19   frame you would be able to return to work or did

20   you -- could you not have predicted that?  That's

21   just all I'm asking.

22 A  I couldn't predict that.

23 Q  Okay.  And do you see under "Ability to Work"?

24 A  Yeah.

25 Q  And it asks for disability dates, and it says

1    June 16th of 2018 to undetermined.

2  A   Right.

3  Q   Do you agree or disagree with that?

4  A   I think at that time that was correct because we

5    didn't know.

6  Q   Okay.  And up towards the top of this exhibit, the

7    first page -- I said -- I apologize.  I said first

8    page and I just kept scrolling.  I'm actually

9    referring to personal leave.  Do you see up here,

10    it's checked, personal leave?

11  A   Yes.

12  Q   And do you see that it says "does not guarantee

13    reinstatement"?

14  A   Yeah.

15  Q   Is it your understanding of the HCR ManorCare

16    policy that personal leave -- merely a pending of a

17    personal leave of absence doesn't guarantee the

18    right to reinstatement after that leave is over?

19  A   Well, based on the history of the company, they did

20    not follow that policy.

21  Q   What policy?

22  A   We've had people on personal leave for years if you

23    look at the six pack reports.

24  Q   So what policy says that the company will keep

25    somebody on personal leave for years?

1   A   Well, it doesn't.  But that's what they've done.

2   Q   But the policy itself, based on your recollection,

3       is that a personal leave does not guarantee

4       reinstatement?  Is that a safe --

5           MR. WHITE:  Objection.

6   A   Yeah.

7           MR. WHITE:  Misstates prior testimony.

8   Q   You can answer.

9   A   Oh, I thought I did.  Yes, that's what's on their

10      form.

11  Q   Okay.  So based on these two exhibits, the FMLA

12      request and the personal leave request, do you

13      agree that you represented to HCR ManorCare that

14      you had been unable to work, return to work, since

15      June 16th, 2018?  Strike that question.

16          The question that I'm asking is do you agree

17      that in submitting Exhibit 8 and Exhibit 7, which

18      is the personal leave and the FMLA leave, you had

19      represented to the company that you could not work

20      in any capacity?

21          MR. WHITE:  Object to form.

22          You can answer.

23  A   I believe I filled out the personal leave because

24      Jeff and Deb told me I could do that and it would

25      continue my benefits.

1  Q  My question simply is by completing exhibits -- by

2     submitting a request for FMLA leave and submitting

3     a subsequent personal leave, do you agree that you

4     represented to HCR ManorCare that you were unable

5     to return -- well, first of all, in requesting the

6     FMLA leave, my question is do you agree that you

7     had represented that you needed FMLA because you

8     could not work?

9         MR. WHITE:  Object to form.

10 A  The FMLA is when I could not work.  The personal

11    leave is a different matter.

12 Q  Okay.  Well, then, let's talk about that real quick

13    because ...

14 A  Okay.

15 Q  Do you see where it's marked "reason for the

16    employee's own non-work-related serious health

17    condition that makes the employee unable to perform

18    the functions of the employee's position"?  Should

19    that not have been --

20 A  Well, is that for the FMLA or the personal leave?

21    I'm confused as to which form.

22 Q  This is "Non-FMLA Leave of Absence Request Form."

23 A  Oh, okay.  And when was this one dated?

24 Q  October of -- this is Exhibit 8.  Your signature

25    appears here --

1   A   Okay.

2   Q   -- October 16th, 2018.

3   A   So I probably was not able to work.

4   Q   Okay.  So, Ms. Gray, at some point, you applied for

5       Social Security Disability benefits; is that right?

6   A   That was in 2019 of July.

7   Q   Okay.  Do you see what I've marked as Exhibit 9?

8           (Defendant's Exhibit 9 previously marked.)

9   Q   Do you see it says "Social Security

10      Administration"?

11  A   Yes.

12  Q   Okay.  And your lawyer produced this to us, hence

13      Gray000601.

14  A   Uh-huh.

15  Q   And are you currently receiving Social Security

16      Disability benefits?

17  A   I am.

18  Q   Okay.  And it says here -- and I recognize you

19      didn't author this document.  It says, "We found

20      that you became disabled under our rules on

21      February 1st, 2019."

22  A   Uh-huh.

23  Q   Now, do you see that, Ms. Gray?

24  A   I see it.

25  Q   Okay.  And so it's accurate -- and I believe you

1    testified to this earlier, but I'll ask it again.

2    Your employment ended with the defendant on

3    December 31st, 2018; is that right?

4  A   Yes.  Because they said they could not continue my

5    leave.

6  Q   Okay.  Do you -- do you have any understanding or

7    idea of what the significance of this February 1st,

8    2019, date is?

9  A   Well, I was in -- I guess, could you rephrase the

10    question?

11 Q   Sure.  So it says in this paperwork, "We found that

12    you became disabled under our rules on

13    February 1st, 2019."  Do you see that?

14 A   Uh-huh.  Yes.

15 Q   And to receive Social Security Disability benefits,

16    you would have had to apply for them; right?

17 A   Yes.  But I did not do that until July of 2019.

18 Q   Okay.  And to apply for benefits, do you agree you

19    would have had to provide the Social Security

20    Administration with information about why you need

21    the benefits?

22 A   Yes.

23 Q   And in the document you produced, the Social

24    Security Disability Administration determined that,

25    based on your application, you became disabled

1    under the administrative rules on February 1, 2019,

2    roughly a month after your termination.

3         Do you know what the significance of

4    February 1st, 2019, is?  Was there some change in

5    your condition or was there -- your interrogatory

6    responses reference a car accident.  Is there some

7    reason why the -- in your mind, that the Social

8    Security Disability Administration found you

9    disabled effective February 1st, 2019?

10  A  Yes.  I was rear-ended in an automobile accident

11   and required extensive surgery on my neck, and then

12   they had to wait until that healed.  And then in

13   August, they had to do surgery to correct my lower

14   back from the accident.

15        So I was actively looking for employment,

16   something I could do at home, and was getting

17   Social Security -- I mean, unemployment, see if

18   there was something I could do like I was doing at

19   ManorCare where I could sit and stand and -- but --

20  Q  My question is, was the car accident -- did the car

21   accident happen on February 1st, 2019?

22  A  Yes.  Uh-huh.

23  Q  Okay.  All right.  Because I think your

24   interrogatory responses mentioned it happening in

25   July, but I think that might just be a

1    misunderstanding.

2  A  Yeah, no.  Uh-huh.

3  Q  And you are currently receiving total Social

4    Security Disability payments; correct?

5  A  Yes.  And that amount has -- it's not any longer

6    2,400.  It's 2,200 and something.

7  Q  So you would agree that you have been totally

8    unable to work in any capacity after February 1st,

9    2019?

10  A  I would have to say, I think, yes because I can't

11    work right now.

12  Q  I guess I'm curious, how were you receiving

13    employment benefits when you had not been

14    terminated?  Because you applied for unemployment

15    benefits, but you were still employed by HCR until

16    December 31st --

17  A  Yes.

18  Q  -- 2018.

19  A  Yes.

20  Q  Did the unemployment office know that?

21  A  Yes, they did.  As a matter of fact, it was Jeff,

22    the corporate -- the corporate human resource

23    director, and Deb Durham, the regional HCR

24    director, who both told me when they told me that I

25    should have been given an FMLA or offered one, that

1   they wanted me to also apply for unemployment and

2   that they would not dispute it so that I was

3   receiving some pay, and I started getting it.  And

4   then I got a letter in the mail that then there was

5   a dispute.

6       So I called Sharon Jones, the human resource

7   director at the building, and she said when Diane

8   Lube found out about it, she told them no way.  And

9   she sent an e-mail to her and Kelly and said that

10   they were to fight it.

11       So I called Jeff and I let him know and I let

12   Deb know, and I had a hearing with unemployment and

13   I was -- told them exactly what happened with her

14   and the circumstances and that I had to take the

15   FMLA and -- because I was able to take that due to

16   my physical condition, and they said that they

17   agreed with me and they paid my unemployment.  And

18   I filed the claim with EEOC too.

19 Q  Okay.  So you did receive unemployment benefits and

20   that continued despite going to the hearing?

21 A  Yes.  Yup.

22 Q  All right.

23 A  That's when I was entitled to it.

24 Q  All right.  Let's take a look at Exhibit 10.

25       (Defendant's Exhibit 10 previously marked.)

1      MR. TSCHANZ:  Ethan, I'm trying to move along

2    as quickly and efficiently as I can here.

3      MR. WHITE:  Sure.  Sounds good.

4  Q  All right.  This document familiar to you,

5    Ms. Gray?

6  A  I don't -- I don't know if I've seen it or not seen

7    it.  I don't remember.

8  Q  Okay.  Well, let's look down here, "charging party

9    signature."  Is that your signature?

10  A  Yes.

11  Q  And dated 3/6/2019?

12  A  Uh-huh.

13  Q  All right.  Is this the charge of discrimination

14    you filed?

15  A  Yes.

16  Q  With the EEOC?

17  A  Yes.

18  Q  Okay.  And did you -- did you -- do you see in this

19    field, it says "The Particulars Are" -- and then 1,

20    2, 3, 4, 5, 6, 7, 8, 9 are paragraphs, 10

21    paragraphs.  Do you see that?

22  A  Yes, sir.

23  Q  Did you type that information in?

24  A  Did I?  No.  I had nothing to do with that.

25  Q  Oh.  Who did?

1  A  It had to be the person from EEOC.

2  Q  Okay.  And you had not retained Mr. White at the

3     time that you filed this; right?

4        MR. WHITE:  Objection.  Asked and answered.

5        MR. TSCHANZ:  Did I?

6        You can still answer.

7  A  I don't remember.  I just know I filled this out

8     and they called me about it.  EEOC called me and

9     told me I had a case, and that's when I decided to

10    seek my attorney.

11 Q  So in paragraph 3, you say, "On or about June 6,

12    2018, I notified Respondent about my disability via

13    a note from my physician noting that I could not

14    sit for long intervals and should stand regularly,

15    but not for extended periods of time."

16       Do you see that?

17 A  Yes.

18 Q  Okay.  Were you referring to the ...

19 A  To the doctor's note that they had sent.

20 Q  This June 6th doctor's note?

21 A  Yeah, that they had sent.

22 Q  Okay.  And despite your disability, you say, "at

23    all relevant times, I could perform the essential

24    functions of my job with or without reasonable

25    accommodations.  On or about June 18, 2018, my

1    direct supervisor told me that my position was

2    being eliminated and proposed a transfer to a new

3    position."

4        Now, we've already determined that that's not

5    accurate; right?  June 18, 2018, is when you

6    submitted your leave paperwork.

7  A  Well, that, I believe, was the Tuesday when -- or

8    the following week after I had the conversation

9    with Diane, and Jeff told me and Deb told me to

10    fill out the paperwork with Sharon.

11  Q  So this doctor's note followed that conversation

12    with Ms. Lube and it's dated 6/12/2018.  Is that

13    inaccurate, in your opinion?

14  A  After my conver- -- what do you mean?  You mean

15    Dr. Hamidani's note?

16  Q  Earlier in your deposition, I asked you about what

17    had changed from this doctor's note that talked

18    about your restrictions on the 6th, and then this

19    doctor's note on the 12th talked about your need to

20    take FMLA leave.  And you said that you had a

21    discussion with Jeff and he told you that you could

22    take FMLA.

23  A  Yeah.

24  Q  And so this doctor's note -- earlier in your

25    deposition, you testified that this doctor's note

1    followed your conversation with Deb [sic] Lube;

2    right?

3  A  Yes, I believe it did.

4  Q  Okay.  So then your conversation with Deb Lube

5    could not have happened on June 18, 2018; right?

6  A  You mean with Diane Lube?

7  Q  Oh, yes, Diane Lube.  Sorry.

8  A  No.  It happened -- that's why I said before --

9    earlier, I believe I said it was sometime preceding

10    that.  I don't remember if it was the Thursday

11    before -- I believe the 18th of June, and 18 was on

12    a Tuesday.

13  Q  Okay.

14  A  But I don't know.

15  Q  That's fine.  And then you say, "At that time, my

16    supervisor was aware of my disability and knew my

17    disability would impact my ability to perform in

18    the new position."

19  A  Right.

20  Q  And your telephone conversation -- well, what

21    disability are you referring to here?

22  A  Well, it's talking about the inability to sit for

23    45 minutes or an hour or an hour and a half to get

24    to a location on an interstate.

25  Q  That's what you are talking about when you say your

1  disability?

2  A  Yes.  Yes.  Yes.

3  Q  And the first time you discussed your inability to

4  sit for 45 minutes at a time or otherwise unable to

5  make the commute to Elk Grove was on the day she

6  informed you -- called you to inform you that your

7  position was being eliminated; right?

8  A  Yeah.  Well, I might have had some conversation

9  with Sharon Jones about -- you know, because I

10  was -- we all were friends, talked about --

11  Q  I'm talking about -- you specifically state that

12  your supervisor was aware.  And earlier in your

13  deposition, you say that the first time you

14  discussed this 45-minute restriction --

15  A  Yeah.

16  Q  -- inability to commute was on -- during the

17  conversation where she called you to tell you that

18  your position was being eliminated?

19  A  Yeah.

20  Q  Okay.  Irrespective of who else you talked about,

21  do you have any evidence or documents to suggest

22  that she was aware of this

23  45-minute-inability-to-sit issue prior to calling

24  you?

25      MR. WHITE:  Objection.  Asked and answered.

1  A  Yeah.  You asked me that earlier.

2  Q  And --

3  A  I'm not --

4  Q  Just to clarify, Ms. Gray, your lawyer is just

5     building a record.  So you still have to answer the

6     question unless he specifically instructs you not

7     to answer.

8  A  Oh, okay.

9         MR. WHITE:  I think she's trying to do so.

10 A  Okay.  So, Peter --

11 Q  Do you need me to ask it again?

12 A  No.  I don't know if she knew that or not.  I don't

13    know if anybody said anything to her.  I have no

14    way of knowing that.

15        I just know I told her the day of the

16    conversation, and that I had gotten -- you know,

17    seen the surgeon, gotten a letter so they could put

18    it in my file, and was going to be seeing, you

19    know, the other -- the pain doctor and blah, blah,

20    blah, whatever my plan was.

21 Q  Okay.  That answered my question.

22 A  Okay.

23 Q  Next up is, "At the time, my supervisor" -- sorry.

24    We just talked about that.

25        Paragraph 7, "However despite my attempt to

1    engage in the interactive process at that time,

2    Respondent, through my supervisor, refused to do so

3    and refused to even discuss a reasonable

4    accommodation."

5        Are you referring to Ms. Lube there?

6  A  Yeah.

7  Q  How did she refuse to discuss reasonable

8    accommodation with you?

9  A  Because I said to her, I cannot sit longer than 10

10   or 15 minutes without being in excruciating pain

11   and I need to stand up.  I cannot make that kind of

12   a drive.  I said it's impossible.

13 Q  Okay.  And --

14 A  And her response -- her response was that -- well,

15   you've got -- you know, think about it.  Sleep on

16   it tonight and let me know tomorrow.

17       That was the response.

18 Q  Didn't you also ask her about other employment

19   opportunities?

20 A  I did.

21 Q  Other than the location --

22 A  Yes, I did.  I'm sorry.  I did.

23 Q  No, that's fine.  And anything -- any other

24   solution that you proposed to Ms. Lube?

25 A  Yes.  I said I could go right down the street to

1   Oak Lawn East and help them or go to the Paloses.

2   That takes --

3 Q  We already talked about that.  Yeah, we talked

4   about that.  And I just want to be efficient as

5   possible, Ms. Gray.  I didn't want to cut you off,

6   but we talked about that.  I'm asking if there's

7   anything else.  Did, you know --

8 A  Oh, besides that.  No.  I mean, not that I'm aware

9   of.  That's all I can honestly remember.

10 Q  And then you also asked in your letter to

11   Mr. Cavanaugh that you remain working with Kelly

12   Cigar; is that right?

13 A  Yeah.  That was my hope, that I could stay with

14   her.

15 Q  Any other discussions with anyone about what you

16   felt would be an appropriate accommodation?

17 A  Yes, with Deb and with Jeff.

18 Q  Okay.  And --

19 A  The corporate agent.

20 Q  Let's talk about both of them.  And we may have

21   already discussed this a little bit, but Jeff --

22   well, I'll give you the floor again.  What

23   specifically did you discuss with Deb and Jeff

24   about accommodations?

25 A  Okay.  I'm sorry.  I've got to stand up --

1  Q  No, that's fine.

2  A  -- and move around.

3  Q  Absolutely.

4  A  What I talked to him about was that when -- you

5     know, my discussion with Diane Lube and that it

6     would be -- I would be able to go to four of the

7     other buildings to help them and continue to work

8     like I had been working as I was going to therapy

9     and seeing these doctors until I found out if

10    anything -- I had to have any surgery or, you know,

11    what this tumor actually was.  And I talked to both

12    of them about that.

13        And I know Jeff did respond that they were

14    selling two of the buildings.  One was Naperville,

15    which was not in my region anyway, and the other

16    was South Holland.  And he said under the sales

17    agreement, they can't hire anybody.  And then I

18    just said, no, I mean, just go to help them out,

19    you know, not to hire me or be on my payroll

20    because I could be on anybody's payroll, you know.

21        But it's the -- they reallocate hours and

22    money.  And that was -- he said he would look into

23    it and let me know if anything came up.

24  Q  So he explained to you that -- I mean, was it a

25    budgetary thing?  Like, I'm trying to understand

1   what he was trying to convey to you that it was

2   just not in the budget to ...

3   A   No.  He just said that South Holland was not in the

4   cards, so to speak, not a building that they would

5   be able to send me to because they were in the

6   midst of a sale.

7   Q   Okay.

8   A   And Homewood -- I said I can go to Homewood.  That

9   only takes me, you know -- I don't know.  It takes

10   me under 20 minutes to get there.  And Oak Lawn

11   West, it takes me about 12 minutes.  Oak Lawn East

12   takes me about 13 minutes, and the two Palos

13   buildings I could have went to.

14   Q   And you're -- and that's -- what evidence do you

15   have to support your belief that you could've --

16   that your help was needed?  That's what, I guess,

17   I'm asking.  Is that your assumption or ...

18       MR. WHITE:  Objection.

19   A   Yeah.

20       MR. WHITE:  Asked and answered.

21   A   I just know that he was going to try to look to see

22   if there was something else out there.  I think he

23   was looking for something more permanent and my

24   concern was financial.  And I'm like, I can go to

25   any of these buildings and help them out right now.

1   Q   Okay.  So did he ever follow back up with you to

2       say there was or wasn't opportunities available?

3   A   I think I talked to him once and he said that

4       nothing had opened up.  So once again, I think he

5       was talking about something permanent.

6   Q   Did you ask to clarify that, what he meant by that?

7   A   I don't recall.

8   Q   Okay.  What about anything else that you discussed

9       with Jeff in terms of accommodations?

10  A   Just that I was able to do the job that I was doing

11      because it allowed me the freedom to sit and stand

12      whenever I needed to.

13  Q   And --

14  A   All the jobs that I did allowed me to do that.

15  Q   So was your concern solely to do with the commute?

16  A   Yeah.  Because I knew I was in too much pain to sit

17      that long.  I couldn't to it.

18  Q   So I guess my question is did you think that you

19      would not have been able to sit or stand while

20      stationed at the Elk Grove facility or was it --

21      and I think you just answered this -- or was it

22      simply, it was the commute, that was the problem?

23  A   It was the commute.

24  Q   Okay.  How about Debra Durham?

25  A   What about her?  Did I talk to her?

1   Q   Well, you had mentioned that -- I asked who else

2       you talked about the accommodation -- the request

3       for accommodation with, and I think you mentioned

4       Jeff and, I believe, Debra Durham.

5   A   Yes.  Well, I think Deb -- I think Deb wanted to

6       help me as much as she could.  But I think -- I

7       think in all honesty, that she didn't have any

8       recourse at all.

9   Q   What did you discuss with her specifically?

10  A   I talked to Deb quite a bit.

11  Q   And I'm asking you what did you discuss with her

12      specifically about the accommodation process?

13  A   Oh.  Just -- I talked about how, you know, that I

14      would not be able to sit in my car and about -- you

15      know, she was upset for me.  She was worried about

16      me because of this tumor and she just -- she was

17      just flabbergasted by the way the whole process

18      went.  And, you know, she knew that I could go to

19      the other buildings and to help out.  So it wasn't

20      her decision to make.

21  Q   Anybody else you reached out to in -- as a means of

22      trying to get an accommodation for your disability?

23  A   I spoke to just the people that we talked about.

24      Steve Cavanaugh with the letter.  I talked to Rami,

25      Diane Lube's boss.  I texted Kelly Cigar back and

1    forth when she was on vacation when I found out

2    about my job being eliminated.  She said she knew

3    nothing about it and she was my boss.  I told her

4    about the tumor, you know.  I don't know.  And --

5        MR. TSCHANZ:  Okay.

6        How about we do this, Ethan?

7        MR. WHITE:  Yeah?

8        MR. TSCHANZ:  I think -- and I think that --

9    correct me if I'm wrong, Ms. Gray, maybe you want

10    to take a short break.

11        I can tell you right now, Ethan, I'm going to

12    kind of finish up with the charge.  I want to talk

13    about the complaint a little bit, and I don't know

14    if I'm going to have too, too much after that.

15        I'm not sure what you have in store here, but

16    I think maybe it makes sense to take a, you know, a

17    ten-minute break, maybe, and kind of reconvene.

18    Does that work?

19        MR. WHITE:  That's fine for me.

20        (A brief recess was taken.)

21    BY MR. TSCHANZ:

22    Q  All right.  Ms. Gray, we're back on the record.  Do

23     you still understand that you're under oath and

24     obligated to provide truthful testimony?

25    A  Yes.

1  Q  Okay.  Prior to going on the record, you had

2     mentioned that you wanted to offer some

3     clarification around when you retained Mr. White as

4     your counsel.  Again, I don't want to know anything

5     about conversations, but if you -- go ahead and

6     offer that clarification, and then we can move on.

7  A  Yes.  You asked me about when I had retained him.

8     I think if it was before or after the EEOC paper,

9     then it was before that.

10 Q  Okay.

11 A  That's all.

12 Q  Thank you.

13        So prior to our break, Ms. Gray, we had been

14     talking about other individuals that you had

15     conversations with about reasonable accommodations.

16     And there's a specific interrogatory that sheds

17     some additional light, that response that I'm going

18     to ask you about.  So we can come back to that.

19        If we can go back to this exhibit, I'm going

20     to share my screen again.  Okay.  Do you see

21     paragraph 8?  It says, "Thereafter, on or about

22     June 21, 2018, Respondent terminated my

23     employment"?

24 A  Yes.

25 Q  Earlier on in the deposition, you agreed that your

1    termination actually occurred on or about

2    December 31st, 2018, or January 1st, 2019.  I'm

3    curious where -- what is the significance of that

4    June 21st, 2018, date?

5  A  Because that was the last date that I was employed

6    in that position.  They eliminated my position.

7  Q  Oh, okay.  So --

8  A  I was no longer employed as far as I knew.

9  Q  Okay.  And then paragraph 9, you say, "The reasons

10    given to me were pretext for Respondent's true

11    reasons for my termination -- namely my disability

12    and in retaliation for my seeking to engage in the

13    interactive process"; is that right?

14        Well, let me strike that question and I'll

15    make it a little more streamlined and simple.

16        So in the "Discrimination Based On" fields of

17    your charge, you had clicked the "Retaliation"

18    field; right?

19  A  Yes.

20  Q  Okay.  And then you also clicked or authorized on

21    your behalf to be clicked the "Disability"

22    discrimination field; right?

23  A  Yes.

24  Q  And you didn't identify any other basis for the

25    claims that you're bringing in this charge; is that

1    right?

2    A   Correct.

3    Q   Okay.  And, again -- and you signed this, is it

4        accurate, 3/6/2019?

5    A   Yeah.

6    Q   Okay.  And this is a right to sue notice as issued

7        from the United States Equal Employment Opportunity

8        Division.  Have you seen this document?

9    A   You know, I don't know if I saw it or not.

10   Q   Okay.  And --

11   A   Oh, I believe I did.  Because it said "Right to

12       Sue," and I got a phone call from the EEOC person

13       telling me that I had a right to sue the company.

14   Q   Do you know when you would have received this

15       document?

16   A   I don't.  I don't remember.

17   Q   Would it have been around March 4th, 2020?

18   A   I don't know.

19   Q   Okay.  All right.  I'm showing you what's been --

20       and that was -- Right to Sue Notice that we just

21       discussed is Exhibit 11, marked as Exhibit 11.

22           (Defendant's Exhibit 11 previously marked.)

23   Q   And now I'm showing you what's been marked as

24       Exhibit 12.  And I'll represent to you this is the

25       judicial complaint that you filed in the United

1    States District Court for the Northern District of

2    Illinois Eastern Division underlying this lawsuit.

3        Have you seen this document before, ma'am?

4  A   Yes.

5  Q   Okay.  Do you see where it says "Legal Claims,

6    Count I"?

7  A   Yes.

8  Q   Do you agree that you're bringing a claim for

9    discrimination in violation of the Americans with

10    Disabilities Act?

11  A   Yes.

12  Q   I apologize.  Give me one second.  I lost my place.

13    Okay.  All right.  I think we discussed this in

14    broad terms, but I'm -- I want to make sure that

15    it's clear on the record.

16        You're bringing a claim for disability

17    discrimination.  What is the nature of your

18    disability that you allege is at issue in this

19    case?

20  A   That I was unable to sit or stand for any length of

21    time and that Diane Lube wasn't willing to

22    accommodate that.

23  Q   And I'm actually asking for the nature of your

24    disability, so -- and we talked about -- was it a

25    back injury?

1  A  It was just -- I had a tumor in my sacral bone.  I

2    had bulging and herniated disk in my lumbar,

3    thoracic, and cervical spine.

4  Q  Okay.  And that's the disability you're identifying

5    for purposes of your Americans with Disabilities

6    Act claim?

7  A  Yeah.

8      MR. WHITE:  I'll just object to the extent it

9    calls for a legal conclusion.

10  Q  Okay.  When did that condition manifest?

11      MR. WHITE:  Object to form.

12      MR. TSCHANZ:  I'll restate that.

13  Q  When did -- when did this disability -- when did

14    you start to experience difficulties; do you

15    recall?

16  A  This -- this was a chronic condition that I've had

17    on and off my whole life.

18  Q  Okay.

19  A  It would get exacerbated and then go away.  It

20    started to exacerbate in the spring of 2018 again,

21    and then that's when the pain got pretty unbearable

22    and I needed to see the doctor.  And that's what I

23    did.

24  Q  And prior to the spring of 2018, were you

25    experiencing difficulties with this condition or

1    was it in a period of remission?

2  A  It was come and go.  It was come and go.

3  Q  Okay.

4  A  But I didn't -- and I would get treatment for it.

5  Q  Okay.  And when you say it was come and go, would

6     it be -- would -- you know, was it a weekly

7     occurrence or could you go months without

8     experiencing difficulty only for it to come back?

9     I'm just trying to ascertain how it impacted your

10    life.

11 A  It could go -- it could happen, you know, weekly,

12    daily.  It could go away for months at a time and

13    then come back.  It seems as I got older, you know,

14    it got worse and was happening more repeatedly.

15    And that's why I decided to see the doctor and go

16    for therapy and see a pain doctor and see a

17    surgeon.

18 Q  And then based on your decision to get that

19    treatment, you received the June 6th doctor's note

20    about this 15 minutes of standing and ...

21 A  Yes.

22 Q  Okay.  And, you know -- and I think we discussed

23    this a little bit, but, you know, I just -- I want

24    to get an idea of how that -- your impairment

25    impacted your life.

1       Was it just your inability to sit or stand for

2    15 minutes at a time or was there anything -- and

3    I'm talking about -- let's actually make it more

4    simple, Ms. Gray, because I understand you had the

5    car accident and things got significantly worse.

6    And I'm sorry to hear that, I really am.

7       What I would really be talking about is in

8    the, you know, the spring of 2018 time frame

9    through the end of your employment at the end of

10    2018 or January 1st, 2019.  What were the effects

11    of your disability?  Was it just the inability to

12    sit for 15 minutes -- more than 15 minutes?  Or is

13    there anything else?

14   A  Yeah.  My inability to stand for, you know, longer

15    than 20 minutes or sometimes more.  I'd have to

16    shift my weight sometimes with my leg up, you know.

17    I mean, nothing significant, but those were things

18    that would take pressure off the nerve root in my

19    back.

20   Q  Okay.  And you were always able to do that in the

21    workplace?

22   A  Always.

23   Q  Okay.  So, Ms. Gray, recognizing that a corporation

24    only acts through its individuals, who do you claim

25    at HCR subjected you to discrimination based on

1   your disability?

2        MR. WHITE:  Objection.  Calls for a legal

3   conclusion.

4        You can answer.

5   A  Well, the foremost is Diane Lube.

6   Q  Okay.

7   A  Because when I --

8   Q  Let's just -- my question simply is who at HCR do

9    you claim subjected you to discrimination based on

10   your disability?

11        And then we can discuss each individual in

12   turn just to keep it simple.

13  A  Okay.  So Diane Lube.  This gentleman, Jeff, was

14   unable to accommodate my needs.  I don't know if

15   Steve Cavanaugh had anything to do with this.

16   Rami, Diane Lube's boss.

17  Q  So --

18  A  And that's all I can think of now.

19  Q  So we have Diane Lube, Jeff -- you mentioned you're

20   not sure whether Mr. Cavanaugh had anything to do

21   with it?

22  A  I can't say that.  I don't know what he was told by

23   them and what he was not told.  I only know what I

24   sent him in an e-mail, so I can't speak to that.

25  Q  Okay.  And then, finally, Ms. Lube's boss.  What

1    was her name?

2  A   His name is Rami.  R-A-M-I, Rami.  Rami something.

3    I don't know.

4  Q   Okay.  Diane Lube, what did she -- to the extent

5    that we've now already discussed -- well, let's

6    just, for the sake of completeness, what facts or

7    evidence do you have to support your claim that

8    Diane Lube discriminated against you based on your

9    disability?

10        MR. WHITE:  Objection.  Asked and answered,

11     and to the extent it calls for a legal conclusion.

12        Go ahead.

13  A   Based on my conversation with her when I told her

14     about what was going on with me physically and

15     that -- the pain I was in, and that I had an

16     inability to sit for longer than 10 or 15 minutes

17     without having to stand up and move around, and

18     that I had a tumor, and until we knew whether or

19     not that was the cause of it as well as the issues

20     of my lower back, you know, I would need to be able

21     to do that, and that I'm able to do it, was my

22     conversation with her.

23        I can do that now, and I've been doing it

24     since I've been in therapy.  But I cannot sit in a

25     car for longer than 15 or 20 minutes without having

1    to get up or get out unless I'm laying down.  And

2    it went in one ear and right out the other.  And

3    that's when she said we'll think about it and call

4    me tomorrow.

5  Q  How else do you claim Diane Lube discriminated

6    against you based on your disability?

7  A  I couldn't hear you, Peter.  I'm sorry.

8  Q  I'm sorry.  Let me get this microphone closer.

9        How else do you claim that Ms. Lube

10   discriminated against you based on your disability?

11  A  Well, I think that she could -- I could have stayed

12   where I was or I could have went to other buildings

13   and helped and been able to continue to work with

14   reasonable accommodation.  It was very reasonable

15   because we've accommodated people with much more

16   significant limitations than mine and let them

17   continue to work.

18  Q  And let me just -- because there's some overlap, so

19   let me just ask you this question.

20       Is it your claim that Ms. Lube failed to

21   reasonably accommodate your disability?

22  A  Yeah.

23       MR. WHITE:  Object to the extent that it calls

24   for a legal conclusion.

25       Go ahead.

1  Q  And what should she have done to accommodate your

2     disability, in your opinion?

3  A  She should have allowed me to continue working.  If

4     she didn't need me at Oak Lawn East, she could have

5     called the other centers and found out who needed

6     me to come and give them a hand, whether it be the

7     administrator or DON, doing whatever it was that

8     they needed.  And I would have gone and been able

9     to do it.

10 Q  How do you know that she did not call?

11 A  Because I never got any phone calls.  And her

12    comment to me was, well, there isn't a whole lot

13    out there when I mentioned the other buildings.  So

14    to me, she wasn't even going to make an attempt.

15    Her response was "There isn't a lot out there."

16    And that was it.

17 Q  So that's your -- is that just your assumption?

18 A  That's what she said to me.  She never --

19 Q  Well, I'm asking you -- I'm asking you specifically

20    what evidence, facts, or documents you have to

21    support your claim that Ms. Lube did not look into

22    other opportunities for you.

23       MR. WHITE:  Objection.  Asked and answered.

24 A  Well, I never got a phone call that she looked,

25    asked, sent e-mails out, or made phone calls.  And

1    she never got back to me saying I called everybody

2    and none of the buildings can use you, except way

3    up north in Elk Grove Village.

4  Q   What facts or evidence --

5  A   And I even told --

6  Q   Well, what facts or evidence or documents do you

7    have to support your claim that other buildings

8    other than -- buildings other than Elk Grove could

9    use your help?

10  A   Facts or evidence?  I don't know.  I think I might

11    have spoken to one of the directors of nursing at

12    Palos East -- it was Elaina Terrell at the time --

13    and told her what was going on, and she said I

14    could always use your help.  But that's all I have.

15  Q   Okay.  And what did you do with that information?

16  A   What could I do?  I couldn't do anything.  I was

17    waiting for them to call me back.

18  Q   And did she give you a specific opportunity that

19    you could have presented to Ms. Lube?

20  A   Oh, as a matter of fact, I did tell her that I knew

21    that there were buildings that could use me.  And

22    her comment to me was, you need to quit calling the

23    centers and talking to people.

24        And I said, well, first of all, I have, after

25    25 years in this company, many friends in this

1    company.  And there should be no reason why --

2    unless it's on work time, I could understand

3    that -- that I can't continue my friendships with

4    people that I've made.  But she made that

5    absolutely clear the day that I met with her and

6    she had me sign that paper.

7  Q  Any other facts, evidence, documents to support

8    your claim that Diane Lube discriminated against

9    you based on your disability?

10        MR. WHITE:  Object to the extent --

11  A  Not that I have --

12        MR. WHITE:  -- that it calls for a legal

13    conclusion.

14        Go ahead.

15  A  Not that I -- I don't have anything else, no.

16  Q  Any other facts, evidence, documents or support --

17    are there any other facts, evidence, documents or

18    support for your claim that, other than what we've

19    discussed today, that Diane Lube either failed to

20    engage in the interactive process or reasonably

21    accommodate your disability?

22        MR. WHITE:  Object to form.

23  A  None other than what I mentioned.

24  Q  Okay.  We talked about Jeff.  And just to -- you

25    know, I'll ask the questions sort of similar to how

1   I phrased it with Diane Lube.  What -- how did --

2   well, I'll say this.  How did Jeff -- and do you

3   recall his last name?

4   A  I don't.

5   Q  Okay.  We had that in the records somewhere.  But

6   how it did Jeff discriminate against you based on

7   your disability?

8       MR. WHITE:  Objection to the extent it calls

9   for a legal conclusion.

10      Go ahead.

11  A  Well, I think he was like Rami in the -- or Rami,

12  whatever his name -- I'm sorry.  I don't know how

13  to pronounce it.

14      I think there could have been calls made to

15  other buildings.  I don't know if he did or didn't,

16  but I know that I did call him and talk to him

17  sometime after I left the building -- I don't know

18  if it was two weeks, three weeks -- saying, have

19  you heard anything?  You know, is there any -- can

20  I go to any other buildings?

21      And his response was that, you know, they

22  didn't have anything at that point.

23  Q  And that was Jeff who said this?

24  A  Yeah.

25  Q  And that's -- and you believe that constitutes

1   discrimination based on your disability?

2  A   Absolutely.

3  Q   Okay.  Any facts, evidence, or documents to support

4   Jeff was being untruthful when he represented that

5   to you?

6      MR. WHITE:  Objection to the form.

7   Foundation.

8  A   Are you -- I guess I don't -- could you rephrase

9   that?

10  Q   Sure.  Sure.  So far you testified that Jeff

11   discriminated against you based on your disability.

12      A few seconds ago you mentioned that Jeff

13   had -- you had a conversation with Jeff and he told

14   you that there weren't any other opportunities

15   available, which is consistent with what Ms. Lube

16   had conveyed to you.

17      My question simply is what evidence do you

18   have to support -- do you have any evidence to

19   support a claim that isn't true, that he wasn't

20   being truthful with you?

21      MR. WHITE:  Object to form.

22  A   No.  But I don't have any evidence that they did

23   call around and see if anybody needed me because

24   that was never communicated to me.

25  Q   Okay.  So you don't know either way?

1   A   No.

2   Q   Okay.  Any other way you believe Jeff discriminated

3       against you based on your disability?

4   A   No.

5   Q   Okay.  Mr. Cavanaugh, I believe you mentioned you

6       don't know what he was told other than what was

7       conveyed to him in your letter.  So do you believe

8       Mr. Cavanaugh discriminated against you based on

9       your disability?

10  A   Yeah.  I think he could have told them, find her

11      somewhere.  This is a 25-year employee with an

12      exemplary record and we've accommodated people with

13      more severe limitations and to find her something.

14  Q   Do you have any evidence to suggest that he didn't

15      try?

16  A   No.

17  Q   Okay.  Any other way you believe Mr. Cavanaugh

18      discriminated against you based on your disability?

19  A   No.

20  Q   Okay.  You also had mentioned Mr. Rami?

21  A   That was Diane Lube's supervisor.

22  Q   Okay.  Was --

23  A   I called him --

24  Q   Well, my question is, is it your claim that

25      Mr. Rami discriminated against you based on your

1    disability?

2  A   Yes.

3  Q   And how did Mr. Rami discriminate against you based

4    on your disability?

5  A   Because I have no proof or any communication -- no,

6    he did not communicate to me that he would try or

7    look and see who needed help and to send me to

8    those specific buildings.  Nothing.

9        He just said to me -- his response was Diane

10    Lube is the director of regional operations, and

11    it's her decision to make the cuts for budgetary

12    reasons, you know, according to how she sees fit.

13        So it was nothing about my physical

14    limitations.  It was that, you know, my job at Oak

15    Lawn East was over.  And I told him I could not

16    make the drive to Elk Grove Village, and I told him

17    about what was happening.

18  Q   Okay.  And --

19  A   And I was -- I'm sorry.

20  Q   Sorry.  No, that was my fault.  I cut you off.  I

21    apologize.

22  A   That's okay.  I don't remember what I was going to

23    say.

24  Q   Any other way you claim Mr. Rami discriminated

25    against you based on your disability?

1  A  No.

2  Q  We talked about Diane Lube and your claim that she

3     failed to engage in an interactive process and

4     failed to reasonably accommodate your disability;

5     right?

6  A  Yes.

7  Q  Is there anything else that you want to add to that

8     claim that we haven't discussed today?

9  A  Not that I can think of.

10 Q  Okay.  Is there anyone else at HCR that you claim

11    failed to engage in the interactive process or --

12    and/or failed to accommodate your disability?

13       MR. WHITE:  Object to form to the extent it

14    calls for legal conclusion also.

15 A  No.

16 Q  So Diane Lube is the only individual that you

17    believe failed to accommodate your disability?

18       MR. WHITE:  Objection.  Misstates testimony.

19 A  No.  No.  I think I believe I said that she, Rami,

20    and Steve Cavanaugh, and Jeff -- I don't have any

21    proof that they did anything to see -- to find me

22    work and that they could have reasonably

23    accommodated my limitations, but they did not as

24    far as I know.

25 Q  Thank you.  And so let me just ask it this way

1   because, again, there's some overlap.

2      Have we now discussed all the individuals that

3   you believe discriminated against you based on your

4   disability, failed to engage in the interactive

5   process, and failed to accommodate your disability?

6      MR. WHITE:  Object to form --

7  A  Yeah.

8      MR. WHITE:  -- to the extent it calls for a

9   legal conclusion.

10  A  Yeah.

11  Q  Was that a yes?

12  A  Yeah.

13  Q  Have we also --

14  A  Sorry.

15  Q  -- discussed all the facts, evidence, and documents

16   or support that you may have to support your claim

17   that these individuals either discriminated against

18   you based on your disability, failed to engage in

19   the interactive process, or failed to accommodate

20   your disability?

21      MR. WHITE:  Same objections.

22  A  Yeah.  I named them all.

23  Q  Okay.  And if you go down to Count II of your

24   complaint, do you agree that you're alleging

25   retaliation in violation of the Americans with

1   Disabilities Act?

2 A  Yes.

3 Q  Okay.  So, again, recognizing that corporations

4   only act through its individuals, who at HCR do you

5   claim retaliated against you in violation of the

6   Americans with Disabilities Act?

7      MR. WHITE:  Object to the extent it calls for

8   a legal conclusion.

9      You can answer.

10 A  Diane Lube, Rami, Jeff, and Steve Cavanaugh.

11 Q  Diane Lube, Rami, Jeff, and Steve Cavanaugh?

12 A  Yes.

13 Q  Okay.  Nobody else?

14 A  No.

15 Q  Okay.  How did --

16 A  Wait.  Let me change that.  Kelly Cigar was my

17   direct supervisor.  I don't know if or there was

18   anything that she could have done about it.  When

19   Diane Lube makes up her mind, nobody questions her,

20   so -- but I think Kelly could have tried to do

21   something to help me, and I don't know that she did

22   either.

23 Q  So do you believe that she -- are you saying that

24   Kelly also discriminated against you based on your

25   disability?

1  A  I'm not saying she did or didn't.  I'm saying I'm

2    not sure.

3  Q  Okay.  Are you claiming that Kelly failed to

4    accommodate your disability or failed to engage in

5    an interactive process?

6  A  No.  Because she knew I was in therapy and my

7    getting up and down was not an issue with Kelly.

8    It was with Diane Lube.

9  Q  And what do you mean it was an issue with Diane

10    Lube?

11  A  Because she didn't care that I could not sit for a

12    long period of time and had to stand and move

13    around.  It didn't matter to her.  When I told her

14    and repeated it, she just said that -- think about

15    it, sleep on it, and call me tomorrow.

16  Q  Okay.

17  A  And I --

18  Q  And --

19  A  Yeah.

20  Q  Okay.

21  A  Because that isn't accommodating my disability.  I

22    couldn't do it.

23  Q  What is accommodating your disability though?  Are

24    you saying just to stay the --

25  A  Sitting in a car --

1  Q  -- sitting position --

2  A  Yeah, sitting in a car for 45 minutes or an hour

3     and a half and trying to drive and not being able

4     to get up.

5  Q  Well, I guess what I'm asking you, Ms. Gray, is are

6     you suggesting -- is it your claim that the company

7     should have -- given your inability to make the

8     commute to Elk Grove, the company should have

9     accommodated your disability just by leaving you in

10    the nursing educator position?

11 A  No.  I think I could have stayed there.  I could

12    have went to other buildings that were close by and

13    done things and helped them in ways that I've

14    always done, which allowed me and would allow me to

15    be able to sit and stand as needed.

16 Q  Okay.  I just want to make sure I understand.

17 A  Yeah.

18 Q  So you're not suggesting that the company was

19    obligated to keep you in your nurse educator role;

20    is that right?

21 A  No.  Just to keep me in some capacity, regardless

22    of where it was, expect 45 minutes or an hour and a

23    half away.

24 Q  Okay.  So you didn't dispute that there was a

25    business reason for the elimination of your

1   position?  Is that what you're saying?

2      MR. WHITE:  Object to foundation.

3  A  No, I'm not saying that.  She said there was.

4  Q  Okay.

5  A  She said that she couldn't afford me anymore.

6  Q  And did you think that was untrue?

7  A  Yes.

8      MR. WHITE:  Objection.  Asked and answered.

9      THE WITNESS:  That -- did you say not to

10  answer, Ethan?

11      MR. WHITE:  No, no, no.  I said asked and

12  answered.  You can answer it again.

13      MR. TSCHANZ:  I will be having a discussion

14  with Ethan before ever letting a witness answer --

15  continue to answer if he instructs them not to

16  answer a question, so don't worry.  He and I will

17  have a sidebar.

18  A  My conversation with her was when she said that I

19  make too much money.  I said, the building I'm in

20  is the only building in the region that made over a

21  million dollars in profit.  Why would you cut a

22  position from here?  I said it makes no sense to

23  me.

24  Q  Were you involved in personnel decisions and who to

25  cut?

1  A  Yeah.  Yes.  In many of the buildings over my years

2    of employment, yes.

3  Q  Okay.  But you weren't involved in any decision or

4    discussion about your position prior to its

5    elimination; right?

6  A  No.  No, I was not.

7  Q  So safe to say you do not -- you don't have any

8    personal knowledge regarding what was considered in

9    arriving at the decision to eliminate your

10    position; right?

11  A  No, I don't.

12  Q  Okay.  And so do you think Diane Lube was lying or

13    she just made a mistake when she decided to

14    eliminate your position due to budgetary reasons?

15  A  Oh, I think she was doing it -- and I'm a long-term

16    employee.  I made a lot of money.  And she said she

17    was going to get rid of me, so that's how she did

18    it.

19  Q  And when she said she was going to get rid of you,

20    that was because of the frustration you caused her

21    starting with the Hinsdale investigation?

22      MR. WHITE:  Objection.  Asked and answered.

23    Calls for speculation.

24  A  Yeah.  I just think for many reasons.  As I said

25    before, the woman --

1  Q  Well, Ms. Gray, here's the thing.  This is my one

2     opportunity to talk to you.

3  A  Right.

4  Q  These are your claims.

5  A  Right.

6  Q  You're alleging that my client discriminated

7     against you based on your disability, failed to

8     accommodate your disability.

9  A  Yeah.

10  Q  And so if there are reasons that you have to

11     support why -- and part of that is Diane Lube had

12     eliminated your position.  It's right in your

13     complaint.  So if there are specific reasons why

14     you believe she acted the way she did and what

15     motivated her, then I'm entitled to know that.  And

16     so I am simply asking --

17  A  Yeah.

18  Q  -- to the extent you believe that she eliminated

19     your position, why do you think that?  And I know

20     there could be many other reasons.  And if there

21     are many other reasons, we're going to be here

22     longer that -- you know, than I anticipated.

23  A  Yeah.

24  Q  I need to know all those reasons.

25  A  Uh-huh.

1      MR. WHITE:  Objection.  Asked and answered.

2    Calls for speculation.

3  A  I have to plug my computer back in.  I'm sorry.

4  Q  That's fine.

5  A  Give me one minute, please.  Okay.  Can you hear me

6    all right?

7  Q  Yup.

8  A  Okay.  All right.  All right.  So can you ask me

9    the question one more time about Diane Lube?

10  Q  Sure.  You mentioned Diane Lube wanted to get rid

11    of you.

12  A  Yes.

13  Q  And we talked about in the context of the letter

14    that was -- your letter had stated that she was

15    upset about the investigation at the Hinsdale

16    location.  You had also mentioned --

17  A  Yes.

18  Q  -- you protesting a patient's safety issue with --

19    I believe it was an alcoholic patient who came in.

20  A  Two patients.

21  Q  Okay.  And I simply asked you, okay, you know, is

22    there anything else that would, in your mind --

23    that you claim was the reason that Diane Lube

24    wanted to eliminate your position?

25      And you said, many other reasons.

1        And I said, well, I can't just leave it at

2   many other reasons.  I need to know exactly why you

3   believe she eliminated your position and by

4   extension discriminated against you.

5        MR. WHITE:  Same objection.

6   A  I just -- I don't know.  There are many things that

7   have happened over the years that I've worked for

8   that company.  And she's been there where I've

9   intervened on behalf of employees and -- for the

10  way of her treating them.  And I just -- I don't

11  know.  There's many reasons.

12       But the most important to me is that a week or

13  two before I get this phone call from her, that I

14  have this need for an accommodation -- and I'm

15  thinking I'm going to have surgery -- that I tell

16  her this, that I'm not able to sit, I have to move

17  and get up.

18       I said, I can't drive to Elk Grove Village.  I

19  can't do that right now.

20       She didn't even respond to that.

21       And I said it again when I told her, you know

22  how long that commute is, you, as an administrator,

23  with the rest of them, you would all put up a fit

24  if there was going to be a meeting there.  You

25  didn't want to do the drive.

1       And she said, just think about it.  Sleep on

2  it and call me tomorrow.

3       She didn't care, like I said, about the tumor

4  and my need for accommodation.  And I guess that's

5  what I have to say about that.  I don't have any

6  more, other than -- like I said, I don't have proof

7  that she didn't call other places.

8       I just know what she said when I asked her

9  about going to other buildings, and that was,

10  Peter, that she said there's not much out there,

11  Liza.

12       Not that she would call, not that she would

13  see what she could do.  And that was kind of what I

14  expected because that's what I would do.  And

15  that's what I would counsel supervisors in doing,

16  is you always try to help the employee.

17  Q  Okay.  So we kind of got sidetracked.  So let me

18  button that up because I thought we were sort of

19  done with the discrimination, failure to

20  accommodate, interactive piece of it.

21       Other than everything that we've discussed

22  today, which was a lot, is there anything else,

23  allegations, support, documents, facts that support

24  your claim that Diane Lube discriminated against

25  you based on your disability?

1   A   No.

2   Q   Okay.  Same question for any other facts, evidence,

3       documents, support for your claim that she failed

4       to engage in the interactive process with you or

5       failed to accommodate your disability?  Other than

6       what we've discussed today, is there anything else?

7   A   No.

8   Q   Okay.  We have just started on -- it's Count II.

9       We talked about retaliation, and I believe you said

10      that you believe Diane Lube -- you're claiming

11      Diane Lube, Rami, Jeff, and Steve Cavanaugh you're

12      claiming subjected you to retaliation violation of

13      the ADA; is that right?

14  A   Yes.

15  Q   And when I say ADA, do you understand that I'm

16      referring to the Americans with Disabilities Act?

17  A   Americans with Disabilities Act, yes.  Uh-huh.

18  Q   Okay.  Diane Lube, how did she retaliate against

19      you in violation of the ADA?

20          MR. WHITE:  Objection to the extent it calls

21      for a legal conclusion.

22  A   She did not provide reasonable accommodation for me

23      to do or perform my job.

24  Q   Okay.  And retaliation, what is your -- what is

25      your understanding of what it means?  I'm asking

1    for your understanding, not a legal definition,

2    your understanding of what it means to retaliate

3    against someone.

4  A  Yes, I know what retaliate means.  You're doing --

5    it's if someone is reacting in a negative way

6    because of something that has transpired or

7    occurred, you know, in an earlier time.

8  Q  Okay.

9  A  So they do something negative.

10  Q  Okay.  So my question to you based on your

11    definition, because these are your claims, what is

12    it that transpired in an earlier time that you

13    claim would cause Ms. Lube to retaliate against

14    you?

15  A  Well, nothing that I've done, just her actions

16    towards me.

17  Q  Okay.

18  A  Not answering -- not answering e-mails.  When I

19    walk past the office, when she sees me, slams the

20    door in my face.  I mean, there's all kinds of

21    things.

22  Q  And did she do that because you requested an

23    accommodation or did she do that because of the

24    investigation in Hinsdale?  Why?  Why did she do

25    that?

1       MR. WHITE:  Objection.  Calls for speculation.

2   A  Yeah.  She did it because she was just trying to

3       send a message to me, I think, that, you know, I

4       didn't matter.  She didn't like me and she was

5       going to let me know any way she could.

6   Q  Okay.  Any other facts, evidence, documents or

7       support you have for your claim that Diane Lube

8       retaliated against you in violation of the ADA?

9   A  No.

10  Q  Okay.  Same question for Rami -- Rami.  What did

11      Mr. Rami do that you believe amounts to retaliation

12      and violation of the ADA?

13  A  I don't have proof.  I just don't know because I

14      was never informed that he told her to call other

15      buildings and look around and see who needed help

16      and get me in those buildings because that's what

17      the expectation would have been from my previous

18      boss.

19          That's what I would have recommended.  And I

20      would have -- and I worked with the HRs a lot as

21      well, the HRDs.  And that's what we try to do, we

22      try to accommodate our employees.

23  Q  Okay.  Same line of questioning as we talked about

24      Ms. Lube.  Why -- what was the -- in your mind, why

25      did he engage in that behavior?  What would have

1    transpired in the past, using your words, to cause

2    him to do that?

3  A  I have no idea.  None, whatsoever.  I just think

4    that the company was making financial cuts.  And

5    they had made a few and they were starting with the

6    oldest and -- older employees that were making the

7    most money and that had been there the longest

8    time.

9  Q  Anything else about Mr. Rami we haven't discussed

10    today as it relates to your retaliation claim?

11  A  No.

12  Q  Okay.  Jeff, how do you claim Jeff retaliated

13    against you in violation of the ADA?

14  A  By not communicating to me whether or not there

15    were calls made to buildings, administrators, CONs,

16    to see if there was anything else or anyone else

17    that needed my help or to send me to another

18    building that I could continue to help them do what

19    they needed done and -- with my accommodation,

20    which was very reasonable.

21  Q  Okay.  Anything else related to how you believe

22    Jeff retaliated against you in violation of the

23    ADA?

24  A  No.  No.

25  Q  Same question using your words, something had

1    transpired in the past to cause someone to -- these

2    aren't your words -- but to seek retribution, so to

3    speak.  What happened in the past that would have

4    caused Jeff to retaliate against you?

5   A  Nothing.

6   Q  Okay.  Anything further to add about Jeff?

7   A  No.

8   Q  Okay.  Steve Cavanaugh.  How did is Steve Cavanaugh

9    retaliate against you in violation of the ADA?

10  A  Well, first of all, in other instances where --

11   over the many years I've worked with the company,

12   there have been frontline employees that have

13   needed accommodation.  And we have gone above and

14   beyond what we needed to do, even extending those

15   accommodations and -- past their medical date

16   because it's the appropriate thing to do as far as

17   employee relations.  Well, that didn't happen with

18   me.

19  Q  So are you claiming that part of your allegation is

20   that you should have been able to continue on a

21   leave of absence instead of being terminated around

22   the end of --

23  A  Oh.

24  Q  I'm sorry.  Say that again?

25  A  Yes.  Yes, Peter.  That's one of the reasons.

1    There are hundreds and hundreds, if not thousands,

2    of employees that have been on the payroll

3    for years that have not been terminated out of the

4    system and are still considered employees, and it

5    it's all in the six pack report.  I've seen them.

6    I know.  I help with scheduling.

7  Q  You are intimately familiar with the hundreds and

8    thousands of employees' situations and you were

9    tasked on making the call as to whether or not they

10    should be terminated or continued on a leave of

11    absence in every case?

12       MR. WHITE:  Objection.  Argumentative.

13  A  I believe --

14  Q  Well, that taken, I didn't mean that, Ms. Gray.

15    I'm just trying to get a sense of your personal

16    knowledge.  I apologize.

17  A  Well, part -- part of what I did was help the

18    schedulers who master schedules, set them up in

19    their buildings -- that was another thing I did.

20    We would look at the six pack report on how many

21    employees we had.

22       We had employees that were still active

23    employees that had been on there for years and were

24    active and never terminated out of the system.

25       So, number one, their tenure never changed.

1   Their expiration --

2  Q  Let me just ask it this way.  I just want to make

3   sure --

4       MR. WHITE:  Hold on.  Hold on.  She's in the

5   middle of her answer.  Let her answer.

6  Q  Go ahead.

7  A  They -- they -- you know, and then I would say to

8   them, if this employee has not been here, you know,

9   they're considered an active employee.  Their start

10   and end date isn't going to be until they're

11   terminated out of the system.  And some people with

12   medical reasons, we let far exceed -- go sometimes

13   over a year on a leave because of the medical

14   necessity and their years of service with the

15   company.

16       And the -- you know, my education, way of

17   thinking is it's fair and consistent.  You always

18   be fair and consistent and you never go wrong

19   because no one can ever charge you with anything

20   then.  And we were not fair and we were not

21   consistent with all employees, and that includes

22   myself.

23  Q  Okay.  And I guess my question that I was starting

24   to ask is were you involved in all of the decisions

25   to either keep or discharge these employees or were

1    you just aware of the circumstance that they were

2    out or --

3  A  Well --

4  Q  Were you the decision-maker?  Were you making the

5    decision as to whether these employees should stay

6    or be transitioned out?

7  A  Yes.  When I would go through a master schedule

8    with myself and my assistant, Carrie, we would

9    look.  If they hadn't worked in so long, we'd send

10    an e-mail, we'd let the administrator know that we

11    were going to have them terminated out of the

12    system.

13        And that -- yes.  That -- that decision was

14    based on what I have researched and what I had seen

15    and my assistant, Carrie, doing these master

16    schedules and letting people know we needed to get

17    them out of the system.  Because they're still an

18    active employee and they haven't been here in over

19    a year or two.  It's crazy.

20  Q  And so that decision -- you said that decision was

21    based on the research that you did.  So you weren't

22    the one that made that decision, you were just

23    providing the information; right?

24  A  Well, it -- it was my decision to say the following

25    people have not worked since such and such a date,

1    they need to be turned out of the system and

2    communicate that to the administrator, payroll, and

3    HR.  And then the payroll person would put the code

4    in whether they were eligible for rehire or not

5    rehire.  So I was involved in that whole process.

6  Q  Okay.  Well, let me ask it this way.  Were you in

7    any way -- do you have personal knowledge regarding

8    the decision to terminate your employment?

9  A  Ask me that again.

10  Q  Sure.  Absolutely.  Do you have personal knowledge

11    regarding the decision to terminate your

12    employment?

13  A  Well, all I know is I called Sharon Jones in

14    December and said -- because I wanted to continue

15    my health care benefits -- I said, can you guys

16    please, can you please just keep -- keep me on as

17    an active employee for another quarter so I can

18    continue my insurance because I was having these

19    issues.

20        And she told me no, that Deb Durham said that

21    we can't do that.

22        And I said, but we've done that with hundreds

23    of employees.  And now you're telling me, for me,

24    we cannot do this?

25  Q  And who told you this?

1  A  Sharon Jones.

2  Q  Okay.  And Sharon Jones is in human resources?

3  A  Yeah.  She was my human resource director at Oak

4     Lawn East.

5  Q  Okay.  What was her response to you stating that?

6  A  Well, I mean, she felt bad, you know.  She felt

7     really bad, and she knew I was right.  I mean --

8  Q  I just want to know what she said to you.  I mean,

9     what did she --

10  A  She said, Liza, I'm sorry.  You know, I asked and

11     they won't let me do it.

12  Q  Okay.  So -- and safe to say you weren't involved

13     in the discussions surrounding whether to keep you

14     on or not; right?

15  A  No.  No, no.

16  Q  Okay.  Again, we got a little sidetracked there,

17     but I think it's important to make sure we drill

18     down on all these details.

19         We were talking -- we talked -- we were

20     talking about retaliation.  We talked about Rami,

21     and I believe you said you had provided me with all

22     evidence, support, facts or documents that support

23     your claims that Rami retaliated against you in

24     violation of the ADA.  Do you recall that question?

25  A  Yeah.

1  Q  And is it true, sitting here today, you provided me

2     with all the information, documents, and facts you

3     have to support your retaliation claim against

4     Rami?

5  A  Yes.

6  Q  Same question for Jeff.  How did Jeff retaliate

7     against you in violation of the ADA, and why do you

8     believe he did that?

9        MR. WHITE:  Objection to form.

10 A  I guess I'm going to just be repeating myself, that

11    as a corporate HR person, your personnel is your

12    most important asset.  And he could have gone above

13    and beyond and tried to find something for me

14    somewhere close.  And I guarantee you that any

15    building that was called in my vicinity would have

16    taken me in a heartbeat.

17 Q  Okay.  Anything else regarding Jeff as it relates

18    to your retaliation claim?

19 A  No.

20 Q  Okay.  And then, lastly, Steve Cavanaugh.

21 A  Yeah.

22 Q  Same question.  How do you -- why do you believe

23    Steve Cavanaugh -- or what did Steve Cavanaugh do

24    that you believe amounts to retaliation in

25    violation of the ADA, and why do you believe he

1   engaged in that conduct?

2     MR. WHITE:  Objection to form.

3 A  Because he was the CEO of the company.  And not

4   only was he the CEO, but they were also -- part of

5   the company was going bankrupt and they were

6   selling off buildings, and I think that it didn't

7   matter to him if I had a disability or not.

8     The thing was I was a 25-year employee with an

9   exceptional record and I made a decent amount of

10   money.  And like the other older employees, I was

11   going to be gone.

12 Q  Do you think there was some sort of age component?

13   You said the older employees.  Do you think there

14   was some sort of motivation based on age?  I

15   guess --

16 A  Oh, I know -- yes.  I know of some things that have

17   occurred with people that were older and were kind

18   of pushed out, so -- but I don't even want to get

19   into that.

20 Q  Well, anything else related to Mr. Cavanaugh and

21   your retaliation -- and your claim that he

22   retaliated against you?

23 A  No.

24     MR. TSCHANZ:  Okay.  Ethan, we're on the

25   homestretch here.  Just wanted to let you know.

1    There's a couple things that I wanted to talk about

2    really quick.

3  BY MR. TSCHANZ:

4  Q  Ms. Gray, earlier on, you testified that you

5    received monthly Social Security Disability

6    benefits.  Is that your only source of income?

7  A  Yes.

8  Q  Okay.  And how much do you earn per month in Social

9    Security Disability?

10  A  It's 2,200-some dollars.

11  Q  Okay.  And you -- and you have not worked in any

12    capacity since you were employed by HCR; right?

13  A  No.  I did apply for jobs, but nobody hired me.

14  Q  Okay.  And that was prior to February 1st, 2019;

15    right?

16  A  Yeah.

17  Q  And February 1st, 2019, is the date of the car

18    accident?

19  A  Yup.  Uh-huh.

20  Q  Are you involved in any litigation over that car

21    accident?

22  A  I was.  That's all over.  The person -- yes.  It's

23    all over.

24  Q  Okay.  Were you -- so you were a party to a civil

25    matter, and that was the car accident lawsuit or

1   was there a lawsuit not filed or was it --

2   A   No.  The person that hit me was only insured for

3       $25,000 and I had 300 and -- over $300,000 in

4       medical bills.  So I had a good insurance policy

5       that took care of my -- most of my medical bills.

6       I'm still paying some.

7   Q   Okay.  Have you sought any treatment for emotional

8       distress damages associated with your employment

9       with HCR?

10  A   I did.  I'm very close with my attending physician,

11      and she was my rock through all of this.  I had to

12      get some antianxiety medication.

13  Q   And when did that start and is it still continuing?

14  A   Yeah.

15  Q   Okay.

16  A   It started about a week after this whole incident

17      happened with my job.  And I was doing really well

18      until we had to do the deposition and then all came

19      back again.  I'm fine.

20  Q   I'm sorry.  If we need to take a break, I'm happy

21      to do it.  I just have just a little bit more.

22  A   I'm good.  I'm good.

23  Q   But that is out there for you if you need to take

24      advantage of it.  I know that your lawyer might

25      have a few questions for you as well after.  And to

1     kind of move away from that particular topic, let's

2     take a look at what's on my screen right now.  It's

3     the interrogatory -- it's Exhibit 1.

4   A  Okay.

5   Q  This asks you to identify all persons you

6     communicated with, either orally or in writing,

7     concerning the claims and allegations in this case.

8     And so you responded with communications with

9     defendant's regional director.  Was that -- that

10     would be Ms. Lube; right?

11   A  Right.

12   Q  Okay.  About your position elimination, you say

13     either one or more phone calls with Deb Durham

14     regarding her supervisor and her supervisor's

15     refusal to engage in the interactive process.

16        Deb Durham, when you say regarding her

17     supervisor, Dub Durham's supervisor or are you

18     saying Deb --

19   A  No.  No.  Let's see.  Says, "her position was being

20     eliminated and proposed a transfer ... Plaintiff

21     had one or more telephone calls with Deb Durham

22     regarding" the fact that I had tried to get ahold

23     of Kelly, my boss, who was on vacation.

24        I kept calling her, and I went outside and I

25     was calling her and she wasn't answering.  And then

1   I texted her about the phone call.  I said, well, I

2   just got a phone call from Diane Lube, and she just

3   told me she was eliminating my position here.  Did

4   you have any knowledge of this?

5       And she said, no.  She said, I didn't know

6   anything about that.  She said, she told me before

7   I went on vacation, she was going to farm you out

8   again.

9  Q  Okay.  Anything else discussed in that

10   conversation?

11 A  No.

12 Q  And so you also referenced a telephone call with

13   Kelly Cigar, telephone call with Rami --

14 A  Yeah.  I tried calling her but she didn't answer.

15   She texted me and I texted her.

16 Q  Okay.  Rami -- I guess what I'm getting at --

17   because we've covered a lot of ground today,

18   Ms. Gray, and I really appreciate your patience.

19   And you take this very seriously, and I really

20   appreciate that because this can be a long process.

21       My question to you is have we already

22   discussed all the conversations and communications

23   that are referenced in this interrogatory response

24   today?

25 A  Yeah.  I mean, to the degree that you've asked me

1     about it, I don't know if --

2  Q  Well, we talked about, you know, is there anything

3     regarding -- is there any other discussions that

4     you had with Kelly Cigar, Rami, Jeff, Diane Lube,

5     or even Steve Cavanaugh regarding your leave,

6     regarding your request for accommodation, regarding

7     your disability?

8        Is there anything else regarding these topics

9     or your claims against the company that -- is there

10    anything else out there that we need to talk about

11    that was not already talked about today?  Is there

12    anything else you have to add?

13       MR. WHITE:  Object to form.

14  A  No, Peter.  No.

15  Q  Okay.  The commute to Elk Grove, was it a traffic

16    issue or what was the issue?  Because I know --

17    just purely by way of background, I am from the

18    area originally.  I'm in Indiana now, but I

19    actually went to Loyola University of Chicago.  So

20    I've lived in Chicago proper.  I know that it's not

21    so much the distance in Chicago --

22  A  It's the commute.

23  Q  -- it's the traffic; right?

24  A  Yeah.  It's horrid.  Horrid.

25  Q  Yeah.

1   A   Especially going from south to north the way you

2       have to get there.

3   Q   Because you have to go on 294, right, to get to ...

4   A   Yeah.  And I would get on La Grange Road to 55 to

5       294 to 290, take that up towards 355.  I mean, it

6       is an absolute nightmare.  And traffic -- there's

7       always construction.  And when it's not

8       construction, it's the weather.  There's no way you

9       can get there from where I lived in under

10      40 minutes.  It's not possible, unless you fly.

11  Q   Okay.  Now, that's going to be dependent on the

12      time of day though; right?  I mean, it's going

13      to -- because you had mentioned earlier there

14      was --

15  A   No.

16  Q   So it's your position, no matter what, across the

17      board, it is --

18  A   It's a minimum of 40 minutes in good -- you know,

19      in good flowing traffic.

20  Q   Okay.  And what do you base that on, I guess,

21      because that's, you know --

22  A   Because I used to work up there.  I used to work in

23      Rolling Meadows.  And I lived --

24  Q   Okay.  And --

25  A   I lived 15 miles closer, and it would take me

1   45 minutes to get to Rolling Meadows.  And because

2   of the area that I live on, 55 backs up.  It takes

3   20 minutes just to get to the on-ramp to 294 in the

4   morning.

5   Q  Okay.  You mention Donna Bellocchio.

6   A  Bellocchio.

7   Q  Bellocchio.

8   A  Bellocchio.

9   Q  What evidence do you have to support that she

10  replaced you after your position was eliminated?

11  A  Well, it happened, I think, by an accident.  But I

12  was in the office with Kelly and she got a call

13  from Diane Lube, who -- and Kelly didn't ask me to

14  leave.  I mean, she just didn't, you know.

15      We were -- worked together and the

16  conversation, apparently, she was having -- I could

17  hear some of it -- but was repeating some of it.

18  And that was that Diane Lube was trying to contact

19  Donna Bellocchio to take a mobile regional, like,

20  DON position and basically do the same things that

21  she told me she didn't need me to do anymore.

22  Q  How do you --

23  A  So I was --

24  Q  How do you know it was the same things?  I mean,

25  did they list --

1   A   Because Kelly and I talked about it.  She wanted

2       education to be done.  She wanted her to, you know,

3       to work on starting and precepting, you know, new

4       DONs and ADONs, and many of the things that I did.

5           And I'm just sitting there with my mouth

6       agape.  And I told Kelly, I said, what am I?  I

7       mean, these are the things that I do.  Why would

8       she need her to do those?

9   Q   That was after you went on leave and were

10      terminated?

11  A   No.  This was before, well before, when Diane just

12      started in her position.

13  Q   What evidence do you have to support that she

14      replaced you though?

15  A   Well, I use the words "replaced me" because she was

16      doing the things that I had been doing.  She was

17      asking --

18  Q   At what point in time?

19  A   -- you know --

20  Q   At what point in time, I guess, I'm asking?

21  A   I just -- it started when Diane first took the

22      position.  She was trying to get ahold of her and

23      she finally made contact and told Kelly what she

24      was going to offer her, and Kelly told me.

25  Q   Okay.  I guess what I'm asking is if you

1    specifically allege that she -- that your position

2    was eliminated and essentially Donna was brought in

3    and replaced the position that was eliminated.

4        And my question to you is what evidence do you

5    have to support that?  I mean, do you have any

6    reason to dispute that Ms. Donna was hired --

7    rehired by the company on February 27, 2017, and

8    resigned in November of 2018?  Do you have any --

9  A  She had --

10 Q  -- reason to dispute that?

11       MR. WHITE:  Objection --

12 A  No.

13       MR. WHITE:  -- to form and foundation.

14 A  No.  And Donna Bellocchio has been -- she has been

15   hired and is quit the company, I don't know, four

16   or five times.  And they've rehired her.

17 Q  Okay.  And it's just, again, going back to the

18   letter in Exhibit 4.

19 A  Uh-huh.

20 Q  You do reference her.  Let me find that quickly.

21 A  Yeah.

22 Q  "Diane also hired Donna Bellocchio as the mobile

23   DON after she eliminated my regional nurse job and

24   that position was never offered to me."

25 A  Right.

1  Q  So she wasn't -- you're saying she wasn't -- she

2     didn't replace you after your education nursing

3     position was eliminated in 2018.  You're talking

4     about prior to?

5  A  Yes.  When she eliminated my regional position and

6     all the jobs that I had done, she hired Donna on to

7     do some of the responsibilities that I was doing

8     and had done prior.

9  Q  And were you involved in any way in the

10     decision-making process?

11 A  No.  No.

12 Q  Okay.

13 A  And I don't -- and Diane Lube doesn't even know

14     that I know that conversation occurred between her

15     and Kelly Cigar.

16         MR. TSCHANZ:  Okay.  All right.

17         Ethan, if we could take like a four-minute

18     break, I just want to look at a couple notes and

19     then ask just a handful of wrap-up questions and

20     then I'm going to be finished.  Is that all right

21     with you?

22         MR. WHITE:  Okay.  Sounds good.

23         (A brief recess was taken.)

24 BY MR. TSCHANZ:

25 Q  All right.  Ms. Gray, we're back from a brief

1    recess.  You understand that you're still under

2    oath and obligated to provide truthful testimony?

3  A  Yes.

4  Q  Okay.  Couple quick questions and then we can wrap

5    up.  The position that was offered to you at the

6    Elk Grove facility, what was -- what were the

7    particulars of that position?  Was that ever

8    communicated to you?

9  A  No.  Basically it was told to me -- she said, I

10    need you just to -- apparently they were in a

11    substandard care situation with the State.  And she

12    said, I need you to go there and help the DON get

13    it cleaned up.

14  Q  Is that a pretty serious issue?

15  A  Yeah.  I mean, nobody wants to be considered

16    substandard.

17  Q  Okay.  And she was -- she wanted you to be the one

18    to correct it?

19  A  Yup.

20  Q  So do you believe she had trust in your abilities

21    to do that?

22  A  Well, I think she knew that I had done it in so

23    many other buildings and helped that she wanted me

24    to do it, but Donna Bellocchio was around.

25        And I even said to her, I said, with this

1   issue with my back, I can't do that.  Why don't you

2   send Donna?  That's what you hired her for, you

3   know.

4   Q  What was her response to that?

5   A  I don't -- Donna was helping at Westmont or

6   something.  I don't know.  I don't know.

7   Q  Okay.  Earlier on, you testified that you had that

8   restriction in the June 6th note about not sitting

9   or standing for 15 minutes, you needed to get up

10   and stretch.  I think you described it as the

11   little things you could do to sort of relieve the

12   pain.

13      Did you ever ask -- have to ask anyone for

14   permission to do that?

15      MR. WHITE:  Objection to form.

16   A  No.

17      MR. WHITE:  Foundation.

18   Q  Okay.  And that doctor's note had nothing to do

19   with sitting in a car; right?  That was purely in

20   the workplace?

21   A  That was just a fluke that I happened to get the

22   doctor's note after I found out about my back and

23   they gave it to me.  And I always got doctors'

24   notes and things like that to keep in my personnel

25   file.

1  Q  Okay.  But you didn't think you needed it to be

2     able to --

3  A  No.

4  Q  Okay.

5        THE REPOTER:  I'm sorry.  Mr. White, I didn't

6     catch your objection.  Was it objection to form and

7     then what else?

8        MR. WHITE:  Probably foundation.

9        THE REPOTER:  Okay.  Thank you.

10       MR. WHITE:  Yeah.

11 Q  Do you know what happened -- so your job duties as

12    a nurse educator in 2018, what happened with that,

13    those functions after you went on leave and then

14    eventually were terminated?  Do you know who

15    performed them or were they performed anymore

16    or ...

17       MR. WHITE:  Objection.  Calls for speculation.

18    Form.  Foundation.

19 Q  I'm just asking you if you know.

20 A  I don't.  I don't.

21 Q  Okay.

22 A  I was also the --

23       MR. WHITE:  Liza.  Liza, there's not a

24    question pending.  There's not a question pending.

25 A  Okay.

1  Q  Okay.  All right, Ms. Gray.  Have you now provided

2    all witnesses, facts and evidence you have to

3    support your claim for disability discrimination in

4    violation with the American Disabilities Act as

5    alleged in Count I of your complaint?

6      MR. WHITE:  Object to form.  Calls for a legal

7    conclusion.

8  A  I guess I don't understand the question.  I mean,

9    there are other people that I worked with that knew

10    about my back and my issues.  I don't -- are you

11    talking about them too?

12  Q  Well, let me -- let me phrase it this way.  Do you

13    remember us discussing your claim for disability

14    discrimination in violation of the ADA?

15  A  Yes.

16  Q  Okay.  Sitting here today, I'm simply asking you

17    have we now discussed all the facts and evidence

18    you have to support your claim for disability

19    discrimination in violation of the ADA?

20      MR. WHITE:  Same objections.

21  A  Yeah.

22  Q  Okay.  And do you remember discussing your claim

23    that my client failed to engage in the interactive

24    process in violation of the ADA?

25  A  Yeah.

1  Q  Okay.  Sitting here today, have we now discussed

2  all the facts and evidence you have to support your

3  claim that HCR failed to engage in the interactive

4  process in violation to the ADA?

5      MR. WHITE:  Same objections.

6  A  As far as I know, yes.

7  Q  Do you remember discussing your claim that the

8  defendant in this case failed to reasonably

9  accommodate your employment in violation of the

10  ADA?

11  A  Yes.

12  Q  I mean, failed to reasonably accommodate your

13  disability in violation of the ADA?

14  A  I'm sorry.  My phone's ringing.  Can you repeat the

15  question?

16  Q  Sure.  Earlier on in your deposition, I asked you

17  to provide all facts and evidence you have to

18  support your claim that my client failed to

19  reasonably accommodate your disability.  Do you

20  remember that?

21  A  Yeah.

22  Q  Okay.  My question simply is have we discussed all

23  the facts and evidence you have to support your

24  claim that the defendant in this matter has failed

25  to reasonably accommodate your employment -- or

1   your disability?

2 A  Yeah.

3       MR. WHITE:  Objection to form.

4 A  Oh, I'm sorry.

5       MR. WHITE:  Calls for a legal conclusion.

6       Go ahead.

7 A  Yes.

8 Q  Okay.  Earlier on in your deposition, we discussed

9   the claim -- your claim that my client retaliated

10   against you in violation with the Americans with

11   Disabilities Act.  Do you remember that?

12 A  Yeah.

13 Q  Okay.  Sitting here today, have you now provided me

14   with all the facts and evidence you have to support

15   your claim for disability retaliation in violation

16   of the Americans with Disabilities Act?

17       MR. WHITE:  Same objections.

18 A  Yes, as far as I know.

19 Q  With respect to the claims brought in this lawsuit,

20   Ms. Gray, have you now provided me with all facts

21   and evidence you have to support your claims?

22       MR. WHITE:  Object to form.  Foundation.

23   Calls for legal conclusion.

24 A  As far as I know.

25 Q  Okay.  Sitting here today, Ms. Gray, have we

1    Discussed all the claims and allegations you have

2    against the defendant that you are bringing in this

3    lawsuit?

4  A  Yes, as far as I know.

5  Q  Do you have -- okay.  Have you provided me with

6    truthful testimony today?

7  A  Absolutely.

8  Q  Have you understood each of the questions I have

9    asked of you today where you did not specifically

10    ask for clarification?

11  A  Yes.

12        MR. TSCHANZ:  I have nothing further.

13        MR. WHITE:  All right.  We're all done.

14    Thanks, everybody.

15        THE REPORTER:  Before we get off, can I get

16    transcript orders on the record if anybody's

17    ordering today?

18        MR. TSCHANZ:  We are just your standard, I

19    think, is to get the PDF, condensed.  And you can

20    probably do this as a matter, of course, Grace, but

21    just the -- I can click on the link and it has the

22    exhibits in there?

23        THE REPORTER:  Yes.
     MR. TSCHANZ:  Okay.
24        MR. WHITE:  And I'll hold off for now, thanks.
     (The deposition concluded at 5:02 p.m.)
25

```
 1            UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF ILLINOIS
 2                 EASTERN DIVISION

 3

 4
    LIZA GRAY,                    )
 5                               )
             Plaintiff,          )
 6                               )
          -v-                    ) CASE NO.
 7                               ) 20-CV-02466
    MANORCARE HEALTH SERVICES,   )
 8  LLC, DOING BUSINESS AS HCR   )
    MANORCARE HEALTH SERVICES,   )
 9  LLC,                         )
                                 )
10           Defendant.          )

11

12                Job No. 165909

13

14

15        The deposition of LIZA GRAY, taken in the
    above-captioned matter, on September 23, 2021, and at
16  the time and place set out on the title page hereof.
              It was requested that the deposition be
17  transcribed by the reporter and that same be reduced
    to typewritten form.
18        It was agreed that the reading and signature
    by the deponent to the deposition were waived on
19  behalf of the parties plaintiff and defendant by their
    respective counsel, the witness being present and
20  consenting thereto, the deposition to be read with the
    same force and effect as if signed by said deponent.
21

22

23         STEWART RICHARDSON & ASSOCIATES
           Registered Professional Reporters
24          One Indiana Square, Suite 2425
              Indianapolis, IN  46204
25                (800)869-0873
```

1  STATE OF INDIANA

2  COUNTY OF MARION

3      I, Grace E. Roh, a Notary Public in and for

4  said county and state, do hereby certify that the

5  deponent herein was by me first duly sworn to tell the

6  truth, the whole truth, and nothing but the truth in

7  the aforementioned matter;

8      That the foregoing deposition was taken on

9  behalf of the Defendant; that said deposition was

10  taken at the time and place heretofore mentioned

11  between 11:11 a.m. and 5:02 p.m.;

12      That said deposition was taken down in

13  stenograph notes and afterwards reduced to typewriting

14  under my direction; and that the typewritten

15  transcript is a true record of the testimony given by

16  said deponent to the best of my abilities;

17      And that the reading and signature by the

18  deponent to the deposition were waived on behalf of

19  the parties plaintiff and defendant by their

20  respective counsel, the witness being present and

21  consenting thereto, the deposition to be read with the

22  same force and effect as if signed by said deponent.

23      I do further certify that I am a disinterested

24  person in this cause of action; that I am not a

25  relative of the attorneys for any of the parties.

1      IN WITNESS WHEREOF, I have hereunto set my

2  hand and affixed my notarial seal this 8th day of

3  October, 2021.

4

5

6

7

8

9

10

11

12

13

    My Commission expires:
14  September 20, 2028

15

16  Job No. 165909

17

18

19

20

21

22

23

24

25

Index: $25,000..45

## Exhibits

**Liza Gray Ex 01** 3:8 24:20,23 180:3

**Liza Gray Ex 02** 3:10 24:24,25

**Liza Gray Ex 03** 3:12 26:24,25

**Liza Gray Ex 04** 3:13 33:4,5 78:15 97:8,16 186:18

**Liza Gray Ex 05** 3:14 70:10,11, 21,22 88:17 99:13

**Liza Gray Ex 06** 3:15 91:8,10

**Liza Gray Ex 07** 3:16 101:6,7 110:2 118:17

**Liza Gray Ex 08** 3:17 113:5,6 118:17 119:24

**Liza Gray Ex 09** 3:18 120:7,8

**Liza Gray Ex 10** 3:19 124:24, 25

**Liza Gray Ex 11** 3:20 140:21, 22

**Liza Gray Ex 12** 3:21 97:9,10 140:24

## $

**$25,000** 179:3

**$300,000** 179:3

## 0

**06-07-18:03:11** 100:9

## 1

**1** 24:20,23 122:1 125:19 180:3

**10** 73:8 124:24,25 125:20 131:9 146:16

**10/1/18** 113:15

**10/11/18** 102:8

**10/16** 114:16

**11** 23:24 140:21,22

**11:11** 4:5

**11th** 26:7,13

**12** 75:23 97:9,10 103:19 134:11 140:24

**12th** 91:25 99:3,7,9 103:1 127:19

**13** 17:18 75:23 134:12

**14** 87:5

**14th** 26:18

**15** 66:1 69:19 71:12,13 73:8 74:8,24 76:14,25 77:3 81:14 82:1 109:1 131:10 143:20 144:2, 12 146:16,25 183:25 189:9

**15-minute** 75:3

**16** 42:4 72:9

**16th** 101:14 117:1 118:15 120:2

**17** 72:20

**18** 72:20 102:21 126:25 127:5 128:5,11

**18th** 88:11,12,13 90:1 100:20,21 102:11,12 103:17 114:8,12 128:11

**1994** 26:8,13

**1st** 24:5 114:9 120:21 121:7,13 122:4,9,21 123:8 139:2 144:10 178:14,17

## 2

**2** 24:24,25 110:9 125:20

**2,200** 123:6

**2,200-some** 178:10

**2,400** 123:6

**20** 30:3 59:20 69:19 81:16 109:2 134:10 144:15 146:25 184:3

**20-some** 43:24

**2000** 56:15

**2016** 31:3 41:16,23 56:12,19

**2017** 53:20 56:7 186:7

**2018** 26:8,13,21 29:19,24,25 31:10 41:24 42:2,4 44:25 52:20 53:5,19 55:7,9,16 56:8 57:6,9 70:16 71:9,10,22 72:13 81:11 88:6 90:1 94:24 99:19 100:2,6,

13,18 101:14 102:21 111:1 114:8,10,13 117:1 118:15 120:2 121:3 123:18 126:12,25 127:5 128:5 138:22 139:2,4 142:20,24 144:8,10 186:8 187:3 190:12

**2019** 120:6,21 121:8,13,17 122:1,4,9,21 123:9 139:2 144:10 178:14,17

**2020** 24:5 140:17

**2021** 4:4

**21** 138:22

**21st** 139:4

**22** 106:10

**23** 4:4

**2425** 4:3

**25** 26:21 109:23 149:25

**25-year** 153:11 177:8

**27** 186:7

**290** 183:5

**294** 81:18,19 183:3,5 184:3

## 3

**3** 26:24,25 97:5 110:8 125:20 126:11

**3/18** 115:3

**3/6/2019** 125:11 140:4

**30** 44:16 45:13 46:2 47:21 50:25 51:3,7 54:19 57:20 58:1,2 60:14

**30-hour-a-week** 50:3

**300** 179:3

**31st** 26:8,13 53:5 121:3 123:16 139:2

**355** 183:5

## 4

**4** 33:4,5 78:15 97:5,8,16 125:20 186:18

**40** 183:10,18

**45** 77:16 87:6 128:23 129:4 159:2,22 184:1

Index: 45-minute..admissions

**45-minute** 129:14

**45-minute-inability-to-sit**
129:23

**4th** 140:17

---
**5**
---

**5** 70:10,11,12,21,22 88:17 99:13
125:20

**55** 45:8 183:4 184:2

**578** 61:24

**587** 78:17

**589** 62:18,19

**5:02** 194:24

---
**6**
---

**6** 71:9,10 91:8,10 94:24 104:8
125:20 126:11

**6/12** 98:9

**6/12/2018** 91:13 127:12

**6/18** 111:1

**6/18/18** 101:21

**6/6** 71:22

**6/6/2018** 71:18

**6/7** 100:17 104:9

**60458** 15:16

**6th** 70:16 91:25 94:10 126:20
127:18 143:19 189:8

---
**7**
---

**7** 17:17 99:19 101:6,7 110:2
118:17 125:20 130:25

**7/13/18** 102:5

**718** 110:4

**723** 110:10

**7998** 15:16

**7th** 100:2,6,12

---
**8**
---

**8** 113:5,6 118:17 119:24 125:20
138:21

**84th** 15:16

---
**9**
---

**9** 120:7,8 125:20 139:9

**9/10/18** 101:21

---
**A**
---

**A-S-S** 51:25

**a.m.** 4:5

**abilities** 188:20

**ability** 116:23 128:17

**above-named** 91:16

**absence** 94:13 95:7 101:15
102:15 112:10,17 113:11,16
114:8 117:17 119:22 170:21
171:11

**absolute** 183:6

**absolute-** 83:22

**absolutely** 7:11 8:11 36:23
50:8 87:1 108:14 112:24 133:3
150:5 152:2 174:10 194:7

**accepted** 51:4 78:24 79:16

**accident** 106:13 122:6,10,14,
20,21 144:5 178:18,21,25
184:11

**accommodate** 31:19 65:7 70:3
141:22 145:14 147:21 148:1
150:21 155:4,12,17 156:5,19
158:4 162:8 165:20 166:5
168:22 192:9,12,19,25

**accommodated** 147:15 153:12
155:23 159:9

**accommodating** 158:21,23

**accommodation** 69:14 75:5
131:4,8 132:16 136:2,3,12,22
147:14 164:14 165:4 166:22
167:23 169:19 170:13 182:6

**accommodations** 28:14,23

126:25 132:24 135:9 138:15
170:15

**accomplish** 46:4 48:6

**accomplished** 47:20

**account** 17:1 47:8

**accountable** 41:4,10

**accurate** 26:6 31:1,8 32:15
50:14 58:8 66:18 71:21,23 76:12
77:1 120:25 127:5 140:4

**achievable** 44:19

**act** 29:5 141:10 142:6 157:1,4,6
166:16,17 191:4 193:11,16

**acted** 162:14

**action** 16:25 17:3

**actions** 37:11 167:15

**active** 171:22,24 172:9 173:18
174:17

**actively** 122:15

**acts** 144:24

**actual** 71:3

**ADA** 166:13,15,19 168:8,12
169:13,23 170:9 175:24 176:7,
25 191:14,19,24 192:4,10,13

**add** 155:7 170:6 182:12

**addicted** 65:16

**additional** 40:25 138:17

**additionally** 11:12

**address** 15:15,17

**adjustments** 7:6

**admin** 50:13,16,22

**administration** 47:5 120:10
121:20,24 122:8

**administrative** 14:22 18:3,5
122:1

**administrator** 30:10,17,21
42:18 46:18 56:21 86:17 105:20
148:7 164:22 173:10 174:2

**administrators** 86:22 169:15

**admission** 65:22 66:9

**admissions** 66:5,19 68:16

**admit** 65:2

**ADONS** 185:4

**advantage** 179:24

**advised** 34:10 91:16

**afford** 86:6 160:5

**afternoon** 93:14

**agape** 185:6

**age** 177:12,14

**agency** 14:22

**agent** 132:19

**agree** 11:10 24:7 25:7,15,19
26:6,12 27:10,14,15,16,17,22
28:1,5,9 29:4,7,16 53:17 83:19
98:10 99:8 102:12,19,24 103:19
111:14 112:1 114:7 115:11,14,
23 117:3 118:13,16 119:3,6
121:18 123:7 141:8 156:24

**agreed** 30:13 124:17 138:25

**agreement** 133:17

**ahead** 19:19 33:10 35:16 95:10
98:23 115:8 138:5 146:12
147:25 150:14 151:10 172:6
193:6

**ahold** 85:14 180:22 185:22

**Alan** 42:3 62:21 63:16,20

**alcohol** 65:12

**alcoholic** 65:11,16 163:19

**aliases** 5:8,10

**Allan** 62:20

**allegation** 170:19

**allegations** 165:23 180:7 194:1

**allege** 141:18 186:1

**alleged** 191:5

**alleging** 156:24 162:6

**allowed** 135:11,14 148:3
159:14

**allowing** 77:2

**alternatively** 9:9

**American** 191:4

**Americans** 141:9 142:5 156:25
157:6 166:16,17 193:10,16

**amount** 86:1 110:11 123:5
177:9

**amounts** 168:11 176:24

**and/or** 155:12

**angry** 37:21

**animals** 15:18

**announce** 55:20

**announced** 62:23

**announcement** 62:25

**answering** 11:10,17 167:18
180:25

**answers** 9:5

**antianxiety** 179:12

**anticipated** 80:6 162:22

**anybody's** 133:20 194:16

**anymore** 43:15 58:22 59:4,6
63:8 80:4 85:25 160:5 184:21
190:15

**anytime** 89:5 106:2

**apologies** 110:6

**apologize** 22:4,8 49:12 52:24
62:2 117:7 141:12 154:21
171:16

**apparently** 184:16 188:10

**appears** 33:22 34:24 70:15
119:25

**application** 121:25

**applied** 18:22 120:4 123:14

**apply** 45:17 121:16,18 124:1
178:13

**appointment** 99:2

**appointments** 93:4

**April** 55:16

**area** 17:22 80:16 182:18 184:2

**Argumentative** 171:12

**Arlington** 43:18

**arriving** 161:9

**ascertain** 143:9

**asks** 111:6 116:25 180:5

**asset** 176:12

**assignment** 26:15 36:16 68:5

**assistant** 59:17 107:15 115:10
173:8,15

**assistants** 110:17

**assisting** 59:15

**associate** 4:2

**associate's** 18:22,23

**Associates** 4:2

**assume** 13:20 71:24 84:6,7
90:16

**assumed** 48:15

**assuming** 18:13 36:11

**assumption** 134:17 148:17

**assurance** 37:24

**at-will** 29:14,16

**attempt** 19:16 130:25 148:14

**attend** 18:11,16

**attending** 55:12 72:17 73:1
96:9 179:10

**attitude** 63:18

**attorney** 14:5 25:16 126:10

**attorney-client** 13:5 15:3

**audible** 11:5,9

**audio** 7:16 9:5,8,15,18 10:10

**August** 26:18,22 122:13

**author** 120:19

**authored** 33:24 34:5

**authority** 36:12

**authorized** 139:20

**automobile** 122:10

**Avenue** 15:16

**average** 57:25

**AVG** 20:21

**aware** 101:14 113:16 128:16
129:12,22 132:8 173:1

**B**

**back** 10:4 20:6 21:17 22:3,19 47:24 49:4 52:8 55:12 56:4 69:16 72:7,8 73:10 74:6,8,23,24 82:16 83:3 88:17 96:15,24 104:17 105:12 106:20,21 110:1 112:23 122:14 135:1 136:25 137:22 138:18,19 141:25 143:8, 13 144:19 146:20 149:1,17 163:3 179:19 186:17 187:25 189:1,22 191:10

**background** 18:14,15 182:17

**backs** 184:2

**bad** 107:22 175:6,7

**bankrupt** 177:5

**bankruptcy** 17:10,12,18,25

**base** 19:8 32:8 183:20

**based** 28:11 84:9 90:13 115:16 117:19 118:2,11 121:25 139:16 143:18 144:25 145:9 146:8,13 147:6,10 150:9 151:6 152:1,11 153:3,8,18,25 154:3,25 156:3,18 157:24 162:7 165:25 167:10 173:14,21 177:14

**basically** 69:14 73:3 109:9 184:20 188:9

**basing** 51:19

**basis** 28:2 56:12 100:1,4 139:24

**Bate-** 62:9

**Bates** 62:10,14,18 110:10

**bedside** 60:3

**began** 53:15 55:2

**begging** 86:24

**begin** 57:16 114:22

**beginning** 62:19 110:10,25

**behalf** 139:21 164:9

**behavior** 168:25

**belief** 57:10 64:11 84:9,23 105:24 107:17 112:14 134:15

**Bellocchio** 184:5,6,7,8,19 186:14,22 188:24

**belonged** 37:4

**benefits** 118:25 120:5,16 121:15,18,21 123:13,15 124:19 174:15 178:6

**benign** 73:17 78:3 86:14

**Berwyn** 18:12 77:15

**big** 104:13

**bigger** 114:24

**bills** 179:4,5

**birth** 5:5

**bit** 7:22 9:8,19 25:25 27:1 51:1 68:1 110:6 132:21 136:10 137:13 143:23 179:21

**blah** 130:19,20

**blessed** 106:16

**blowing** 51:25

**board** 183:17

**bone** 73:15 75:10 78:2 86:13 142:1

**boss** 34:18 36:1 39:11,13 55:19 59:18 63:1 87:23 90:11 109:4 136:25 137:3 145:16,25 168:18 180:23

**bothering** 10:16

**bottom** 58:10,13 62:20 97:18 110:3,10

**box** 89:8

**break** 10:6 11:22,23 12:2 48:24 96:18,21 137:10,17 138:13 179:20 187:18

**breakdown** 111:17

**bringing** 139:25 141:8,16 194:2

**broad** 52:19 141:14

**broadly** 51:10

**brought** 65:12 70:9 102:18 186:2 193:19

**budget** 86:4 134:2

**budgetary** 133:25 154:11 161:14

**building** 30:4,13,17,21 36:6,22 38:15 39:25 42:3,15 46:18 50:19 55:21 65:6,23 81:5,7 85:17,25 86:3,4 93:8 95:12 105:4,14,23 106:15 124:7 130:5 134:4

151:17 160:19,20 169:18 176:15

**building's** 44:11

**buildings** 36:21 43:19 45:20 47:1 55:18 59:22 70:1 80:16 82:17 108:18,23 133:7,14 134:13,25 136:19 147:12 148:13 149:2,7,8,21 151:15,20 154:8 159:12 161:1 165:9 168:15,16 169:15 171:19 177:6 188:23

**bulging** 142:2

**bunch** 20:8

**bus** 22:10

**business** 159:25

**button** 165:18

**C**

**calendar** 100:23 101:23

**call** 9:16 36:5 58:14 61:18 66:16,22 84:2,16,25 85:10,12 90:5 91:1 93:7 97:19 98:8,20 100:17 104:1,15 108:2 140:12 147:3 148:10,24 149:17 151:16 152:23 158:15 164:13 165:2,7, 12 168:14 171:9 181:1,2,12,13 184:12

**called** 34:7 35:20 42:1 53:6,7 54:6 62:9 77:11 83:13 84:16 92:6,7,9,19,21,23 95:12 105:20 108:7 109:4,5 124:6,11 126:8 129:6,17 148:5 149:1 153:23 174:13 176:15

**calling** 83:15 84:11 92:3,7 129:23 149:22 180:24,25 181:14

**calls** 80:15 83:21 84:13 85:1 87:19,20 90:2 91:3 109:15 142:9 145:2 146:11 147:23 148:11,25 150:12 151:8,14 155:14 156:8 157:7 161:23 163:2 166:20 168:1 169:15 180:13,21 190:17 191:6 193:5,23

**cancer** 78:13

**cancerous** 86:14

**capacity** 107:14 111:1 118:20 123:8 159:21 178:12

**capped** 57:25

**car** 75:21,22 82:24 106:17
122:6,20 136:14 144:5 146:25
158:25 159:2 178:17,20,25
189:19

**cards** 134:4

**care** 45:9 55:10 60:3 65:19
68:11,12,13,14 158:11 165:3
174:15 179:5 188:11

**caring** 68:19

**Carol** 89:9,12 104:12

**Carrie** 173:8,15

**carry** 50:23

**case** 5:25 6:16 25:15 62:11,12
126:9 141:19 171:11 180:7
192:8

**cases** 5:21 6:11

**CAT** 96:12

**catastrophic** 57:23

**catch** 190:6

**caused** 161:20 170:4

**causing** 112:4

**Cavanaugh** 58:11 92:2 97:18
103:4 104:20 108:1 132:11
136:24 145:15,20 153:5,8,17
155:20 157:10,11 166:11 170:8
176:20,23 177:20 182:5

**center** 31:20 38:9,12 58:21,22
59:6 63:19,24

**centers** 60:2 148:5 149:23

**CEO** 33:25 58:11,12 78:5 92:1,
21 177:3,4

**CEO's** 92:16

**certainty** 103:23

**certificate** 5:5

**certifications** 18:21

**cervical** 142:3

**CEU** 19:4,9,10

**CEUS** 18:25 19:5

**chair** 73:10

**challenged** 65:24

**chance** 22:6 93:8

**change** 24:10 30:1 122:4
157:16

**changed** 29:25 31:19 43:22
59:25 91:25 94:21 95:4,24
127:17 171:25

**changing** 56:2

**Chapter** 17:17,18

**charge** 14:21 18:3 125:13
137:12 139:17,25 172:19

**charges** 18:5

**charging** 125:8

**checked** 103:3 117:10

**Chicago** 17:24 92:4 108:4
182:19,20,21

**children** 15:11

**Christ** 65:13

**chronic** 142:16

**Cigar** 30:9,15 34:17 42:13,17
46:16 47:11 48:19 50:10,21 51:6
53:13,15 55:2,3,6 57:17 58:7,23
60:8 61:8 66:6 78:25 81:25
87:23 107:9 132:12 136:25
157:16 181:13 182:4 187:15

**circumstance** 36:19 173:1

**circumstances** 7:3 124:14

**city** 17:24 41:8

**civil** 16:1,6 178:24

**claim** 6:16 124:18 141:8,16
142:6 144:24 145:9 146:7 147:5,
9,20 148:21 149:7 150:8,18
152:19 153:24 154:24 155:2,8,
10 156:16 157:5 159:6 163:23
165:24 166:3 167:13 168:7
169:10,12 176:3,18 177:21
191:3,13,18,22 192:3,7,18,24
193:9,15

**claiming** 158:3 166:10,12
170:19

**claims** 139:25 141:5 162:4
167:11 175:23 180:7 182:9
193:19,21 194:1

**clarification** 12:17,19 138:3,6
194:10

**clarified** 49:18

**clarify** 13:13 16:16 54:10 67:4
130:4 135:6

**clarifying** 52:8

**classes** 19:7

**classified** 29:16

**cleaned** 188:13

**clear** 8:1,13 141:15 150:5

**click** 194:21

**clicked** 20:23 139:17,20,21

**client** 162:6 191:23 192:18
193:9

**clinical** 38:14 40:24

**close** 7:24 159:12 176:14
179:10

**closed** 89:12

**closer** 87:5 147:8 183:25

**CNAS** 40:23 43:14 45:24

**code** 174:3

**college** 18:16,19

**comfortable** 81:4

**comment** 78:8 148:12 149:22

**comments** 85:13

**Commission** 80:23 82:15

**communicate** 154:6 174:2

**communicated** 152:24 180:6
188:8

**communicating** 107:21 169:14

**communication** 13:5 154:5

**communications** 180:8
181:22

**commute** 77:14 82:19 83:11
86:25 129:5,16 135:15,22,23
159:8 164:22 182:15,22

**company** 30:2 32:9 35:17 37:2
39:9 43:22 56:10 58:12 59:16
62:24 90:13 92:13,15,18 109:21,
23 113:15 117:19,24 118:19
140:13 149:25 150:1 159:6,8,18
164:8 169:4 170:11 172:15
177:3,5 182:9 186:7,15

**compensating** 14:24

**competencied** 45:25

**competencies** 40:24 41:5 44:4 46:1

**complaint** 20:13 137:13 140:25 156:24 162:13 191:5

**complaints** 18:6

**complete** 8:24 10:13,18 11:15 50:24 56:5 60:13 102:13,16 110:12

**completed** 36:16 45:13 50:3 54:18

**completeness** 146:6

**completing** 119:1

**compliance** 42:13,15 46:20 59:23

**component** 177:12

**computer** 7:24 69:23 74:7 163:3

**CON** 42:13

**concentrate** 93:24

**concern** 91:15 134:24 135:15

**concerned** 37:19 40:21

**concerns** 63:16 82:24

**conclude** 37:10

**concluded** 194:24

**conclusion** 142:9 145:3 146:11 147:24 150:13 151:9 155:14 156:9 157:8 166:21 191:7 193:5, 23

**conclusions** 39:14

**condensed** 194:19

**condition** 10:20 91:17 95:3 111:23 115:17 119:17 122:5 124:16 142:10,16,25

**conduct** 177:1

**conducted** 7:8

**conference** 6:25 42:22 43:3 52:15 54:14 102:17

**confident** 13:3

**Confidential** 99:14

**confirm** 21:21

**confuse** 71:1

**confused** 27:21 119:21

**confusing** 13:9

**CONS** 169:15

**considered** 17:2 161:8 171:4 172:9 188:15

**consistent** 152:15 172:17,18, 21

**constitutes** 151:25

**construction** 183:7,8

**consultant** 30:7,8 38:14

**consulting** 73:18

**contact** 184:18 185:23

**content** 14:3,7

**context** 75:17 78:19 163:13

**continue** 49:10 73:14 97:2 107:13 118:25 121:4 133:7 147:13,17 148:3 150:3 160:15 169:18 170:20 174:14,18

**continued** 71:20 124:20 171:10

**continuing** 19:9 179:13

**continuous** 94:12,13 95:6 110:22

**controlled** 36:9 37:4 39:19,22

**conver-** 127:14

**conversation** 11:4 37:15 42:5 43:4 46:14 47:11,14 51:21 52:14 53:10,18 54:24 55:8,22 61:3,18 63:3 66:11 82:23 83:8,20 84:17 85:4,5 87:21 93:18 112:7 127:8, 11 128:1,4,20 129:8,17 130:16 146:13,22 152:13 160:18 181:10 184:16 187:14

**conversations** 46:11 47:23 50:15 138:5,15 181:22

**convey** 134:1

**conveyed** 64:8 152:16 153:7

**convicted** 17:8

**copy** 32:20 34:1 93:20

**corporate** 101:2 123:22 132:19 176:11

**corporation** 144:23

**corporations** 157:3

**correct** 15:24 17:6 19:24 22:3 24:15 29:10 50:1,5 52:16 53:5 57:6 89:22 110:12 116:1 117:4 122:13 123:4 137:9 140:2 188:18

**correctly** 15:23 44:24 79:15

**cost** 58:21 59:5

**could've** 134:15

**counsel** 4:8,21 14:19 19:18 49:8 84:19 138:4 165:15

**Count** 141:6 156:23 166:8 191:5

**counted** 39:23 101:23

**couple** 34:20 36:3 46:19 54:1 55:10 65:3 105:4 178:1 187:18 188:4

**courses** 18:24

**court** 5:1 7:2 11:3,4,7,12 17:4,5, 6 19:18 71:1 141:1

**courtesy** 11:17

**courtroom** 6:23

**coverage** 32:14

**covered** 181:17

**crazy** 173:19

**created** 59:18

**credence** 87:12

**credentials** 18:15

**crime** 17:8

**criminal** 16:8,11,22,24,25 17:2

**crossed** 79:10,21

**crying** 86:24

**curious** 123:12 139:3

**cursor** 22:23 34:22 115:1

**cut** 10:10 66:13 74:19 94:18 132:5 154:20 160:21,25

**cuts** 109:8,10,11 154:11 169:4

**cutting** 7:17 9:19 109:11

---

**D**

**D'ANTONIO** 66:1,16,22

**da** 110:20

**daily** 143:12

**damages** 179:8

**date** 4:4 14:20 17:13 26:19 31:6,
9 34:4,5,6,9,12 40:24 51:15
52:23 56:9 57:3,6 88:1,2 99:21
100:5 103:2,6 104:3 110:14
111:2 113:19 114:13,22 115:3,
20,25 116:18 121:8 139:4,5
170:15 172:10 173:25 178:17

**dated** 70:16 71:8 91:13 94:23
104:9 119:23 125:11 127:12

**dates** 52:24 54:22 97:13 101:20,
23 111:1 113:23 116:25

**day** 10:17 30:24 39:21 41:12
42:19 59:25 60:1 61:12 65:8,12,
22 77:19 83:7 85:18,19 87:8
93:11,13,22 97:23 100:22
102:16 103:2 107:25 108:7
109:5 129:5 130:15 150:5
183:12

**days** 31:12,14,15,18 41:9,11
95:1 107:8 108:9,10

**deal** 104:13

**deals** 42:6

**Deb** 92:6,9,16,20 93:10 95:11
108:6 116:7 118:24 123:23
124:12 127:9 128:1,4 132:17,23
136:5,10 174:20 180:13,16,18,
21

**Debra** 135:24 136:4

**December** 24:5 26:8,13 53:5
55:6 121:3 123:16 139:2 174:14

**December/november** 31:3

**decent** 177:9

**decided** 126:9 143:15 161:13

**decision** 68:8 83:20 84:7,10,22,
23 85:6,21 136:20 143:18
154:11 161:3,9 173:5,13,20,22,
24 174:8,11

**decision-maker** 173:4

**decision-making** 187:10

**decisions** 67:21 69:7,11 160:24
172:24

**declined** 45:14

**defendant** 4:12,21,24 16:24
27:10,23 28:5 29:4,7,21 33:23
53:4 72:5 74:14 121:2 192:8,24
194:2

**defendant's** 21:24 22:2 24:23,
25 25:2,8 26:25 27:3 28:21 33:5
70:11 91:10 97:10 101:7 113:6
120:8 124:25 140:22 180:9

**define** 16:23

**definition** 27:20 167:1,11

**definitive** 115:25

**degree** 18:24 181:25

**degrees** 18:20,22

**delay** 9:12

**dependent** 183:11

**depending** 47:7

**depends** 60:4

**deponent's** 4:6

**deposed** 6:2

**deposition** 4:5 5:12,16,19,24
6:12,15 7:7,10,13 11:20 12:7
13:3 14:4,6,16 15:7 23:23 52:25
64:7 67:4 103:11 127:16,25
129:13 138:25 179:18 192:16
193:8 194:24

**depositions** 7:4 15:20 16:4

**description** 59:20,21

**designation** 62:6 114:13

**desk** 89:4 95:1

**despondent** 93:23

**destruction** 39:23

**details** 175:18

**determination** 110:20

**determine** 39:5

**determined** 112:19 121:24
127:4

**diagnosis** 112:6

**dial-in** 9:10,13

**Diane** 30:3,18,19 34:24 35:10
36:3,11,17,21 37:9 38:6,8 40:3
41:19 42:22 43:4,5,21 44:25
46:13 48:15,18 50:24 52:12

53:11,18 54:13,25 55:8,17
58:14,17 59:2 60:10,18 61:4
62:25 63:1,5,17 64:3,8,11,19
66:1,4,16,21 67:6,7,11 68:4,7,24
77:11 78:2,20 79:3,11,18 80:4,
15,19 81:6,24 82:18,24 85:13
86:17 87:21 89:20 90:13,17
92:8,17 93:13 94:4 97:19
102:17,18,20,24 104:1,15
108:12 109:4 124:7 127:9 128:6,
7 133:5 136:25 141:21 145:5,13,
16,19 146:4,8 147:5 150:8,19
151:1 153:21 154:9 155:2,16
157:10,11,19 158:8,9 161:12
162:11 163:9,10,23 165:24
166:10,11,18 168:7 181:2 182:4
184:13,18 185:11,21 186:22
187:13

**Diane's** 67:21

**differential** 28:10

**difficult** 85:14

**difficulties** 8:15 142:14,25

**difficulty** 8:18 143:8

**Digianfilippo** 72:25 95:21
99:25

**direct** 23:16 24:13 30:16 127:1
157:17

**directed** 38:19

**directing** 81:24

**director** 30:19 36:1 37:1 45:6
46:16 58:17 59:3,17,18 66:5
85:23 123:23,24 124:7 154:10
175:3 180:9

**directors** 62:22 149:11

**Disabilities** 141:10 142:5
157:1,6 166:16,17 191:4 193:11,
16

**disability** 28:2,11,16 116:25
120:5,16 121:15,24 122:8 123:4
126:12,22 128:16,17,21 129:1
136:22 139:11,21 141:16,18,24
142:4,13 144:11 145:1,10 146:9
147:6,10,21 148:2 150:9,21
151:7 152:1,11 153:3,9,18
154:1,4,25 155:4,12,17 156:4,5,
18,20 157:25 158:4,21,23 159:9
162:7,8 165:25 166:5 177:7
178:5,9 182:7 191:3,13,18
192:13,19 193:1,15

**disabled** 120:20 121:12,25 122:9

**disagree** 15:5 117:3

**disagreed** 13:7 81:6

**disagrees** 12:21

**discharge** 39:22 172:25

**discharged** 39:19

**discovery** 27:4 33:23

**discriminate** 151:6 154:3

**discriminated** 146:8 147:5,10 150:8 152:11 153:2,8,18,25 154:24 156:3,17 157:24 162:6 164:4 165:24

**discrimination** 14:22 28:2,10 125:13 139:16,22 141:9,17 144:25 145:9 152:1 165:19 191:3,14,19

**discuss** 6:15 77:23 80:5 82:23 107:24 131:3,7 132:23 136:9,11 145:11

**discussed** 13:2,25 14:15 73:24 74:2 85:11 90:7 91:21 129:3,14 132:21 135:8 140:21 141:13 143:22 146:5 150:19 155:8 156:2,15 165:21 166:6 169:9 181:9,22 191:17 192:1,22 193:8 194:1

**discussing** 86:18,20 97:9 191:13,22 192:7

**discussion** 9:25 11:13 14:2,8 22:17 41:21 80:11 127:21 133:5 160:13 161:4

**discussions** 14:3 48:19 132:15 175:13 182:3

**disk** 142:2

**dispute** 28:13,20 31:7 56:12 100:1 124:2,5 159:24 186:6,10

**dissatisfied** 64:20

**distance** 70:1 182:21

**distraught** 111:16 112:25

**distress** 179:8

**District** 141:1

**diversion** 80:21

**diversions** 39:25

**Division** 140:8 141:2

**divisional** 62:21

**doc-** 21:4

**doctor** 55:12 71:18,19 72:23 73:1 76:21 88:25 95:19,25 99:7 111:19 130:19 142:22 143:15,16

**doctor's** 70:15,16 71:8 77:24 82:4 89:2,3,13,25 90:16 91:12, 20 94:23 98:5,20 100:5,11 103:14 110:17 111:24 115:9 126:19,20 127:11,17,19,24,25 143:19 189:18,22

**doctors** 44:17 71:20 72:19,20 86:11 133:9

**doctors'** 75:13 189:23

**document** 11:5,8,13 20:7 21:11,22 22:5,8,10,20 23:11,20 24:3 25:11,14,21 26:4 28:25 29:3 35:15 62:8 91:12 97:5 101:10 111:21,22 112:2 113:7 120:19 121:23 125:4 140:8,15 141:3

**documentation** 6:3,4

**documenting** 11:4

**documents** 14:10,12 25:8,11 26:3 62:1,7 105:25 110:7 129:21 148:20 149:6 150:7,16,17 152:3 156:15 165:23 166:3 168:6 175:22 176:2

**dollars** 86:5 160:21 178:10

**DON** 58:17,20,24,25 59:9,21 77:16 105:21 148:7 184:20 186:23 188:12

**Donna** 184:5,19 186:2,6,14,22 187:6 188:24 189:2,5

**DONS** 66:17 185:4

**door** 89:11 167:20

**downtown** 17:24

**drank** 65:11

**drill** 175:17

**drive** 76:10 77:18 86:25 105:11 131:12 154:16 159:3 164:18,25

**driving** 22:10 70:1

**drove** 107:25

**drug** 80:21

**drugs** 65:16

**Dub** 180:17

**due** 8:17 67:21 91:17 95:3 96:15 110:19 124:15 161:14

**duly** 4:15 24:2

**Durham** 92:6,9,16,20 93:10 95:11 123:23 135:24 136:4 174:20 180:13,16,21

**Durham's** 180:17

**duties** 80:17 190:11

**dynamic** 61:22

---

**E**

**e-mail** 33:25 34:1,5 35:13 36:7 49:17 53:13 57:16 92:1,21 97:16,23 98:5,13 103:3 104:18 107:16 108:2 124:9 145:24 173:10

**e-mails** 80:15 81:8 89:6 148:25 167:18

**ear** 147:2

**earlier** 23:23 28:4 48:13 49:22 50:14 52:9 55:4 64:7 67:1,3 94:22 103:14 121:1 127:16,24 128:9 129:12 130:1 138:25 167:7,12 178:4 183:13 189:7 192:16 193:8

**earliest** 98:9

**early** 72:12 103:18

**earn** 178:8

**East** 29:21 30:11 31:2 36:12 40:6 41:21,25 42:10,11,23 43:4 46:11,15,18,21,25 47:12 48:16 50:11 51:3,7,13 52:13 54:2,8 57:5,17 59:25 61:5 64:25 75:24 78:21 80:22 81:15 82:16 85:23 93:11 106:9 108:6 132:1 134:11 148:4 149:12 154:15 175:4

**Eastern** 141:2

**easy** 106:20

**educate** 42:15

**educated** 46:1

**education** 18:24 19:8,9 41:1 80:7,12 172:16 185:2 187:2

**educator** 30:6,13 35:3 40:22 42:10,21 43:25 44:7 45:12,18 47:24 50:2,17 51:2,7,12 53:16 54:7,17 55:3,5 57:17 58:6 59:7, 12 60:7,12,16 61:5 78:24 79:3 83:16 97:24 105:2 107:9 112:8, 15 159:10,19 190:12

**EEOC** 124:18 125:16 126:1,8 138:8 140:12

**effective** 53:5 122:9

**effects** 144:10

**efficiency** 23:4

**efficient** 94:6 132:4

**efficiently** 125:2

**Elaina** 149:12

**eligible** 174:4

**eliminate** 67:17 68:4 77:12 79:4,19 84:24 85:22 86:2 92:13 161:9,14 163:24

**eliminated** 34:11 35:1,11,18 40:19 41:25 48:14 49:24 54:1,4, 16 55:1 58:15 64:5 67:18 78:22 79:11 80:14,24 83:8,17 84:3 97:20,25 112:16 127:2 129:7,18 137:2 139:6 162:12,18 164:3 180:20 184:10 186:2,3,23 187:3, 5

**eliminating** 30:5 34:8 40:8 43:9,23 45:1 55:23 63:6 93:15 104:16 181:3

**elimination** 112:8 159:25 161:5 180:12

**Elk** 43:18 58:16 77:12,18 78:9 81:20 86:9,16,22 93:16 106:7, 18,22 129:5 135:20 149:3,8 154:16 159:8 164:18 182:15 188:6

**elopement** 65:17

**EMG** 96:13

**emotional** 49:11 111:22 113:2 179:7

**emotionally** 111:15 112:24

**employed** 26:7,12 29:21 123:15 139:5,8 178:12

**employee** 29:17 32:20 56:3 75:16 92:14 108:5 110:21 114:3 119:17 153:11 161:16 165:16 170:17 172:8,9 173:18 174:17 177:8

**employee's** 119:16,18

**employees** 28:22 44:3 65:10 75:15 164:9 168:22 169:6 170:12 171:2,4,21,22,23 172:21, 25 173:5 174:23 177:10,13

**employees'** 171:8

**employer** 18:6

**employment** 17:14 26:16 27:8, 11,12,18,23,24 28:6,7,21 29:10, 13 42:8 53:4 55:6 69:8,11 75:12 92:14 121:2 122:15 123:13 131:18 138:23 140:7 144:9 161:2 174:8,12 179:8 192:9,25

**end** 7:18 8:12,16 33:17 42:2 61:3 73:16 88:6 101:25 107:7 114:22 115:3,20 144:9 170:22 172:10

**ended** 53:4 55:6 66:12 121:2

**ending** 110:25

**engage** 131:1 139:12 150:20 155:3,11 156:4,18 158:4 166:4 168:25 180:15 191:23 192:3

**engaged** 177:1

**entire** 45:21 73:5

**entirety** 23:8

**entitled** 14:1 35:6 93:5 95:16 96:3 108:14 124:23 162:15

**environment** 111:20

**equal** 27:7,11,18,23 28:6,21 140:7

**equipment** 65:7,19,25

**ER** 65:13

**essential** 126:23

**essentially** 59:10 186:2

**estimate** 98:12

**estimated** 110:25

**Ethan** 4:10 13:1,4 15:6 20:11 23:3 48:25 56:16 71:2 91:8 96:17 125:1 137:6,11 160:10,14 177:24 187:17

**evaluation** 51:18,22

**event** 25:21

**events** 57:13

**eventually** 43:6 190:14

**everything's** 78:8 87:13

**evidence** 6:15 57:10 90:23 100:13 105:25 129:21 134:14 146:7 148:20 149:4,6,10 150:7, 16,17 152:3,17,18,22 153:14 156:15 166:2 168:6 175:22 184:9 185:13 186:4 191:2,17 192:2,17,23 193:14,21

**exacerbate** 142:20

**exacerbated** 142:19

**exact** 31:6,9 34:6 37:15 88:1,2 104:3

**EXAMINATION** 4:18

**examined** 4:16

**exceed** 172:12

**excellent** 58:20,25 59:9

**exceptional** 177:9

**exchanging** 62:7

**excruciating** 131:10

**exemplary** 153:12

**exhibit** 24:20,23,24,25 26:24,25 29:12 33:4,5,18,19 40:2 52:11 53:11 58:13 63:24 70:10,11,21, 22 75:2 78:15 88:17,20 91:7,8, 10,13 98:7,8,9,10,16 99:13 101:6, 7 103:5 110:2 113:5,6 117:6 118:17 119:24 120:7,8 124:24, 25 138:19 140:21,22,24 180:3 186:18

**exhibits** 19:17 71:3 118:11 119:1 194:22

**exit** 65:23

**expand** 19:8

**expect** 44:19 159:22

**expectation** 45:23 168:17

**expected**  44:3 165:14

**experience**  142:14

**experienced**  76:23 77:2 94:24

**experiencing**  7:19 8:16 142:25 143:8

**expiration**  172:1

**explain**  25:24

**explained**  50:23 62:2 77:11 104:20 133:24

**express**  82:24

**expressions**  37:14

**extended**  126:15

**extending**  170:14

**extension**  164:4

**extensive**  122:11

**extent**  142:8 146:4,11 147:23 150:10 151:8 155:13 156:8 157:7 162:18 166:20

**extreme**  65:17

**extremely**  76:11

---

**F**

**face**  167:20

**faces**  20:8

**facetious**  86:23

**facial**  37:14

**facilities**  6:8 81:10,12,25

**facility**  29:22 36:12 40:6 59:13 65:2 135:20 188:6

**Facsimile**  99:14

**fact**  34:17 69:13 87:24 104:10 123:21 149:20 180:22

**facts**  6:15 91:2 103:23 146:6 148:20 149:4,6,10 150:7,16,17 152:3 156:15 165:23 166:2 168:6 175:22 176:2 191:2,17 192:2,17,23 193:14,20

**failed**  147:20 150:19 155:3,4,11, 12,17 156:4,5,18,19 158:3,4 162:7 166:3,5 191:23 192:3,8, 12,18,24

**failure**  165:19

**fair**  13:23 57:5 172:17,18,20

**familiar**  18:14 32:1 101:11 113:10 125:4 171:7

**Family**  29:5

**farm**  181:7

**fault**  154:20

**fax**  89:5 100:1,8 104:5

**feasible**  41:7 44:18

**February**  120:21 121:7,13 122:1,4,9,21 123:8 178:14,17 186:7

**feedback**  32:22

**feel**  50:3 63:6,10 64:15 81:3 91:18 104:21,23,25 105:8

**feeling**  64:15

**felt**  36:8 38:25 64:16 68:20 72:15 105:7 132:16 175:6

**field**  125:19 139:18,22

**fields**  139:16

**fight**  124:10

**figure**  47:9 54:12 94:7

**file**  17:12 32:20 104:13 108:5 130:18 189:25

**filed**  4:22 6:17 17:10 18:3,5 124:18 125:14 126:3 140:25 179:1

**files**  90:12

**filing**  14:21 17:25

**fill**  101:22 110:16 127:10

**filled**  96:3,10 106:1 110:16,17 116:3 118:23 126:7

**films**  73:20

**finally**  145:25 185:23

**financial**  68:17 134:24 169:4

**find**  92:9 153:10,13 155:21 176:13 186:20

**fine**  48:11 49:1 88:4 94:1 96:19 103:5 108:20 128:15 131:23 133:1 137:19 163:4 179:19

**finish**  137:12

**finished**  187:20

**fit**  154:12 164:23

**five-day-a-week**  40:21

**five-minute**  96:18,21

**flabbergasted**  87:17 136:17

**flare-ups**  115:18

**floor**  132:22

**Florida**  26:14

**flow**  106:14

**flowing**  183:19

**fluke**  189:21

**fly**  81:19 183:10

**FMLA**  93:2,6 95:25 96:2,14 101:24 108:12 114:7 118:11,18 119:2,6,7,10,20 123:25 124:15 127:20,22

**focus**  29:19

**folks**  64:8

**follow**  48:11 98:24 110:20 117:20 135:1

**follow-up**  14:9 111:7

**foremost**  145:5

**form**  17:15 25:22 28:25 32:17, 25 53:21 64:13 67:23 73:2 77:4, 9 82:5 83:1 84:12 90:18 111:6 113:10 114:13 118:10,21 119:9, 21,22 142:11 150:22 152:6,21 155:13 156:6 176:9 177:2 182:13 186:13 189:15 190:6,18 191:6 193:3,22

**forms**  116:4

**found**  25:17 37:3 53:7 78:1 86:11 120:19 121:11 122:8 124:8 133:9 137:1 148:5 189:22

**foundation**  32:25 56:13 77:9 80:8 83:23 84:12 85:1 90:18 98:15 152:7 160:2 186:13 189:17 190:8,18 193:22

**four-minute**  187:17

**frame**  29:20 31:3 41:17 81:21, 24 82:19 116:19 144:8

**frank**  34:23 35:9 64:3

**free** 91:18

**freedom** 135:11

**frequency** 115:18

**Friday** 85:17

**friends** 105:5 129:10 149:25

**friendships** 150:3

**front** 60:11 100:24 103:5

**frontline** 170:12

**froze** 20:15,19

**frozen** 21:9

**frustrated** 36:19 37:10 38:7 68:7

**frustration** 36:17 161:20

**functions** 49:21 54:5,16 119:18 126:24 190:13

**furious** 36:22,23

**future** 18:1

**G**

**G-R-A-Y** 5:7

**gave** 72:3 73:2 94:4 110:14 189:23

**generalized** 23:5 101:9

**Generally** 31:12

**gentleman** 92:3 107:19 145:13

**geographic** 17:22

**gist** 40:15

**give** 9:6,7,16 31:9 45:17 48:3 56:8 60:16 87:11 89:12,20,21,22 93:7 105:21 115:20 132:22 141:12 148:6 149:18 163:5

**giving** 78:14

**glad** 8:13

**gladly** 51:3

**glued** 38:24

**good** 4:20 42:20 52:23 87:8 105:8 125:3 179:4,22 183:18,19 187:22

**Grace** 4:1 194:20

**graduate** 18:8

**Grange** 81:18 183:4

**Gray** 4:7,14,20 5:12 6:14 8:22 10:3 11:2,20 12:8 15:9 17:10 18:9 19:15 21:21 22:4,19 23:19 26:3,6 27:2,8 29:20 31:1,10 33:3,17,24 47:3 49:4,15 53:1 57:2 62:1 71:8,10 74:1 88:22,23 94:7 96:24 120:4,23 125:5 130:4 132:5 137:9,22 138:13 144:4,23 159:5 162:1 171:14 178:4 181:18 187:25 191:1 193:20,25

**Gray000601** 120:13

**Gray00589** 62:4

**great** 11:6 21:18

**ground** 11:1 181:17

**Grove** 43:18 58:16 77:12,18 78:9 81:20 86:9,16,22 93:16 106:7,18,23 129:5 135:20 149:3,8 154:16 159:8 164:18 182:15 188:6

**guarantee** 117:12,17 118:3 176:14

**guess** 5:18 8:14 23:9 27:21 48:13 49:17 61:20 64:4 67:20 75:6 76:19 79:16 84:18 98:11 102:3 114:2 121:9 123:12 134:16 135:18 152:8 159:5 165:4 172:23 176:10 177:15 181:16 183:20 185:20,25 191:8

**guys** 174:15

**H**

**half** 103:25 104:14 128:23 159:3,23

**Hamidani** 96:7 98:7,24 104:2

**Hamidani's** 127:15

**hand** 60:17 89:10 105:21 148:6

**handbook** 27:3

**handful** 187:19

**handing** 37:7

**handle** 37:18

**handled** 22:16

**hang** 32:24 114:23

**hanging** 32:1

**happen** 45:15 122:21 143:11 170:17

**happened** 7:21 30:9 53:12,19, 20 55:8 112:13 124:13 128:5,8 164:7 170:3 179:17 184:11 189:21 190:11,12

**happening** 9:4 84:21 93:9 122:24 143:14 154:17

**happy** 13:17 16:16 52:3 112:2 179:20

**hard** 114:23 116:15

**Hash** 42:3 62:21

**HCR** 4:24 17:14 26:7,12 117:15 118:13 119:4 123:15,23 144:25 145:8 155:10 157:4 178:12 179:9 192:3

**head** 11:8 88:13

**healed** 122:12

**health** 119:16 174:15

**hear** 8:1,3,17 12:8 14:2,7 19:20 20:17,18 26:9,10 32:3 74:18 78:7 87:12 144:6 147:7 163:5 184:17

**heard** 12:13 26:9 34:24 35:10 64:3 66:21 78:20 151:19

**hearing** 12:16 124:12,20

**heart** 64:16

**heartbeat** 176:16

**Heights** 43:18

**held** 4:5 9:25 22:17 36:20 41:4,9 42:6 43:24

**helped** 67:4 147:13 159:13 188:23

**helpful** 9:10 52:7

**helping** 40:7 42:11 46:19 59:10, 13 189:5

**herniated** 142:2

**high** 18:8,12

**Hinsdale** 30:21 35:21 36:6,15 38:16 39:2,5,6 46:17 56:21 64:21,22 67:7,8,12,19 68:5 161:21 163:15 167:24

**Hinsdale's** 39:2

**hire** 133:17,19

**hired** 60:9 178:13 186:6,15,22 187:6 189:2

**history** 115:17 117:19

**hit** 179:2

**hold** 65:21 66:3 111:16 172:4 194:24

**holding** 35:13

**Holland** 46:23 106:10 108:16, 18 133:16 134:3

**home** 43:20 94:1 101:4 122:16

**homestretch** 177:25

**Homewood** 46:23 81:16 106:10 108:17 134:8

**honest** 41:6

**honestly** 79:21 132:9

**honesty** 136:7

**hope** 18:2 78:7 132:13

**hoping** 107:15

**horrid** 182:24

**hospital** 47:5 65:9

**hospitals** 6:9

**hour** 98:18 128:23 159:2,22

**hourly** 56:3

**hours** 31:11,21 41:12 44:16 45:13 46:2 47:21 50:25 51:3,7 54:19 57:20 58:1,2 60:14 111:10 133:21

**HR** 101:2 174:3 176:11

**HRD** 92:7

**HRDS** 168:21

**HRS** 168:20

**human** 123:22 124:6 175:2,3

**hundreds** 171:1,7 174:22

**hurting** 82:13

**husband** 15:18

---

**I**

**idea** 103:11 116:5,11 121:7 143:24 169:3

**identify** 4:8 139:24 180:5

**identifying** 142:4

**II** 156:23 166:8

**illegal** 37:5

**Illinois** 15:14,16 19:5 141:2

**imagination** 11:21

**immediately** 42:7 87:18

**impact** 128:17

**impacted** 143:9,25

**impairment** 143:24

**importance** 25:10

**important** 25:14 65:18 68:18 76:2 164:12 175:17 176:12

**impossibility** 44:11

**impossible** 44:21 60:14 131:12

**inability** 128:22 129:3,16 144:1, 11,14 146:16 159:7

**inaccurate** 127:13

**inappropriate** 68:22

**inaudible** 7:15 8:25 11:8

**incapacitated** 110:22

**incapacity** 115:19

**incident** 179:16

**include** 40:22

**includes** 172:21

**including** 38:14 45:21

**income** 178:6

**Indiana** 4:3 182:18

**Indianapolis** 4:3

**individual** 145:11 155:16

**individuals** 138:14 144:24 156:2,17 157:4

**industry** 67:5

**influence** 8:22 10:12

---

**inform** 84:2 91:19 129:6

**information** 9:21 66:2,8,18,20 91:18 109:3 121:20 125:23 149:15 173:23 176:2

**informed** 49:20 54:15 129:6 168:14

**initial** 102:8

**initialed** 102:5,6,7

**initials** 101:18,19

**initiating** 18:4

**injections** 72:24

**injury** 141:25

**insane** 87:1

**insignificant** 63:6

**instance** 39:5 40:14

**instances** 64:24 170:10

**instructs** 12:10,24 13:12 130:6 160:15

**insurance** 174:18 179:4

**insured** 179:2

**intended** 11:20

**interactive** 131:1 139:13 150:20 155:3,11 156:4,19 158:5 165:20 166:4 180:15 191:23 192:3

**interested** 15:6 46:5 55:25

**interject** 9:3

**interrogatories** 14:11 21:25 22:3

**interrogatory** 23:22 24:7,11 122:5,24 138:16 180:3 181:23

**intersection** 81:17

**interstate** 77:21 106:16,19 128:24

**intervals** 71:11 126:14

**intervened** 164:9

**intimately** 171:7

**intimidated** 38:25 68:10 69:4 81:3 104:24

**investigation** 35:21,25 36:24, 25 63:19,24 64:12,21 67:19

80:22 161:21 163:15 167:24

**involved** 160:24 161:3 172:24
174:5 175:12 178:20 187:9

**Irrespective** 129:20

**issue** 63:25 68:6 74:9,14 75:25
77:13 79:25 80:1,2 83:11 129:23
141:18 158:7,9 163:18 182:16
188:14 189:1

**issued** 140:6

**issues** 10:4 57:23 69:17 72:8
73:5 74:22 75:8 76:13,23 77:2
82:19 93:1 113:1 146:19 174:19
191:10

**items** 23:15

---

**J**

**Jackie** 59:2 85:23

**January** 139:2 144:10

**Jeff** 92:3,19,21 93:25 95:11
101:2 107:19,20,24 108:3
118:24 123:21 124:11 127:9,21
132:17,21,23 133:13 135:9
136:4 145:13,19 150:24 151:2,6,
23 152:4,10,12,13 153:2 155:20
157:10,11 166:11 169:12,22
170:4,6 176:6,17 182:4

**job** 11:6 29:24 34:25 35:11,12,
17 39:4,8 46:6 48:4 53:24,25
58:15 59:20,21 63:21 64:4 69:22
78:21,22 79:13,17 83:8 85:24
97:20 126:24 135:10 137:2
154:14 166:23 179:17 186:23
190:11

**jobs** 35:17 45:9 56:20 135:14
178:13 187:6

**Joint** 80:23 82:15

**joke** 39:1

**Jones** 102:6 124:6 129:9 174:13
175:1,2

**Jones's** 102:11

**Juan** 65:20 66:3,18

**judge** 13:10

**judicial** 140:25

**July** 120:6 121:17 122:25

**jumped** 105:22

**June** 34:16 55:15 70:16 71:9,10
88:7,9,11 90:1 91:25 94:10,24
99:7,9,19 100:2,6,12 101:14
102:11,12,21 103:1,17,19 114:8,
12 117:1 118:15 126:11,20,25
127:5 128:5,11 138:22 139:4
143:19 189:8

**Junior** 18:12

**jurisdiction** 17:21

**Justice** 15:14,16

---

**K**

**Kelly** 30:9,15 34:17 42:13,17,18
43:21 46:10,14,16 47:22 48:19
50:10,15,21,22 51:2,6 53:13,15
57:16 58:7,23 60:9,11,12,15,24
61:1,8 66:6,10 78:25 79:8,13,24
80:2,3,5,14,20 81:2,24 87:22
88:7 90:11,12 92:8 107:9,13
124:9 132:11 136:25 157:16,20,
24 158:3,7 180:23 181:13 182:4
184:12,13 185:1,6,23,24 187:15

**Kelly's** 50:17 51:12

**kidding** 78:12

**kind** 7:16,24 8:13 9:18 19:25
33:7 41:10 47:6 49:15 55:24
57:15 59:15 61:21 67:4 72:15
73:24 97:11,14 131:11 137:12,
17 165:13,17 177:17 180:1

**kinds** 167:20

**knew** 34:25 35:11 38:18,22,24
46:12 47:16 48:1,12,13,17 56:4
64:4 67:17 68:20 76:2 78:21
79:12 89:24 90:24 91:5 107:20
128:16 130:12 135:16 136:18
137:2 139:8 146:18 149:20
158:6 175:7 188:22 191:9

**know** 5:1 7:11,20 8:9,12,15,18
11:23 13:15 14:20,23 16:14
19:11 22:7,12,25 23:4,8,10,20,
22 26:1,18 28:17 31:6 33:9 34:7,
9,15,17 36:8 37:12,13,20 38:22
39:1 44:2,3,8,23 45:8,19 46:2,4,
9,25 47:22 48:3 51:14,16 52:21,
22,23 54:17,21 55:17,23 56:8,
18,20 57:3,6,10,22 60:2,5,25
61:21 62:14,25 64:16 67:6 68:2,
16 69:19,22 70:2 72:4,12,14,16,

22 73:2,8,17 74:4,22,24 75:10,
13,15,24 76:1,6,23 77:19,22
78:2,10,11,13 79:1,6,21,22
80:20 81:2,3,14 82:9,11 83:4,6
84:5,20 85:3,5,7,15,17,21 86:1,
13,23,24 87:2,12,13,14,15,24,25
88:12,13 89:3,18,24 90:4,11,20,
21,22 91:5,6 92:23,25 93:6,8
94:21,25 95:4,18 96:5,11 97:12
98:17 99:4 100:10 101:25 103:3,
8,9,10,12,23 104:10,11 105:14,
15 106:2,4,12,17,22 108:5,7,10,
23,25 109:1,3,6,7,24 111:5,6,21
112:5,20,22,25 113:13,22,24
115:8,10,18 116:16,18 117:5
122:3 123:20 124:11,12 125:6
126:7 128:14 129:9 130:12,13,
15,16,19 131:15,16 132:7 133:5,
10,13,19,20,23 134:9,21 136:13,
15,18 137:4,13,16 138:4 140:9,
14,18 143:6,11,13,22,23 144:8,
14,16 145:14,22,23 146:3,20
148:10 149:10 150:25 151:12,
15,16,17,19,21 152:25 153:6
154:12,14 155:24 157:17,21
162:15,19,22,24 163:21 164:2,6,
11,21 165:8 167:4,7 168:3,5,13
171:6 172:7,8,16 173:10,16
174:13 175:6,8,10 177:16,25
179:24 181:5 182:1,2,16,20
183:18,21 184:14,24 185:2,3,19
186:15 187:13,14 189:3,6
190:11,14,19 192:6 193:18,24
194:4

**knowing** 130:14

**knowledge** 19:8 27:5 53:1 89:2
90:13 92:10,11,16 103:12
115:17 161:8 171:16 174:7,10
181:4

**Kris** 37:3

---

**L**

**L-I-S-A** 5:5

**L-I-Z-A** 5:6

**La** 81:18 183:4

**labeled** 71:3

**Lacks** 83:23

**lastly** 176:20

**late** 103:19

**law** 17:4,6 93:5

**Lawn** 29:21 30:11 31:2 36:12 40:6 41:21,25 42:10,11,23 43:3 46:11,15,18,21,22,25 47:12 48:16 50:11 51:3,7,13 52:13 54:2,7 57:4,17 59:25 61:5,6 64:25 75:24 78:21 80:22 81:15 82:16 85:23 93:11 106:9 108:6 132:1 134:10,11 148:4 154:15 175:4

**laws** 39:9

**lawsuit** 4:22 6:16 15:25 18:4 141:2 178:25 179:1 193:19 194:3

**lawsuits** 6:1,7 15:22

**lawyer** 12:8,9 14:1,25 27:4 62:1 120:12 130:4 179:24

**lawyers** 62:6

**laying** 147:1

**learned** 38:2 97:23

**leave** 17:5 29:5,8 75:14 81:7 91:17 94:13 95:3,6,14 101:15 102:2,15 110:3,11 112:9,17 113:11,12,16 114:8,9 115:12,24 116:3,11 117:9,10,16,17,18,22, 25 118:3,12,18,23 119:2,3,6,11, 20,22 121:5 127:6,20 164:1 170:21 171:10 172:13 182:5 184:14 185:9 190:13

**leaving** 59:21 62:23 63:1 159:9

**led** 37:10

**left** 54:1 62:12 151:17

**leg** 73:7 144:16

**legal** 5:4 141:5 142:9 145:2 146:11 147:24 150:12 151:9 155:14 156:9 157:8 166:21 167:1 191:6 193:5,23

**length** 76:6 141:20

**lesion** 110:19

**Leslie** 30:4,21 36:1,4,5 37:18 38:9 63:1 86:24

**Leslie's** 34:25 35:10 64:4

**letter** 33:22,24 48:13 49:17 50:9 57:15 61:20 67:16 70:8 78:4 82:22 85:10 92:20 97:16 104:17 107:7 124:4 130:17 132:10

136:24 153:7 163:13,14 186:18

**letting** 36:8 76:24 93:6 160:14 173:16

**liaison** 43:12,13 65:20

**liaisons** 65:9 66:2,8

**license** 32:2,13,20,24 56:21

**licensure** 19:6

**life** 72:8 142:17 143:10,25

**light** 138:17

**limitations** 28:15,24 82:23 147:16 153:13 154:14 155:23

**limited** 82:1,2

**lines** 97:15

**link** 194:21

**list** 45:22 48:5 184:25

**listen** 56:25

**litigation** 178:20

**live** 6:22 15:14 184:2

**lived** 77:15 81:17 87:5 182:20 183:9,23,25

**Liza** 4:7,14 5:6,10 7:20 9:14 20:14 22:9 23:14 30:23 52:1 56:24 61:11 71:9 80:21 85:13 88:21,22,23 94:15,17 95:13 105:21 114:1 165:11 175:10 190:23

**located** 106:15

**location** 35:21 86:18,21 128:24 131:21 163:16

**locations** 107:18

**logical** 11:24

**long** 41:24 51:10,12 71:11 79:22 80:6 87:4 98:12,17 126:14 135:17 158:12 164:22 173:9 181:20

**long-term** 161:15

**longer** 31:16 37:2 40:9,16,17 43:15 51:17 62:8 66:7,23 69:19 71:13 73:7 92:15 123:5 131:9 139:8 144:14 146:16,25 162:22

**longest** 169:7

**looked** 60:24 65:4 148:24

**Lori** 70:14

**Lori's** 99:24

**lost** 141:12

**lot** 7:4 148:12,15 161:16 165:22 168:20 181:17

**love** 105:15

**lower** 122:13 146:20

**Loyola** 182:19

**LPNS** 45:25

**Lube** 30:3,18,19 31:1 34:24 35:10 36:11,18,22 37:9 38:8 39:14 40:3 41:19 44:25 47:10 48:18 49:19 52:12 53:11,18 54:13,25 55:8,17 56:11 57:4 58:14 60:10 61:18 63:17 64:3 66:4,22 67:6,8 68:4,7,24 78:20 79:3,11,18 80:4 81:24 84:9 89:20 92:17 97:19 98:8 100:17 102:17,20,25 103:15,16 104:1, 15 124:8 127:12 128:1,4,6,7 131:5,24 133:5 141:21 145:5,13, 19 146:4,8 147:5,9,20 148:21 149:19 150:8,19 151:1 152:15 154:10 155:2,16 157:10,11,19 158:8,10 161:12 162:11 163:9, 10,23 165:24 166:10,11,18 167:13 168:7,24 180:10 181:2 182:4 184:13,18 187:13

**Lube's** 36:17 38:6 43:21 109:4 136:25 145:16,25 153:21

**lumbar** 142:2

**lying** 161:12

**Lyrica** 76:9

---

**M**

**machine** 89:5,6

**mad** 37:21

**made** 7:6 62:25 63:5 66:15,16, 23 78:4 83:20 84:7,10,24 85:6, 13,21 86:4 87:18 93:19 105:8 148:25 150:4 151:14 160:20 161:13,16 169:5,15 173:22 177:9 185:23

**mail** 124:4

**maintain** 27:20 28:23

**maintained** 27:10,14,18

**make** 9:20 11:1 16:20 19:23 24:21 35:8 43:2 45:24 55:19 68:8 73:23 76:1 79:14 86:1,25 96:2 104:4 105:11 114:24 116:9 129:5 131:11 136:20 139:15 141:14 144:3 148:14 154:11,16 159:7,16 160:19 172:2 175:17

**makes** 9:14 119:17 137:16 157:19 160:22

**making** 40:23 42:3 78:18 109:8, 10,11 169:4,6 171:9 173:4

**malignant** 73:17 78:3

**malpractice** 6:7

**manager** 30:8

**manifest** 142:10

**Manorcare** 4:23 26:14 39:3,7 65:10,21 67:9,22 100:12 116:1 117:15 118:13 119:4 122:19

**marathon** 11:21

**March** 140:17

**marching** 57:15

**marital** 15:9

**marked** 24:20,23,25 26:24,25 27:7 33:3,5 61:24 70:10,11 91:10 97:10 101:5,7 110:4,23 113:4,5,6 119:15 120:7,8 124:25 140:21,22,23

**married** 15:10

**mass** 95:22 112:6,19

**master** 171:18 173:7,15

**matter** 12:16 16:1,6,9,12,22,25 119:11 123:21 149:20 158:13 168:4 177:7 178:25 183:16 192:24 194:20

**Meadow** 77:16

**Meadows** 87:7 183:23 184:1

**means** 32:6,7,8,12,13 100:10 136:21 166:25 167:2,4

**meant** 35:17 78:6 87:11 135:6

**measure** 19:12

**mechanism** 28:22

**medical** 6:6 10:20 29:5 30:8

43:12 47:2 64:25 65:4 66:24 68:6 83:6 91:16,17 95:2,3,14 115:16,17 170:15 172:12,13 179:4,5

**medically** 111:10

**medication** 8:23 10:12 37:1 76:8,9 179:12

**meet** 14:15

**meeting** 37:24 44:25 47:10 48:18 49:19 54:12,14 60:10 100:16 102:19,24 103:2,15,16 104:6 164:24

**meetings** 86:20

**members** 37:23 38:3

**memorializing** 75:2 94:22

**mental** 28:24 96:16

**mention** 46:12 184:5

**mentioned** 23:22 28:5 64:6 74:21 122:24 136:1,3 138:2 145:19 148:13 150:23 152:12 153:5,20 163:10,16 183:13

**message** 168:3

**met** 68:9 73:4 94:4 108:6 150:5

**microphone** 7:25 147:8

**middle** 52:22 172:5

**midst** 134:6

**mileage** 77:13

**miles** 87:5 183:25

**million** 86:4 160:21

**mind** 38:6 47:25 56:4 61:22 68:8 74:9 79:10,22 84:21 100:21 107:22 122:7 157:19 163:22 168:24

**mine** 101:22 110:5 147:16

**Mine's** 113:25

**minimum** 183:18

**minute** 48:22 163:5

**minutes** 10:25 15:19 66:1 69:19 71:12,13 73:8 74:8,24 75:23 76:14,25 77:3,16 81:14,16 82:1 87:6 106:10 109:2 128:23 129:4 131:10 134:10,11,12 143:20 144:2,12,15 146:16,25 159:2,22

183:10,18 184:1,3 189:9

**Mischaracterizes** 67:24

**mishandling** 36:9

**mispronounced** 88:24

**misstates** 35:14 48:20 76:15 91:2 118:7 155:18

**mistake** 78:4 161:13

**mistruths** 66:19

**misunderstanding** 123:1

**MO** 79:23

**mobile** 184:19 186:22

**Monday** 94:3

**money** 86:1 133:22 160:19 161:16 169:7 177:10

**month** 34:15 122:2 178:8

**monthly** 178:5

**months** 54:1 71:19 143:7,12

**morning** 4:20 92:22 184:4

**Morton** 18:12,19

**motivated** 68:3 162:15

**motivation** 177:14

**mouth** 185:5

**move** 15:5 26:2 61:15 69:20 77:22 106:17 125:1 133:2 138:6 146:17 158:12 164:16 180:1

**moved** 21:13

**movement** 22:22

**moving** 21:9

**MRI** 70:19 72:6 73:3 86:12 96:13 98:25

**multiple** 18:24 72:19 73:5 75:13 86:11

**multitude** 43:14

**mute** 9:15

—————————————

**N**

**nail** 54:22 97:14

**named** 156:22

**names** 24:12

Index: naming..opportunities

**naming** 44:12

**Naperville** 133:14

**narcotics** 39:18 63:25

**Nasreen** 96:7

**nature** 5:25 6:6 141:17,23

**necessarily** 69:1

**necessity** 172:14

**neck** 122:11

**needed** 37:8 40:11,16,17 42:14 43:15 56:5 59:23 69:18 74:22 81:5 82:11 89:16 102:1 110:11 119:7 134:16 135:12 142:22 148:5,8 152:23 154:7 159:15 168:15 169:17,19 170:13,14 173:16 189:9 190:1

**negative** 167:5,9

**nerve** 72:15 76:4 144:18

**nerves** 73:13

**nervous** 111:17

**neurosurgeon** 72:25

**Nevermind** 115:7

**nightmare** 183:6

**nods** 11:8

**Noelle** 110:13 115:9

**Non-fmla** 113:11 119:22

**non-work-related** 119:16

**nonetheless** 12:22 13:11 61:7

**north** 43:17 86:22 149:3 183:1

**northbound** 77:19

**Northern** 141:1

**note** 6:5 70:4,15,16 71:8,9,22 72:4 74:14 75:7 76:20,21 77:24 82:4 88:21,25 89:25 90:16,24 91:12,20 94:10,23 95:25 98:5 100:5,12 103:15 104:8 126:13, 19,20 127:11,15,17,19,24,25 143:19 189:8,18,22

**noted** 115:12

**notes** 75:13 111:25 187:18 189:24

**notice** 71:16 89:15 140:6,20

**notified** 126:12

**noting** 126:13

**November** 41:16,18 186:8

**number** 9:16 19:14 60:18,19 68:16 111:10 171:25

**numbered** 70:25

**numbers** 68:15

**nurse** 19:2 26:15 30:2,6,12 31:17 32:2 35:3 40:7,22 42:9,10, 12,21 43:10,25 44:7,20 45:2,5, 18 47:1,17,24 49:20 50:2,17 51:2,6,12 53:16 54:5,7,15,25 55:3,5 57:17 58:6 59:7,12 60:7, 12,16 61:4 78:24 79:3 80:6,12, 14 83:16 97:24 105:2 112:8,15 159:19 186:23 190:12

**nurses** 39:23 40:23 43:13 45:7, 8

**nurses'** 69:24 74:4

**nursing** 18:23 37:2 45:6 46:17 58:18 59:3,17,18 85:23 149:11 159:10 187:2

---

**O**

**Oak** 29:21 30:11 31:2 36:12 40:6 41:21,25 42:10,11,23 43:3 46:11,15,18,21,22,25 47:12 48:15 50:11 51:3,7,13 52:13 54:2,7 57:4,17 59:25 61:5,6 64:24 75:23 78:21 80:22 81:15 82:15 85:22 93:11 106:9 108:6 132:1 134:10,11 148:4 154:14 175:3

**oath** 6:18 12:3 49:6 96:25 137:23 188:2

**object** 12:8 13:4,9 15:2 17:15 25:22 28:25 35:14 53:21 82:5 118:21 119:9 142:8,11 147:23 150:10,22 152:21 155:13 156:6 157:7 160:2 182:13 191:6 193:22

**objection** 12:20 32:17,25 48:20 56:13 64:13 67:23 76:15 77:4,9 80:8 83:1,21 84:12 85:1 90:2,18 91:2 98:15 100:19 109:15 118:5 126:4 129:25 134:18 145:2 146:10 148:23 151:8 152:6 155:18 160:8 161:22 163:1

164:5 166:20 168:1 171:12 176:9 177:2 186:11 189:15 190:6,17 193:3

**objections** 84:19 156:21 191:20 192:5 193:17

**objects** 12:14

**obligated** 12:4 137:24 159:19 188:2

**obtain** 18:20

**occasions** 57:22 65:3

**occur** 39:25 87:21 103:18

**occurred** 57:14 98:9 100:17 102:20,25 103:17 104:6,8 139:1 167:7 177:17 187:14

**occurrence** 143:7

**October** 114:9 116:3 119:24 120:2

**offer** 45:12 93:2 108:12 138:2,6 185:24

**offered** 51:2,6 77:12 95:14,17 108:11 123:25 186:24 188:5

**offering** 78:9

**office** 89:2,3,13 98:20 123:20 167:19 184:12

**oftentimes** 68:15

**Ohm** 36:1,5

**Ohm's** 30:4,22 36:4

**older** 143:13 169:6 177:10,13, 17

**oldest** 169:6

**OLE** 50:10,16,22 53:14 58:20 107:8

**on-ramp** 184:3

**one's** 32:2

**one-page** 91:11

**online** 19:7

**open** 40:20 43:16 86:8,15

**opened** 93:16 135:4

**operations** 30:20 36:2 154:10

**opinion** 127:13 148:2

**opportunities** 107:18 131:19

135:2 148:22 152:14

**opportunity** 27:8,11,19,23 28:6,21 33:16,19 105:22 140:7 149:18 162:2

**option** 9:10 45:14 108:19

**orally** 180:6

**order** 70:24 110:7

**ordered** 99:1

**ordering** 194:17

**orders** 194:16

**ordinarily** 6:25

**originally** 182:18

**osteopathic** 72:10

**outspoken** 67:21 68:12

**outspokenness** 69:5

**overlap** 147:18 156:1

**overnight** 78:10

---

**P**

---

**p.m.** 100:9 194:24

**Pa-** 82:15

**pack** 117:23 171:5,20

**paid** 101:1 124:17

**pain** 55:11 72:7,23 73:6,7 76:6,8 112:4 130:19 131:10 135:16 142:21 143:16 146:15 189:12

**Palos** 80:21 81:13,15 82:9 134:12 149:12

**Paloses** 46:22 106:9 132:1

**pandemic** 7:4

**paper** 93:15 94:4 110:15 138:8 150:6

**papers** 75:14

**paperwork** 95:23 96:3,10 102:13,16 121:11 127:6,10

**paragraph** 126:11 130:25 138:21 139:9

**paragraphs** 125:20,21

**part** 19:6 26:9,10 31:25 46:24 54:11 64:16 67:18 69:7,11 88:9

105:7 109:13,17 162:11 170:19 171:17 177:4

**participated** 5:24 15:20 16:5

**particulars** 125:19 188:7

**partners** 73:19

**party** 6:10,11 15:22 16:1,8,24 125:8 178:24

**passed** 46:1

**past** 167:19 169:1 170:1,3,15

**patience** 181:18

**patient** 65:5,8,11,19 66:12,15 68:11,12,18 91:16 110:18 163:19

**patient's** 6:5 163:18

**patients** 6:2 37:5,8 39:19 65:1,5 68:11 163:20

**pause** 9:6

**pay** 94:1 101:4 108:9 124:3

**paying** 179:6

**payments** 123:4

**payroll** 133:19,20 171:2 174:2,3

**PDF** 71:3 194:19

**penality** 24:8

**penalties** 6:21 7:9

**penalty** 10:7

**pending** 117:16 190:24

**people** 24:14 38:1 59:10 68:9 105:4 117:22 136:23 147:15 149:23 150:4 153:12 172:11 173:16,25 177:17 191:9

**people's** 89:8

**Perfect** 12:20 21:19

**perform** 41:3 119:17 126:23 128:17 166:23

**performed** 60:8 190:15

**period** 59:15 110:22 143:1 158:12

**periods** 126:15

**perjury** 6:22 7:9 10:7 24:8

**permanent** 134:23 135:5

**permission** 92:16 189:14

**permitted** 61:7 77:7

**person** 7:10 126:1 140:12 174:3 176:11 178:22 179:2

**personal** 29:8 53:1 63:7 102:2 103:12 113:12 114:9 115:12,24 116:2,11 117:9,10,16,17,22,25 118:3,12,18,23 119:3,10,20 161:8 171:15 174:7,10

**personnel** 160:24 176:11 189:24

**persons** 4:9 180:5

**Peter** 4:11,21 21:8 25:24 70:21 76:17 112:11 130:10 147:7 165:10 170:25 182:14

**Peter's** 22:9

**pharmacy** 30:7 37:7 43:13

**phenomenal** 85:24

**phone** 9:13,16 34:7 46:10 54:7 63:2 66:4,22 83:7,13 84:2,10 87:18 92:8,19 98:1 140:12 148:11,24,25 164:13 180:13 181:1,2

**phone's** 192:14

**phrase** 32:1 191:12

**phrased** 13:8 151:1

**phrasing** 79:14

**physical** 28:24 44:17 55:15 72:22 83:5 113:1 124:16 154:13

**physically** 100:22 146:14

**physician** 126:13 179:10

**physician's** 55:10

**physicians** 55:12

**picking** 84:10

**piece** 93:14 94:4 165:20

**piecemeal** 66:13

**pinched** 72:15

**pints** 65:12

**place** 27:24 28:6 29:5,8 34:25 35:11 54:13 59:3 64:4 141:12

**places** 165:7

**plaintiff**  4:10 180:20

**Plaintiff's**  21:24 25:2

**plan**  105:7 130:20

**planning**  17:25

**played**  69:7,10

**plethora**  47:19

**plug**  163:3

**point**  11:24 18:1 36:2 43:17
46:7,13 69:20 72:21 78:25 89:20
90:15 93:12 103:6 105:1 111:15
112:21 120:4 151:22 185:18,20

**points**  12:7

**policies**  27:2,6 39:9 67:22

**policy**  27:11,14,18,19,24 28:1,6,
9,12,13,17,21 29:5,8 38:17
90:13 92:13,18 109:20 117:16,
20,21,24 118:2 179:4

**pool**  45:7

**poorly**  54:11

**pop**  53:1

**portion**  110:16,18

**position**  30:4,5,13 32:14 34:8,
10 35:4 36:4,20 40:8,18,20,22
41:25 42:6,9,10 43:9,16,23 44:1
45:1,12,18 46:5 47:17 48:12,14
49:20 50:2 51:2,7,16 54:2,3,4,8,
9,17 55:1,20,23,24 58:22 59:5,
19,22 60:13,22 61:8 63:3,7 64:9
67:17 68:4 77:12 78:9,24 79:4,
10,19 80:7,13,24 83:16 84:3,24
85:22 86:2,8,15 92:12,14 93:15,
16 97:24 104:16 109:6 112:8,16
119:18 127:1,3 128:18 129:7,18
139:6 159:1,10 160:1,22 161:4,
10,14 162:12,19 163:24 164:3
180:12,19 181:3 183:16 184:10,
20 185:12,22 186:1,3,24 187:3,5
188:5,7

**positions**  35:6 40:19 45:6
64:10

**possibly**  50:23

**potential**  50:2

**practice**  7:21

**preceding**  30:20 88:12 128:9

**precepting**  185:3

**preceptor**  30:7 43:13

**predict**  116:13,22

**predicted**  116:20

**preferred**  31:22

**preparation**  23:6

**prepare**  13:3 14:4,16

**present**  4:9,12

**presented**  63:4 149:19

**president**  62:21

**pressure**  73:12 76:4,5 144:18

**pretext**  139:10

**pretty**  52:18 67:14 72:21 142:21
188:14

**prevent**  7:14 8:23 10:13,17,21

**previous**  168:17

**previously**  24:23,25 26:25 33:5
70:11 91:10 97:10 113:6 120:8
124:25 140:22

**primary**  112:5

**printed**  89:5

**prior**  14:21 15:23 18:4 36:3,11
42:7 47:10,13 48:17 50:16 53:12
55:14 76:21 82:22 83:20 84:10,
24 89:25 90:25 100:17 103:17
118:7 129:23 138:1,13 142:24
161:4 178:14 187:4,8

**privilege**  15:3

**privileged**  13:4

**problem**  69:21 81:19 135:22

**problems**  74:3

**procedure**  38:18 39:21

**procedures**  39:9

**process**  33:23 69:1 108:16
131:1 136:12,17 139:13 150:20
155:3,11 156:5,19 158:5 166:4
174:5 180:15 181:20 187:10
191:24 192:4

**produce**  41:10

**produced**  27:3 120:12 121:23

**production**  25:3,8

**profession**  47:3

**profit**  160:21

**progress**  6:5 111:24

**prohibited**  28:1

**prohibits**  28:10

**prolonging**  15:6

**promise**  105:8

**pronounce**  30:18,25 151:13

**pronounced**  5:6

**proof**  154:5 155:21 165:6
168:13

**proper**  65:7,24 182:20

**propose**  106:6

**proposed**  127:2 131:24 180:20

**protesting**  163:18

**provide**  11:9,16 12:4 17:1 74:14
89:1 115:24 121:19 137:24
166:22 188:2 192:17

**provided**  19:18 24:11 25:15
28:22 33:22 45:14 72:4,5 175:21
176:1 191:1 193:13,20 194:5

**providing**  6:17,21 7:12 8:24
10:13,17,22 11:15 25:11 173:23

**psychologically**  112:24

**pubic**  86:12

**pull**  9:20 78:15

**purely**  182:17 189:19

**purpose**  6:14 83:14 84:2,16
103:10

**purposes**  142:5

**purse**  37:12

**pushback**  94:24

**pushed**  177:18

**put**  24:19 62:12 74:7 89:7 91:7
100:22 102:4 104:12 110:14
130:17 164:23 174:3

**puts**  32:13

## Q

**quality**  37:23

**qualms**  66:15

**quarter** 174:17

**question** 9:7 11:15,17 12:11, 15,17,21,23 13:8,12,16,20 14:9 16:13,18 25:25 26:2,10 27:17 28:3,9,18 30:24 51:6 52:19 53:9 54:11 56:25 57:1 61:14 67:20 68:21 70:6,7 74:13 75:6 76:19 77:1 78:23 79:16 83:25 84:5,18 94:18,19 99:13 114:18 115:15 116:10,15 118:15,16 119:1,6 121:10 122:20 130:6,21 135:18 139:14 145:8 147:19 152:17 153:24 160:16 163:9 166:2 167:10 168:10 169:25 172:23 175:24 176:6,22 181:21 186:4 190:24 191:8 192:15,22

**questioning** 11:24 81:4 168:23

**questions** 8:17 10:22 11:10 12:9 16:15 22:7 23:5,15 27:5 34:20 81:8 101:10 114:2 150:25 157:19 179:25 187:19 188:4 194:8

**quick** 22:15 29:19 78:16 110:1 119:12 178:2 188:4

**quickly** 5:23 9:5 104:17 125:2 186:20

**quit** 149:22 186:15

**quiz** 53:2

**R**

**R-A-M-I** 146:2

**raise** 82:18 84:19

**raised** 13:10

**Rami** 136:24 145:16 146:2 151:11 153:20,25 154:3,24 155:19 157:10,11 166:11 168:10,11 169:9 175:20,23 176:4 181:13,16 182:4

**range** 62:14,18 110:11

**ranges** 62:10

**rare** 57:22

**RD-** 56:11

**RDA** 56:11

**RDO** 37:25 40:3 41:20 52:13 53:12 56:11 57:4 64:9 105:5 109:8

**RDOS** 62:22

**reached** 136:21

**reacting** 167:5

**reaction** 39:16

**reading** 25:6

**reads** 95:5

**ready** 49:13

**real** 22:14 119:12

**realized** 88:24

**reallocate** 133:21

**rear-ended** 122:10

**reason** 19:21 28:13,20 31:7 74:15 102:3 106:8 119:15 122:7 150:1 159:25 163:23 186:6,10

**reasonable** 28:14,23 84:6 126:24 131:3,7 138:15 147:14 166:22 169:20

**reasons** 139:9,11 154:12 161:14,24 162:10,13,20,21,24 163:25 164:2,11 170:25 172:12

**recall** 17:17,21 34:4 51:15 79:9 82:13 86:6 87:25 88:4,5 109:24 135:7 142:15 151:3 175:24

**recalled** 102:23

**receive** 98:13 121:15 124:19

**received** 58:14 97:19 100:8,12 114:7 140:14 143:19 178:5

**receiving** 120:15 123:3,12 124:3

**receptionist** 89:10

**recess** 49:2,5 96:22 137:20 187:23 188:1

**recognize** 99:12 120:18

**recognizing** 144:23 157:3

**recollect** 57:13

**recollection** 57:9,11 71:23 118:2

**recommendation** 66:4 73:1 94:12 95:2

**recommended** 168:19

**reconnected** 10:1

**reconvene** 137:17

**record** 4:9 5:2 9:22,25 10:5 12:21 13:9 22:14,17,19 23:7 24:21,22 26:19 49:4,9 96:24 130:5 137:22 138:1 141:15 153:12 177:9 194:16

**records** 30:8 43:12 56:10 65:1, 4 66:24 68:6 151:5

**recounting** 58:24

**recourse** 136:8

**reduce** 111:10

**reduction** 109:13,18,21

**reemployed** 26:17

**refer** 62:8,9,13

**reference** 4:24 52:14 71:2 107:16 122:6 186:20

**referenced** 34:21 53:10 67:15 85:9 181:12,23

**referencing** 42:5

**referring** 4:23 19:1 58:23 117:9 126:18 128:21 131:5 166:16

**refusal** 180:15

**refuse** 131:7

**refused** 131:2,3

**regard** 4:22 10:9 82:25

**region** 39:1 40:17 43:17,19 44:7 45:18,21 46:24 50:18 60:23 81:22 133:15 160:20

**regional** 30:2,6,19 31:2 36:1 37:22,23 38:2 40:7,8 42:9,12 43:10 45:2,5,7 47:1 49:20 54:5, 15,25 59:19 60:12 62:22 64:7 80:14 86:19 92:7 123:23 154:10 180:9 184:19 186:23 187:5

**regions** 43:23

**registered** 19:2

**regularly** 126:14

**rehire** 26:19 174:4,5

**rehired** 186:7,16

**reinstatement** 117:13,18 118:4

**related** 27:6 82:19 115:18 169:21 177:20

**relates** 169:10 176:17

**relations** 170:17

**relationship** 42:20

**relevant** 17:2 126:23

**relieve** 189:11

**remain** 39:24 132:11

**remember** 17:13,18 26:20 34:6, 11 37:15 40:15 67:9 74:5 82:8 88:2,9 89:4,17 93:12 96:6 98:14 99:2 104:11 112:21 125:7 126:7 128:10 132:9 140:16 154:22 191:13,22 192:7,20 193:11

**remission** 143:1

**remote** 7:5

**remotely** 4:5

**removed** 75:11

**repeat** 28:3 76:17 100:3 112:11 115:15 192:14

**repeated** 107:2 158:14

**repeatedly** 143:14

**repeating** 176:10 184:17

**rephrase** 13:17 27:22 32:23 41:19 121:9 152:8

**replace** 187:2

**replaced** 184:10 185:14,15 186:3

**replied** 41:2 108:1

**report** 36:21 66:2 80:4 171:5,20

**reported** 39:10 62:23

**reporter** 4:1 5:2 7:2 9:3,12 11:3, 4,7,12 19:19 71:2 194:15,23

**reporting** 53:15 55:3 57:16 107:9

**reports** 117:23

**reposition** 69:18 71:12 76:14, 24 77:3,7

**repositioning** 75:3,18 82:2 94:9

**REPOTER** 190:5,9

**represent** 27:1 33:21 140:24

**represented** 118:13,19 119:4,7

152:4

**request** 110:3 113:11 114:9 115:11,24 116:2,11 118:12 119:2,22 136:2 182:6

**requested** 167:22

**requesting** 80:15 119:5

**requests** 25:3,8,12 26:4

**require** 75:15 91:18

**required** 12:10,14,22 19:5 28:14 36:20 41:1 50:25 122:11

**requirement** 19:6

**research** 173:21

**researched** 173:14

**Resend** 100:9

**reside** 15:13

**resides** 15:17

**resigned** 186:8

**resource** 123:22 124:6 175:3

**resources** 175:2

**respect** 6:16 193:19

**respiratory** 65:6

**respond** 133:13 164:20

**responded** 180:8

**Respondent** 126:12 131:2 138:22

**Respondent's** 139:10

**response** 21:24 25:2 26:4 60:18 78:11,14 86:7 92:2 98:13 105:18,19 109:25 131:14,17 138:17 148:15 151:21 154:9 175:5 181:23 189:4

**responses** 11:5,8,9 22:2 23:22 24:8,11 25:7 122:6,24

**responsibilities** 35:5 40:19 43:10 187:7

**responsibility** 43:21 44:6,13 48:15 50:24 67:12

**responsible** 41:4 45:24 60:21

**responsive** 25:11

**rest** 164:23

**restate** 26:11 77:6 142:12

**restriction** 82:3 94:8 129:14 189:8

**restrictions** 71:16 94:23 127:18

**results** 41:11

**resume** 12:5

**retain** 14:18

**retained** 126:2 138:3,7

**retaliate** 166:18 167:2,4,13 170:4,9 176:6

**retaliated** 157:5 168:8 169:12, 22 175:23 177:22 193:9

**retaliating** 64:12

**retaliation** 139:12,17 156:25 166:9,12,24 168:11 169:10 175:20 176:3,18,24 177:21 193:15

**retribution** 170:2

**return** 115:12,25 116:6,12,13,19 118:14 119:5

**returned** 113:1

**review** 14:9 22:5 23:8,20 33:19 64:25 66:7,23

**reviewed** 23:6

**Richardson** 4:2

**rid** 63:12 104:23 105:1,6 161:17, 19 163:10

**ride's** 109:1

**ringing** 192:14

**rise** 72:3

**risk** 65:17

**RN** 18:23 19:1

**RNS** 45:24

**road** 77:21 81:18 183:4

**rock** 179:11

**Roh** 4:1

**role** 31:2 40:4 41:20 42:1 43:7 44:14,20 52:13 53:12,16 54:16 56:11 57:4,8,17 58:6 59:7 60:7 61:5 109:8 159:19

**Rolling** 77:16 87:7 183:23 184:1

**room** 7:1 37:1 42:22 43:3 52:15 54:14

**root** 144:18

**roughly** 122:2

**rounds** 42:3 55:19

**row** 31:12

**rule** 74:19

**rules** 11:1 120:20 121:12 122:1

**run** 7:21 10:25 11:1 21:2

**running** 20:1

**S**

**sacral** 73:15 75:10 78:2 86:13 95:22 142:1

**sacrum** 69:17 110:19

**safe** 83:19 84:6 118:4 161:7 175:12

**safely** 65:7

**safety** 163:18

**sake** 23:4 146:6

**salaried** 56:3

**sale** 134:6

**sales** 133:16

**Sarasota** 26:14

**sat** 5:18 6:11

**saving** 37:3

**scan** 20:1,2,21,25 96:12 98:25

**schedule** 31:19 50:4 57:25 173:7

**schedulers** 171:18

**schedules** 171:18 173:16

**scheduling** 171:6

**school** 18:8,12

**science** 18:22,23

**screen** 19:17,24 20:8 21:5,14, 22 22:23,24 24:19 88:16 97:4 138:20 180:2

**scroll** 22:11,24,25 23:2,21 33:7,

9,10,12,14 52:8 61:23 63:13 97:17 112:2

**scrolling** 70:13 117:8

**searing** 73:7

**seconds** 152:12

**section** 115:19,22

**Security** 120:5,9,15 121:15,19, 24 122:8,17 123:4 178:5,9

**sedating** 76:11

**seek** 28:23 83:6 126:10 170:2

**seeking** 139:12

**sees** 154:12 167:19

**seldom** 44:16

**select** 31:21

**selling** 108:16 133:14 177:6

**send** 36:7 65:14 88:25 89:14,15 97:23 134:5 154:7 168:3 169:17 173:9 189:2

**sending** 66:8 92:4

**seniority** 109:22

**sense** 9:14 90:10 94:21 137:16 160:22 171:15

**sentence** 102:7

**September** 4:4

**served** 58:6

**service** 172:14

**services** 14:25 38:14

**set** 21:25 25:3 45:20 171:18

**severe** 91:17 95:3 96:16 112:4 153:13

**share** 19:16 97:4 138:20

**sharing** 19:23 20:12 22:23

**Sharon** 89:11 102:3,6,11 104:12 124:6 127:10 129:9 174:13 175:1,2

**Sharon's** 110:5 113:25

**sheds** 138:16

**Sheet** 99:14

**shift** 144:16

**shifting** 73:10

**short** 48:24 49:4 106:6 137:10

**shorter** 31:15

**shortly** 62:24

**show** 33:3 73:19

**showing** 140:19,23

**sic** 45:25 49:16 77:16 111:1 128:1

**side** 20:9 38:24 62:12,13 68:17 77:21

**sidebar** 160:17

**sidetracked** 165:17 175:16

**sign** 24:3 93:14,19 94:5 150:6

**signature** 110:4 114:5,19 119:24 125:9

**signed** 24:5,7 39:24 114:16 116:5 140:3

**significance** 121:7 122:3 139:3

**significant** 25:19 144:17 147:16

**significantly** 144:5

**similar** 150:25

**simple** 139:15 144:4 145:12

**simplify** 56:22 57:2

**simply** 23:21 41:22 45:19 76:19 119:1 135:22 145:8 152:17 162:16 163:21 191:16 192:22

**single** 110:22

**singled** 104:23

**sir** 49:7 50:12 125:22

**sit** 5:16 69:15,18 71:11 73:7 74:8 76:13 82:7,10 112:5 122:19 126:14 128:22 129:4 131:9 135:11,16,19 136:14 141:20 144:1,12 146:16,24 158:11 159:15 164:16

**sitting** 6:25 47:18 57:3,12 58:5 64:19 69:16 73:6 75:18,21,22 76:5 82:1 90:22 94:8,25 158:25 159:1,2 176:1 185:5 189:8,19 191:16 192:1 193:13,25

**situation** 9:8 188:11

**situations** 40:1 171:8

**size** 41:7

**slams** 167:19

**sleep** 78:10 87:15 131:15 158:15 165:1

**smoke** 51:25

**smoothly** 11:2

**Social** 120:5,9,15 121:15,19,23 122:7,17 123:3 178:5,8

**solely** 135:15

**solution** 106:6 131:24

**something's** 20:19

**sooner** 101:25

**sore** 74:6,23

**sort** 8:15 35:25 59:13 75:2 82:3 95:1 112:1 114:18 150:25 165:18 177:12,14 189:11

**sorted** 89:7

**sought** 179:7

**Sounds** 125:3 187:22

**source** 178:6

**south** 15:16 43:18 46:23 106:10 108:16,18 133:16 134:3 183:1

**space** 26:16

**speak** 6:3 63:16 68:10 134:4 145:24 170:3

**speaks** 29:1

**specific** 23:15 27:5 34:11,21 54:21 56:9 67:15 105:25 138:16 149:18 154:8 162:13

**specifically** 12:23 37:9 40:13 54:14 129:11 130:6 132:23 136:9,12 148:19 186:1 194:9

**speculate** 38:5 44:10 84:20

**speculating** 44:9 88:3

**speculation** 83:21 84:13 85:2 90:2 91:3 109:15 161:23 163:2 168:1 190:17

**speed** 59:14

**spell** 5:3

**spelled** 5:4,5

**spinal** 76:4

**spine** 73:5 142:3

**spite** 113:1

**spoke** 50:23 60:15 109:4 136:23

**spoken** 42:22 149:11

**spring** 72:12 83:4 142:20,24 144:8

**Square** 4:3

**staff** 37:23 38:19 41:7 42:16 59:4 65:18,24 68:19 109:11,14, 18,22

**staffing** 57:23 65:15

**stand** 19:10 69:15 71:11,13 73:11 74:6,7,23 76:24 77:7,21 82:7,10 112:5 122:19 126:14 131:11 132:25 135:11,19 141:20 144:1,14 146:17 158:12 159:15

**standard** 194:18

**standing** 75:3,18 76:5 82:12 94:9,25 143:20 189:9

**stands** 19:11

**start** 142:14 172:9 179:13

**started** 31:2 36:25 41:18 45:22 50:10,21 55:16 56:11,19 59:16 69:23 72:11 75:1 83:3,5 86:23 124:3 142:20 166:8 179:16 185:12,21

**starting** 48:11 50:16 53:13 161:21 169:5 172:23 185:3

**starts** 41:15 55:2

**state** 5:3 19:5 34:23 36:15 41:20 58:13 68:5 96:16 107:22 129:11 188:11

**stated** 84:1 163:14

**statement** 52:12 57:5 98:10 103:20 115:14

**States** 140:7 141:1

**stating** 175:5

**station** 69:24 74:4

**stationed** 135:20

**status** 15:9 69:8,12

**stay** 7:24 30:12 42:21 46:24 60:16 101:4 107:8,13 132:13

158:24 173:5

**stayed** 147:11 159:11

**staying** 46:11,15 47:12,23

**step** 79:19

**stepped** 40:3 41:20 42:1 51:16 52:12 53:11 57:4,7 109:7

**stepping** 36:4

**steps** 25:20

**Steve** 92:2 103:4 108:3 136:24 145:15 155:20 157:10,11 166:11 170:8 176:20,23 182:5

**Stewart** 4:2

**stick** 70:25

**sticks** 88:13 100:21

**stood** 69:23

**Stop** 33:11,13

**stopped** 19:22 88:23

**store** 137:15

**streamlined** 139:15

**street** 131:25

**stretch** 11:21 189:10

**strike** 16:3 26:2 52:10 54:19 75:19 82:20 90:14 118:15 139:14

**struck** 101:20

**subject** 6:21 10:7 61:19

**subjected** 144:25 145:9 166:12

**subjects** 61:20

**submit** 75:7

**submitted** 116:2,10 127:6

**submitting** 118:17 119:2

**subsequent** 119:3

**substance** 8:23 10:12

**substances** 36:10 37:4 39:20, 22

**substandard** 188:11,16

**sue** 140:6,12,13,20

**suffering** 10:21

**sufficient** 33:16,18

**suggest** 90:24 100:4 105:25 129:21 153:14

**suggesting** 159:6,18

**Suite** 4:3

**summer** 26:15

**Sunday** 95:12

**supervisor** 24:13 30:16 80:25 127:1 128:16 129:12 130:23 131:2 153:21 157:17 180:14,17

**supervisor's** 180:14

**supervisors** 165:15

**support** 6:16 57:10 134:15 146:7 148:21 149:7 150:7,16,18 152:3,18,19 156:16 162:11 165:23 166:3 168:7 175:22 176:3 184:9 185:13 186:5 191:3, 18 192:2,18,23 193:14,21

**surgeon** 99:1 103:24 104:9 130:17 143:17

**surgeries** 75:14

**surgery** 76:22 89:16 110:19 122:11,13 133:10 164:15

**surgically** 75:11

**surrounding** 80:16 175:13

**sworn** 4:15 24:2

**system** 53:8 102:4 171:4,24 172:11 173:12,17 174:1

---

**T**

**T-S-C-H-A-N-Z** 4:11

**tailbone** 73:16

**takes** 106:10 132:2 134:9,11,12 184:2

**taking** 7:9 10:6 63:1

**talk** 11:13 19:17 24:16 35:20 50:18 55:21 63:2 70:8,9 87:20 95:21 107:20 119:12 132:20 135:25 137:12 151:16 162:2 178:1 182:10

**talked** 14:5 15:19 46:9 52:15 63:25 65:20 66:5 68:6 78:17 82:21 83:10 88:17 92:20,24 116:4 127:17,19 129:10,20 130:24 132:3,6 133:4,11 135:3

136:2,10,13,23,24 141:24 150:24 155:2 163:13 166:9 168:23 175:19,20 182:2,11 185:1

**talking** 19:22 35:3,5 42:19 45:19 49:17 54:3,4 61:19,25 62:15 75:1 82:21 110:2 116:7 128:22,25 129:11 135:5 138:14 144:3,7 149:23 175:19,20 187:3 191:11

**talks** 111:22

**tape** 66:13

**tasked** 171:9

**team** 38:2,15 86:19

**technical** 8:15,17 10:4

**Technically** 107:14

**telephone** 82:22 84:8,25 85:10, 11 90:5,25 93:18 98:8 100:17 102:17 128:20 180:21 181:12,13

**telephonically** 10:1

**telling** 14:14 47:18 58:14 66:18 73:9 80:20 81:4 86:5,15 89:25 90:25 97:19 104:15 140:13 174:23

**temporary** 30:10

**ten** 41:12

**ten-hour** 31:14

**ten-minute** 137:17

**tenure** 171:25

**terminate** 109:6 174:8,11

**terminated** 43:6 53:8 123:14 138:22 170:21 171:3,10,24 172:11 173:11 185:10 190:14

**terminating** 92:12

**termination** 42:7 122:2 139:1, 11

**terms** 47:19 135:9 141:14

**Terrell** 149:12

**territory** 31:18

**testified** 4:17 49:21 50:15 79:1 94:22 103:14 121:1 127:25 152:10 178:4 189:7

**testify** 68:25

**testifying** 6:22 7:14 73:25 74:5

**testimony** 6:18,20 7:13 8:24 10:9,14,18,23 12:4 15:21,23 17:1 28:4 34:12 48:20 49:18 52:9 67:24 76:15 97:12 98:5 118:7 137:24 155:18 188:2 194:6

**tests** 96:12

**texted** 136:25 181:1,15

**thanked** 52:3

**that'll** 9:8

**therapists** 65:6

**therapy** 44:17 55:11,15 72:23 73:14 83:5 93:1,4 133:8 143:16 146:24 158:6

**thing** 43:25 60:5 95:1 108:4 133:25 162:1 170:16 171:19 177:8

**things** 11:1 18:25 19:7 34:21 38:16,17,18 39:2 40:17,25 41:5 43:14,15 44:12 45:22 47:6,20 49:16 56:5 60:4,6 67:4,8 72:18 76:9 81:1 82:11 144:5,17 159:13 164:6 167:21 177:16 178:1 184:20,24 185:4,7,16 189:11,24

**thinking** 56:2 78:12 164:15 172:17

**thoracic** 142:3

**thought** 13:8 52:20 68:25 79:24 95:9 98:21 102:23 103:24 118:9 165:18

**thousand** 44:3

**thousands** 171:1,8

**threw** 37:11

**thrilled** 79:8,13,17

**Thursday** 34:16 87:22 94:3 101:1 102:22 128:10

**Thursdays** 31:13

**time** 4:4 11:22 13:10 23:19 29:20 31:3 32:4 35:13 41:16 43:17 46:13 55:13 62:24 69:20 71:10,14 73:17 76:6 77:19 81:21,24 82:4,9,17,18 83:10 90:9 97:15 102:1 105:3 110:23 111:12,15 112:21,23 115:13,23 116:3,18 117:4 126:3,15 128:15

129:3,4,13 130:23 131:1 141:21
143:12 144:2,8 149:12 150:2
158:12 163:9 167:7,12 169:8
183:12 185:18,20

**times**  5:18,21 77:22 106:22
126:23 186:16

**tiny**  9:8

**title**  29:24

**titled**  21:24

**titles**  24:14

**today**  6:18,21 7:5,14 8:24
10:14,16 57:3,12 58:5,14 62:1
64:19 90:23 97:19 150:19 155:8
165:22 166:6 169:10 176:1
181:17,24 182:11 191:16 192:1
193:13,25 194:6,9,17

**today's**  4:4 6:14 14:4,16

**told**  30:5 34:8 35:24 37:22,24
39:18 40:7 42:17 43:5 44:19
51:22,23 54:25 56:1 60:10,11
63:17,20 64:8 66:6,9,16,22
72:24 73:4,14 77:17,25 80:25
86:10 87:10 89:23 90:4,9 92:2,
22 93:25 95:13,24 96:1 101:2,22
105:4,11 106:8,23,25 108:8,11,
22 110:15 118:24 123:24 124:8,
13 126:9 127:1,9,21 130:15
137:3 145:22,23 146:13 149:5,
13 152:13 153:6,10 154:15,16
158:13 164:21 168:14 174:20,25
181:3,6 184:21 185:6,23,24
188:9

**tomorrow**  78:11 87:16 93:7
131:16 147:4 158:15 165:2

**tonight**  131:16

**top**  29:13 52:11 78:16 88:20
97:6 100:7 117:6

**topic**  180:1

**topics**  182:8

**total**  123:3

**totally**  123:7

**touch**  96:5

**trach**  65:5,25 66:12

**traffic**  81:18 106:11,14 182:15,
23 183:6,19

**trainer**  43:13

**training**  30:7,11 44:4

**transcript**  194:16

**transfer**  58:16 127:2 180:20

**transferring**  106:7

**transition**  61:7

**transitional**  59:14

**transitioned**  173:6

**transitioning**  42:2 43:7,8

**Transmittal**  99:14

**transpired**  167:6,12 169:1
170:1

**traveling**  26:15 81:11 82:24

**treat**  76:8

**treating**  164:10

**treatment**  28:10 111:7 143:4,19
179:7

**treatments**  72:9,10

**TRM**  45:7

**true**  60:7 100:14 139:10 152:19
176:1

**trust**  66:20 188:20

**truth**  4:15,16

**truthful**  8:24 10:14,18,22 12:4
137:24 152:20 188:2 194:6

**truthfully**  7:14

**Tschanz**  4:11,19,21 7:16 8:5,7,
11,21 9:9,22 10:2 15:5,8 19:22
20:11 21:19,20 22:10,13,18
23:3,13,18 48:23 49:3 70:22,24
71:5,7 91:8 96:17,23 125:1
126:5 137:5,8,21 142:12 160:13
177:24 178:3 187:16,24 194:12,
18,23

**tubing**  66:13

**Tuesday**  31:13 94:2 100:25
101:1 127:7 128:12

**tumor**  69:17 73:15 75:9 76:2,3
78:1 86:12 87:10 133:11 136:16
137:4 142:1 146:18 165:3

**turn**  145:12

**turned**  174:1

**turnover**  41:8

**type**  60:2 125:23

**types**  72:11

**typical**  31:11

---

**U**

**uh-huh**  21:6 24:2 25:1 33:10
63:9,15 70:14,19 76:12 97:3
101:8 104:19 111:9 120:14,22
121:14 122:22 123:2 125:12
162:25 166:17 178:19 186:19

**Uh-uh**  101:17

**umbrella**  43:20

**unable**  110:19 111:12 118:14
119:4,17 123:8 129:4 141:20
145:14

**unannounced**  36:7

**unbearable**  72:22 142:21

**uncertain**  47:19 97:13

**uncomfortable**  38:21

**under-**  83:14

**underlying**  17:2 141:2

**understand**  4:23 6:17,20 7:7
8:19 10:6,8 11:18,25 12:3,12,18
13:16,20 16:13 25:10 35:8 47:5
49:5 50:20 53:2 55:7 59:11
60:25 73:23 79:17 81:23 96:25
104:5 112:12 116:9 133:25
137:23 144:4 150:2 159:16
166:15 188:1 191:8

**understanding**  10:22 15:21,23
29:20 32:5,11 36:18 43:3 44:24
47:6 52:9 54:21,24 78:19 80:18
83:15 84:15,22,23 95:6 98:4
109:17 117:15 121:6 166:25
167:1,2

**understood**  13:21 16:17 194:8

**undetermined**  115:13,23 117:1

**unemployment**  122:17 123:14,
20 124:1,12,17,19

**unfair**  44:19

**unit**  19:12

**United**  140:7,25

**University** 182:19

**unpackage** 49:16 97:11

**unsafe** 66:14

**untrue** 160:6

**untruthful** 152:4

**upset** 60:20 61:4 66:17 93:23
   136:15 163:15

---

**V**

**vacation** 34:17 87:23 88:8
   137:1 180:23 181:7

**vague** 47:6

**vast** 60:3

**vein** 8:14

**verbatim** 40:15 51:22

**verification** 24:1

**vice** 62:21

**vicinity** 176:15

**video** 7:8,13 20:15,19

**videoconference** 4:6

**Village** 58:16 77:13,18 78:9
   86:9,16,22 93:17 106:18 149:3
   154:16 164:18

**violated** 74:19

**violation** 141:9 156:25 157:5
   166:12,19 168:8,12 169:13,22
   170:9 175:24 176:7,25 191:4,14,
   19,24 192:4,9,13 193:10,15

**virus** 20:2,25

**visit** 81:25

**visits** 99:4

**voice** 7:23

---

**W**

**wait** 11:14 56:24 70:6 94:17
   100:3 109:13 122:12 157:16

**waiting** 149:17

**walk** 167:19

**wall** 32:13

**wanted** 6:2 36:6 38:23 44:13
   51:23 52:8 58:16 59:22 60:13
   63:11 65:1 66:3,23 67:16 72:17
   73:3 76:1 79:12 80:25 84:1
   85:20 86:21 93:17 104:22 105:1,
   9 107:12,13 124:1 136:5 138:2
   163:10,24 174:14 177:25 178:1
   185:1,2 188:17,23

**ways** 159:13

**weather** 183:8

**Wednesday** 31:13 94:2 101:1

**week** 31:18 40:3 41:9,12,15,19
   45:13 46:2 50:10,21,25 51:3,8
   52:12 53:11 54:19 55:2 57:21
   58:3 60:14 88:11 100:20 101:3
   103:25 104:14 107:8 127:8
   164:12 179:16

**weekly** 143:6,11

**weeks** 39:19 101:24 103:25
   104:6,14 151:18

**weight** 144:16

**West** 18:12 46:22 80:21 81:13,
   15 82:9 134:11

**Westmont** 189:5

**whatsoever** 169:3

**whining** 86:24

**White** 4:10,13 7:1,20 8:2,4,10
   9:14,18,24 12:20,23 13:2,7
   14:15,18,24 15:2 17:15 20:3,5,7,
   13,18,22,25 21:3,5,7,9,12,15,17
   22:9 23:9,14 25:22 28:25 30:23
   32:17,25 35:14 48:20 49:1
   53:21,23 56:13,17,24 61:11,14
   64:13 67:23 70:6,21,23 71:4,6
   76:15 77:4,9 80:8,10 82:5 83:1,
   21,23 84:12 85:1 90:2,18 91:2,9
   94:15,17 96:19 98:15 100:19
   109:15 114:1 118:5,7,21 119:9
   125:3 126:2,4 129:25 130:9
   134:18,20 137:7,19 138:3 142:8,
   11 145:2 146:10 147:23 148:23
   150:10,12,22 151:8 152:6,21
   155:13,18 156:6,8,21 157:7
   160:2,8,11 161:22 163:1 164:5
   166:20 168:1 171:12 172:4
   176:9 177:2 182:13 186:11,13
   187:22 189:15,17 190:5,8,10,17,
   23 191:6,20 192:5 193:3,5,17,22
   194:13,24

**White's** 62:11

**winter** 72:13

**withhold** 26:3

**witnesses** 191:2

**Wocasick** 115:9

**Wocasick's** 110:13

**woman** 161:25

**wondering** 20:19

**word** 16:23 28:18 52:1

**worded** 54:11

**words** 11:7 36:7 169:1,25 170:2
   185:15

**work** 8:19 31:22 41:11 44:15
   47:7 51:12 57:25 65:9 69:25
   76:14 79:8,13 88:20 93:13,22
   96:11,13 101:3 105:17 108:9,11
   110:19 111:12 114:12 115:13,25
   116:12,14,19,23 118:14,19
   119:8,10 120:3 123:8,11 133:7
   137:18 147:13,17 150:2 155:22
   183:22 185:3

**worked** 6:9 10:3 26:14 31:12,
   13,18 45:25 100:23 164:7
   168:20 170:11 173:9,25 178:11
   184:15 191:9

**working** 41:9 42:20 50:3,25
   51:3,7 56:20 57:20 69:24 105:2
   107:13 132:11 133:8 148:3

**workplace** 28:15 144:21 189:20

**workweek** 94:2

**worried** 63:20 78:25 79:2
   136:15

**worry** 79:18 101:3 108:8 160:16

**worse** 72:12 83:4 113:3 143:14
   144:5

**would've** 102:25

**wrap** 188:4

**wrap-up** 187:19

**write** 40:3 50:22 63:17 99:17,21
   101:15 113:19 114:3,21 115:4

**writing** 99:18,24 102:11 110:13
   113:22,24 115:10 180:6

**wrong** 20:20 36:14 37:17 137:9

172:18

**wrote** 34:2 35:13 92:1 102:5
107:21 115:8

----

**X**

----

**X'D** 21:1

**X-RAYS** 72:17

----

**Y**

----

**year** 26:16,20 51:13,14,17,20
52:6 53:17 54:8 55:5 57:7 58:7
79:1,2 172:13 173:19

**years** 5:17 17:20 26:21 30:3
32:9 36:3,13 42:11,12 43:24
46:19,23 51:13 55:11,14 59:20
75:12 92:15 109:23 117:22,25
149:25 161:1 164:7 170:11
171:3,23 172:14

**yelling** 37:13

**yesterday** 7:21

**Yup** 21:15 110:5 124:21 163:7
178:19 188:19

----

**Z**

----

**zones** 43:22

**zoom** 4:6 22:11,12 27:1